# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

KENNETH CHAMBERLAIN, JR., AS THE
ADMINISTRATOR OF THE ESTATE OF
KENNETH CHAMBERLAIN, SR.,

           Plaintiff,

vs.

CITY OF WHITE PLAINS; WHITE PLAINS
HOUSING AUTHORITY; P.O. ANTHONY
CARELLI; P.O. STEVEN HART; P.O.
MAURICE LOVE; P.O. STEVEN DEMCHUK;
P.O. MAREK MARKOWSKI; SERGEANT
STEPHEN FOTTRELL; SARGEANT KEITH
MARTIN; LIEUTENANT JAMES SPENCER,

           Defendants.

Civil Action No.  12 CV 5142 (CS)

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**



RECEIVED
NOV 21 2012
U.S.D.C.
W.P.

By and through his attorneys Newman Ferrara LLP, Mayo Bartlett, and Abdulwali Muhammad, Plaintiff Kenneth Chamberlain, Jr., as the Administrator of the Estate of Kenneth Chamberlain, Sr., alleges upon knowledge, information, and/or belief as follows:

## PRELIMINARY STATEMENT

1.    This is a civil action seeking monetary relief against Defendant City of White Plains ("White Plains"); White Plains Housing Authority ("Housing Authority"); and certain employees of White Plains, *to wit* Patrol Officer Anthony Carelli ("Carelli"), Patrol Officer Steven Hart ("Hart"); Patrol Officer Maurice Love ("Love"); Patrol Officer Steven Demchuk ("Demchuk"); Patrol Officer Marek Markowski ("Markowski"); Sergeant Stephen Fottrell ("Fottrell"); Sergeant Keith Martin ("Martin") and Lieutenant James Spencer ("Spencer").

2.    It is alleged that the Defendants, acting jointly and severally, committed a series of unlawful acts that resulted in the shooting death of Kenneth Chamberlain, Sr., a 68 year old

African-American man, in his home in the early morning hours of November 19, 2011 and, in so doing, deprived Mr. Chamberlain, Sr. of rights secured by the United States Constitution and the State of New York.

3.     It is further alleged that White Plains failed to adopt adequate policies and procedures to safeguard emotionally disturbed and/or barricaded persons with whom its police officers would likely come in contact.  As a result of its failure to adopt adequate policies as aforesaid, White Plains failed to train or supervise its officers in properly responding to incidents involving emotionally disturbed and/or barricaded persons. The failure to adopt such policies and/or the inadequacy of the policies that were adopted were likely to result in constitutional deprivations.     Moreover, the failure to adopt adequate policies, and to train or supervise its police officers in how to handle properly situations involving emotionally disturbed and/or barricade persons, evidenced a deliberate indifference to the constitutional rights of Kenneth Chamberlain, Sr., and resulted in the deprivation of his constitutional rights.

## PARTIES

4.     Plaintiff Kenneth Chamberlain, Jr. is a citizen of the United States and a resident of Westchester County, New York. Plaintiff is the Administrator of the Estate of Kenneth Chamberlain, Sr. Letters of Administration were granted to Plaintiff by the Westchester Surrogate's Court on February 9, 2012.

5.     Defendant White Plains is a duly constituted municipal corporation of the State of New York, located in Westchester County, New York.

6.     Defendant White Plains Municipal Housing Authority is a municipal corporation that provides low-income housing in White Plains.

7.     Defendants Carelli, Hart, Love, Demchuk, Markowski, Fottrell, Martin and

Spencer were at all relevant times employees of the White Plains Police Department. At all times relevant to the facts of the Complaint, said Defendants were acting under color of law and within the scope of their employment by White Plains.

## JURISDICTION AND VENUE

8.     Subject Matter Jurisdiction. The Court has jurisdiction pursuant to 28 U.S.C. §1331 and §1343. Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. §1367 to hear and decide claims arising under state law.

9.     Venue. Venue in the Southern District of New York is proper under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to this action occurred within the district.

## FACTUAL ALLEGATIONS

### The Siege of Kenneth Chamberlain, Sr.'s Home

10.    On November 19, 2011, at approximately 5 a.m., 68-year-old Marine Corps veteran Kenneth Chamberlain, Sr. was in his apartment at 135 S. Lexington Avenue in White Plains, New York when his medical aid device triggered accidentally.

11.    The medical aid device was provided to Mr. Chamberlain, Sr., and monitored 24 hours a day, by a company called Life Aid because of Mr. Chamberlain, Sr.'s serious health problems.

12.    Life Aid attempted unsuccessfully to contact Mr. Chamberlain, Sr. via a two-way communication device that immediately began recording communications to and from his apartment when the medical aid device activated accidentally.

13.    When Mr. Chamberlain, Sr. did not respond to the Life Aid operator's queries, Life Aid contacted the White Plains Department of Public Safety ("WPDPS"). WPDPS directs

and controls White Plains' police, firefighters, emergency technicians, and emergency service unit personnel.

14.    At approximately 5:05 a.m., Police Officer Cianci received the call from Life Aid and forwarded the call to Police Officer Battaglia ("Battaglia") who was assigned to the radio dispatch console in the communications room of the White Plains Department of Public Safety.

15.    Upon receiving the call, Battaglia dispatched an ambulance to the scene along with the patrol car of Defendant Love.

16.    Battaglia then conducted a computer history check of Mr. Chamberlain, Sr. and his home location. From his computer check, Battaglia learned there had been several emotionally disturbed persons ("EDP") calls involving Mr. Chamberlain, Sr. Battaglia also learned that on June 5, 2011, officers had been dispatched to Mr. Chamberlain's apartment for a welfare check involving an emotionally disturbed person at the location.   Battaglia downgraded the ambulance call response and dispatched Markowski and Martin to at the scene.  All units were advised that there had been several previous "emotionally disturbed person calls" at the location.

17.    Fottrell, who was aware that an EDP had activated his Life Alert system and was refusing entry to officers and paramedics, was at headquarters when Spencer received a call from Martin who requested tactical officers to respond to the scene.  Spencer directed Fottrell and Demchuk to respond to the scene with their tactical gear.

18.    Prior to his departure, Fottrell retrieved from the Armory an orange shotgun and loaded it with five beanbag rounds.  Demchuk had retrieved a plastic riot shield. Both men drove together to the scene.

19.    Spencer ordered Defendants Carelli and Hart to respond to Mr. Chamberlain, Sr.'s

home because they had a master key to the Winbrook Housing apartments, where Mr. Chamberlain resided.  Both Hart and Carelli were advised to get tactical gear.

20.     At the scene, Martin advised Fottrell that Mr. Chamberlain was in his sixties.

21.     At the scene, the officers had the following: beanbag shot gun, riot police shield, halligan tool, axe, Taser, handguns, pepper spray and were wearing tactical gear.

22.     Fottrell and Martin were the supervisory officers at the scene.  Spencer was the highest-ranking officer on duty at headquarters.  On information and belief, Spencer never came to the scene during the incident.

23.     Carelli and Hart, members of the White Plains Police Department's ("WPPD") Neighborhood Conditions Unit, were still at headquarters after their shift was over because they were completing reports for a late arrest.

24.     The Neighborhood Conditions Unit is a tactical unit of the WPPD assigned to patrol the commercial district along Mamaroneck Avenue where several bars and restaurants are located as well as the nearby municipal housing complex, Winbrook Houses, where Mr. Chamberlain, Sr. lived.

25.     The White Plains Housing Authority had provided to the Neighborhood Conditions Unit a master key affording them access to all of the apartments in the Winbrook Houses, including Mr. Chamberlain, Sr.'s apartment, without the residents' knowledge or permission.

26.     Immediately after the police officers arrived at Mr. Chamberlain, Sr.'s home, they began banging loudly on his door and ordering him to let them in.

27.     Mr. Chamberlain, Sr. told the officers, through the door, that he did not call them and that he was okay.

28.     Nevertheless, the police officers continued to bang on his door and insist that he open it.

29.     The Life Aid operators, through the two-way communication device in the apartment, could hear the loud banging of the police officers and Mr. Chamberlain, Sr.'s expressions of reluctance to open the door to them.

30.     The Life Aid operators told Mr. Chamberlain, Sr. that if the officers could tell that he was okay they would go away.

31.     Mr. Chamberlain, Sr. then continued to speak to both the Life Aid operators and the police officers, without opening his door, insisting that he was okay and not in need of assistance.

32.     During the standoff, while Mr. Chamberlain was in his home, and his apartment door had not been opened forcibly by the officers and removed from its hinges, Mr. Chamberlain was not a danger to danger to himself or the officers

33.     The Life Aid operators, reassured by Mr. Chamberlain, Sr. that he was not in need of assistance, attempted to cancel the medical aid call with the WPDPS dispatcher.  However, the police officers on the scene refused Life Aid's request and advised that entry would be made into the apartment.

34.     Despite both Mr. Chamberlain, Sr. and Life Aid's attempts to cancel the medical aide call, the police continued relentlessly in their attempts to forcibly gain entry to the apartment.

35.     Life Aid, using their emergency contact list for Mr. Chamberlain, Sr., called his sister who lives in North Carolina. She advised Life Aid that her daughter Tonyia Greenhill, Mr. Chamberlain, Sr.'s niece, lived in the same apartment building and was on her way downstairs to

assist in resolving the situation.

36.     Ms. Greenhill, now informed by her mother about the situation, pleaded with the officers to allow her to speak with her frightened uncle.

37.     However, the police officers on the scene thwarted Ms. Greenhill's offer to assist or to allow her to communicate with her uncle, as he remained alone and afraid inside his apartment.

38.     The Life Aid recordings document Mr. Chamberlain, Sr.'s growing fear and agitation as the onslaught continued and escalated for over one hour.

39.     During the time that the police were outside Mr. Chamberlain, Sr.'s home (for well over an hour), they continuously banged loudly on his door and on an outside window, cursed at him, and continued to speak to him loudly, threateningly, disrespectfully, and mockingly. At least one officer taunted him with racial slurs.

40.     One of the racial slurs came from Defendant Hart, who stood outside the window of Mr. Chamberlain, Sr.'s first floor apartment and called him a "nigger." He had been ordered by the sergeants to go to Mr. Chamberlain's window to "distract" him.

41.     The master key provided by Defendant Housing Authority to the Neighborhood Conditions Unit was used by Martin and/or Hart to unlock Mr. Chamberlain, Sr.'s door, but a safety lock he had in place prevented the door from being opened more than a few inches. However, the door did open sufficiently for the officers to visually confirm that Mr. Chamberlain, Sr. was not in need of medical assistance.

42.     Martin wedged a halligan tool into the door opening to prevent Mr. Chamberlain from closing it. Martin kicked the door several times. Fottrell ordered Carelli to use a bolt cutter to remove the slap lock on the door. After over one hour of the police unsuccessfully attempting

to gain entry into the apartment, Defendant Demchuk was ordered to violently breach Mr. Chamberlain, Sr.'s door.  Defendant Love assisted in the removal of Mr. Chamberlain Sr.'s door.

43.     After the door had been removed from its hinges and the slap lock cut, Demchuk Martin and Fottrell pushed the door several times, and Mr. Chamberlain, Sr. was struck by the door several times. Once the door was down, Mr. Chamberlain was seen by the officers in his apartment wearing boxer shorts.

44.     As the officers forced open his door, Mr. Chamberlain, Sr. communicated to the Life Aid operators that he was in fear for his life and that he had observed several officers outside his door, with shotguns and handguns drawn.

45.     The Life Aid recordings clearly indicate that as the incident progressed and escalated, so did Mr. Chamberlain Sr.'s fear and agitation, culminating to the point where he suffered delusions and hallucinations, including calling out to report to "Mr. President" that he was under attack. Mr. Chamberlain, Sr. called out to God to protect him and begged Life Aid to continue recording because he believed the police were going to kill him.

46.     Mr. Chamberlain, Sr. warned that they should leave his door alone and not enter his apartment, clearly indicating to the police that he believed they were going to kill him, that they had kidnapped his wife and raped his daughter.

47.     As the siege continued, Mr. Chamberlain, Sr. repeatedly expressed the belief that the officers were there to hurt him, not to help him, and that because they intended to kill him he needed to protect himself.

48.     As the door was being pushed forcibly off its hinges, Mr. Chamberlain, Sr. repeatedly begged the officers to stop their actions, chanting, "Don't" and "Leave" over and over again. He expressed his fear that the police officers were going to take him to White Plains

police headquarters, beat him and kill him.

49.    As the door fell open, a camera on a Taser being held by Defendant Fottrell recorded Mr. Chamberlain, Sr. standing approximately six to eight feet away from the doorway wearing only a pair of boxer shorts.

50.    After the door had been removed, Defendant Fottrell stood in the doorway and prepared to discharge his Taser at Mr. Chamberlain, Sr., who at all times remained in his apartment.

51.    Prior to the discharge of the Taser, Carelli and Hart stood in the hallway with their guns drawn and Demchuk retrieved the police shield in anticipation of entry.  The plan, to the extent that there was one, was for Fottrell to use the Taser to knock Mr. Chamberlain, Sr., down and to use the shield to disarm him.  At no time did Fottrell or Martin, the supervisory officers, consider using pepper spray to distract Mr. Chamberlain, Sr., or to use the bean bags to knock Mr. Chamberlain down, instead of the electrical charge from the Taser. Nor was any tactical plan devised to use the shield as cover for the other officers as they proceeded to engage Mr. Chamberlain, Sr. Nor was there any plan to use the batons, in combination with the shield, to attempt to disarm or contain Mr. Chamberlain once the door was down.

52.    Defendant Fottrell discharged the Taser, but did so in a negligent manner, whereby both electrical prongs did not enter Mr. Chamberlain, Sr.'s body.

53.    Because of Fottrell's negligent discharge of the Taser, Mr. Chamberlain, Sr.'s flesh was severely burned and electric shocks were repeatedly sent throughout his body, but the Taser failed to incapacitate him.

54.    Video from the Taser recorded its tortious and torturous effects on Mr. Chamberlain, Sr.

55.     After the improper use of the Taser by Fottrell failed to fell Mr. Chamberlain, Sr.,
Defendant Martin grabbed a shotgun being held by Defendant Markowski that contained
beanbag ammunition.

56.     Prior to entering the apartment Martin, while he stood in the hallway fired several
beanbag shots at Mr. Chamberlain, Sr. that struck his thigh and his chest. After the beanbags
were deployed, Mr. Chamberlain went down, but there was no effort to contain or restrain him
using the shield, batons, or physical force.

57.     Immediately after the beanbag shots, Carelli discharged his handgun twice and
fatally injured Mr. Chamberlain, Sr. After the gunshots were fired, Martin, Fottrell, Carelli and
Demchuk entered the apartment.

58.     Demchuk grabbed Mr. Chamberlain, Sr.'s feet and dragged him out of the
apartment.

59.     The autopsy of the Mr. Chamberlain, Sr.'s body revealed several abrasions caused
by the Taser and the beanbags.

60.     The autopsy also revealed that the fatal bullet had entered Mr. Chamberlain, Sr.'s
right upper arm and that the bullet passed through his lungs, spine and ribs in a straight line.

61.     The autopsy also confirmed that Mr. Chamberlain, Sr., when he was killed, was
taking several medications for his various medical conditions but had no drugs of abuse in his
system.

62.     The defendant police officers who responded to Mr. Chamberlain, Sr.'s apartment
acted, jointly and severally, in an unreasonable manner in responding to the medical aid dispatch.

63.     At no time was the manner and/or degree of force used by the officers justified by
the circumstances. In fact, the wildly disproportionate use of force employed by the officers was

excessive and unwarranted.

64.    At no time did Mr. Chamberlain, Sr. leave his apartment or initiate contact with any of the police officers.

65.    The entry of the defendant police officers into Mr. Chamberlain, Sr.'s apartment was unwarranted and illegal under the circumstances.

66.    The defendant police officer's threatening, taunting, mocking and racist actions toward Mr. Chamberlain, Sr. reasonably caused him to fear for his safety and life.

67.    The defendant police officers failed to reasonably respond to Mr. Chamberlain, Sr.'s continuous expressions of fear for his safety and life, and ignored his repeated communications that he was okay and wished the officers to leave him alone.

68.    Once it became clear that the defendants' actions were causing Mr. Chamberlain, Sr. to become increasingly fearfully and agitated, culminating in delusions, hallucinations and flashbacks from his military service, defendants took no actions to defuse and resolve the situation that their own actions had brought about.

69.    Instead, defendants took actions that exacerbated the situation, used excessive and unnecessary force, and, ultimately caused Mr. Chamberlain, Sr.'s death.

70.    White Plains Housing Authority, by providing a master key to the Neighborhood Conditions Unit and granting them unbridled authority to access apartments within the Winbrook Houses, including Mr. Chamberlain, Sr.'s, proximately caused injury to Plaintiff.

71.    At all times, Officers Demchuk, Fottrell, Martin, Carelli, Love, Hart and Markowski knew Mr. Chamberlain, Sr. was an EDP whose Life Alert system had been activated accidentally.

72.    Addressing EDPs require separate and careful attention in order to prevent the

escalation of incidents with persons in need in order to reduce the possibility of injury.

73.    Officers Demchuk, Fottrell, Martin, Carelli, Love, Hart and Markowski failed to prevent the escalation of the incident. On the contrary, they proceeded to not only intensify the situation but also magnify Mr. Chamberlain, Sr.'s terror.

74.    Martin, Fottrell and Spencer failed to properly supervise their subordinates in their interactions with Mr. Chamberlain, Sr. The failure of said Defendants contributed to the escalation of the situation and proximately caused Mr. Chamberlain to become increasingly agitated and resulted in his wrongful death and the denial of his constitutional rights.

### White Plains Police Procedures and Practices

75.    White Plain's policy regarding Mentally/Emotionally Disturbed Persons (PR-87) provides no guidance to its police officers with respect to how to respond to an incident involving an EDP. A copy of the policy is attached as Exhibit A.

76.    The policy is inadequate because it only deals with what is to be done when a person is brought by Police Department to White Plains Hospital for psychiatric evaluation. The policy does not address what procedures should be used when confronting an EDP or what steps should be taken to contain or restrain an EDP or otherwise render aid.

77.    In contrast, the EDP policy of the New York City Police Department ("NYC") provides appropriate guidelines and procedures for handling situations involving EDPs. A copy of said policy is attached as Exhibit B.

78.    The NYC policy clearly states that the purpose of the policy is to "safeguard a mentally ill or emotionally disturbed person who does not voluntarily seek medical assistance." No such statement is contained in the White Plains Policy.

79.    The NYC policy specifically provides that if the EDPs actions do not constitute

an immediate threat of serious physical injury or death to others, police officers should attempt to isolate and contain the EDP until the arrival of a patrol supervisor or ESU unit. The White Plains policy contains no such procedure.

80.    The NYC policy states that when the EDP is isolated or contained, but will not leave voluntarily, the patrol supervisor is to maintain firearms control and to direct members not to use their firearms or any other deadly physical force unless their lives are in imminent danger. No such policy is contained in the White Plains EDP policy.

81.    The NYC policy dictates that where the EDP is contained protective devices (shields) are to be deployed. The police are also required to deploy non-lethal devices to ensure the safety of all present. Such non-lethal devices include the following: Taser, stun gun, water fire extinguisher, Velcro restraining straps, 4 and 5 foot shields, or shepherd's crook. The White Plains policy contains no such requirement or procedure.

82.    The NYC policy dictates that the patrol supervisor is to request the assistance of the EDP's family or friends or any public or private agency deemed appropriate for assistance. The White Plains policy contains no such requirement or procedure.

83.    The NYC policy requires that the commanding officer or duty captain should direct the use of alternate means of restraint such as pepper spray, tear gas, baton, restraining equipment, Taser electronic stun device or stun device. The White Plains policy contains no such requirement or procedure.

84.    The White Plains policy regarding barricade situations provides no guidance to its officers as to how to handle situations involving barricaded persons. A copy of the policy is attached as Exhibit C. The White Plains policy is inadequate because it does not define terms or properly instruct officers or supervisors as to how to respond to barricaded situations.

85.    New York City Police Department has a policy for barricaded persons that adequately provides guidance to its officers. A copy of the policy is attached as Exhibit D.

86.    The NYC policy states that "where there is time to negotiate, all the time necessary to ensure the safety of all individuals concerned will be used." The White Plains policy contains no such instruction.

87.    The NYC policy states that "any action which might agitate or provoke the subject should be avoided." The White Plains policy contains no such provision.

88.    The NYC policy states that if the barricaded person is contained and poses no immediate threat or danger to any person, no additional action will be taken without the authorization of the precinct commander /duty captain at the scene. The White Plains policy contains no such requirement or procedure.

89.    David E. Chong, the Public Safety Commissioner for the City of White Plains, served for over 22 years in the NYC Police Department, and retired as Lieutenant Commander of Detectives.  He has also served as the Police Commissioner of Mt. Vernon and Deputy Commissioner of Public Safety in White Plains.  Given his background, he knew or should have known of the aforementioned policies of the NYC Police Department and failed to adopt or recommend the adoption of policies similar to New York's regarding EDPs or barricaded persons.

90.    As a result of the failure to adopt an adequate policy for responding to EDPs or barricaded persons, White Plains has a policy or custom of not training or properly supervising its police officers or supervisors in responding to situations involving EDPs or barricaded persons.

91.    The failure to have an adequate policy was a contributing force in the death of Mr.

Chamberlain, Sr. because White Plains had no policy in place for such situations and had not properly trained or supervised its officers responding to same.

92.     The policies and procedures, training, and supervision of White Plains, its Department of Public Safety and Police Department, proximately caused the injury to Mr. Chamberlain, Sr. by failing to train, supervise, and discipline its officers regarding: properly responding to calls for medical assistance; the use of excessive force; interacting with elderly and/or emotionally disturbed residents; and policing in a non-racist manner.

93.     Said policies, training, and/or failure to adopt policies or to adequately train its employees aforementioned resulted in the physical and psychological torture, and killing, of Kenneth Chamberlain, Sr.

94.     A Notice of Claim pursuant to New York General Municipal Law § 50-e was timely served upon Defendant White Plains on February 15, 2012. More than thirty days have elapsed without the matter being resolved by White Plains. The Notice of Claim provided detailed information regarding the actions that the officers took at Mr. Chamberlain's home and was sufficient to put the officers and the City on notice of the conduct that they were alleged to have engaged in.

95.     White Plains Public Safety Commissioner David Chong did not release Officer Carelli's name to the public until April 5, 2012, the day after The Daily News' Juan Gonzalez leaked the officer's identity. The April 4, 2012 Daily News story identifying Carelli was the first identification of the names of any officers involved in the incident complained of herein.

96.     White Plains responded to Plaintiff's FOIL request for information on May 3, 2012 and for the first time provided information regarding the identity of the officers involved in the incident discussed herein.

97.    A Notice of Claim pursuant to New York General Municipal Law § 50-e was timely served upon Defendant White Plains Housing Authority on February 15, 2012. More than thirty days have elapsed without the matter being resolved by the Housing Authority.

## FEDERAL CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

*(Against Defendants Carelli, Hart, Love, Demchuk, Fottrell, Martin,
Markowski, and Spencer For Use of Excessive Force)*

98.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

99.    At the time of the incident complained of herein, Defendants Carelli, Hart, Love, Demchuk, Fottrell, Martin, Markowski, and Spencer were all employees of the Defendant White Plains, and acted under color of law as police officers.

100.    The aforesaid actions of said Defendants were an unreasonable and unnecessary use of excessive force and unlawful entry into Mr. Chamberlain Sr.'s home that deprived him of rights, privileges and immunities secured by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, in violation of 42 U.S.C. §1983.

### SECOND CAUSE OF ACTION

*(Against Defendants Fottrell, Carelli, Love, Demchuk, Martin,
Markowski, Spencer and Hart For §1983 Conspiracy)*

101.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

102.    Defendants Fottrell, Carelli, and Hart at all times relevant to the Complaint were members of the Neighborhood Conditions Unit ("NCU").  Said unit patrolled the bars, restaurants and social establishments located along Mamaroneck Avenue in downtown White

Plains and the Winbrook Houses, a predominantly African-American development, where Mr. Chamberlain, Sr. resided.

103.    Defendants Carelli, Hart and Fottrell, each, have or had federal civil right lawsuits filed against them wherein it was alleged that they had, *inter alia,* used excessive force, racial or ethnic slurs, and engaged in other deprivations of the constitutional rights of African-Americans, Latinos, and other minority groups members while working under color of law as members of the NCU.

104.    At the time of the incident, said Defendants, and the other defendant police officers, entered into a conspiracy to deprive Kenneth Chamberlain, Sr. of his rights secured by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution in violation of §1983.

105.    Said Defendants engaged in actions in furtherance of the aims of said conspiracy, including, but not limited to, unlawful entry into Mr. Chamberlain Sr.'s apartment, the use of excessive, unreasonable and deadly force, the use of racial slurs, and other words designed to demean, humiliate, cause him severe emotional distress, and to place him in fear for his life.

106.    At no time did any of the officers present at the scene attempt to intervene to stop the deprivations aforesaid or to protect Mr. Chamberlain from the assaults and batteries that were inflicted on him by certain of the officers herein. As such, they are liable for their failure to protect Mr. Chamberlain from the deprivation of his constitutional rights.

107.    As a result of the conspiracy and actions aforementioned, Kenneth Chamberlain, Sr. experienced severe emotional distress, fear of impending death, conscious pain and suffering, assaults and batteries, and wrongful death, in violation of the aforementioned constitutional and civil rights.

108.    The aforesaid actions of said Defendants deprived Mr. Chamberlain, Sr. of rights, privileges and immunities secured by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, in violation of 42 U.S.C. §1983.

## THIRD CAUSE OF ACTION

*(Monell Claims Against Defendants White Plains and Housing Authority)*

109.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

110.    The injuries sustained by Kenneth Chamberlain, Sr. were the result of the City's adoption of inadequate policies regarding EDPs and barricaded persons. The policies failed to provide any guidance to officers in responding to situations involving EDPs or barricaded persons.

111.    As a result of the failure of the City to adopt adequate policies, it also failed to properly train its officers how to handle EDP or barricaded situations. The failures aforementioned evidence a deliberate indifference on the party of the City to the constitutional rights of EDPs or barricaded persons. As a result of said deliberate indifference, the officers and supervisors responding to Mr. Chamberlain's apartment violated his constitutional rights.

112.    The injuries sustained by Kenneth Chamberlain, Sr., were the result of a policy, practice, custom, and/or usage of Defendant White Plains of failing to maintain an updated and organized Police manual that provides its police officers policies and procedures reflecting standards and expectations consistent with relevant legal standards and contemporary police practices, constituting deliberate indifference to the rights of members of the public, including Plaintiff.

113.    The injuries sustained by Kenneth Chamberlain, Sr., were the result of a policy, practice, custom and/or usage of Defendant White Plains of hiring and/or retaining officers without properly screening such employees as to racial animus and propensity for violence or failing to adhere such policies as they may have regarding these issues.

114.    The injuries sustained by Kenneth Chamberlain, Sr. were the result of a policy, practice, custom and/or usage of Defendant White Plains of failing to investigate, discipline or retrain police officers who had engaged in prior acts of excessive force and racially motivated conduct or behaviors.

115.    The injuries sustained by Kenneth Chamberlain, Sr. were the result of the failure of Defendant White Plains to have policies for appropriately responding to service calls involving health emergencies or emotionally disturbed persons.

116.    The failure of White Plains to have such policies was the result of the deliberate indifference of Defendant White Plains and its Department of Public Safety to the rights of citizens who are or may be emotionally disturbed

117.    The injuries sustained by Kenneth Chamberlain, Sr. were the result of the failure of Defendant White Plains to train its police officers how to appropriately respond to service calls involving health emergencies or emotionally disturbed persons.

118.    The injuries sustained by Kenneth Chamberlain, Sr. were the result of the failure of Defendant White Plains and its Department of Public Safety to adequately supervise police officers in connection with service calls involving health emergencies or emotionally disturbed persons.

119.    The injuries sustained by Kenneth Chamberlain, Sr. were the result of the failure of Defendant White Plains and its Department of Public Safety to enforce the limited protocol of

immediately dispatching the Emergency Service Unit when responding to service calls involving heath emergencies or emotionally disturbed person.

120.   The injuries sustained by Kenneth Chamberlain, Sr. were the result of the failure of Defendant White Plains to adopt and implement proper patrol guidelines regarding EDPs and barricaded persons such as those adopted and implemented by the New York City Police Department.

121.   The injuries sustained by Kenneth Chamberlain, Sr. were the result of the deliberate indifference and failure of Defendant White Plains to effectively establish proper protocols addressing the use of force as those implemented by the New York City Police Department when responding to situations involving mentally ill or emotionally disturbed persons.

122.   The injuries sustained by Kenneth Chamberlain, Sr. were the result of the failure of Defendant White Plains and its Department of Public Safety to adequately train its officers in the continuum of force, the use of physical force, deadly force and Tasers in responding to situations involving EDPs or barricaded persons.

123.   As a result of the aforementioned policies, practices, custom, usages, and failures of White Plains, and its deliberate indifference to its duty to have such policies to ensure the safety of the residents of White Plains, Mr. Chamberlain, Sr. sustained the injuries and deprivations aforementioned.

124.   The injuries sustained by Mr. Chamberlain, Sr. were the result of the policy, practice, custom or usage of the Defendant Housing Authority to provide to the NCU or other police officers the master keys to the apartments of its tenants, without their knowledge or consent, and without procedures for how such keys were to be used.

125.   The injuries sustained by Mr. Chamberlain, Sr., also resulted from a policy or practice of the Housing Authority of not adopting practices or policies regarding the use of such keys by the police or informing tenants that the police had keys to their apartments.

126.   By providing a master key to the Winbrook Apartments, including Mr. Chamberlain's apartment, without the knowledge or consent of their tenants, the Housing Authority adopted a policy, custom, practice or usage that resulted in the deprivation of the right to the quiet enjoyment, and/or use and occupancy of said apartments without due process of law in violation of the 14th Amendment.

127.   As a result of the aforementioned policies, etc., of the Defendant Housing Authority Mr. Chamberlain Sr., sustained the injuries and deprivations aforementioned in violation of 42 U.S.C. section 1983

## FOURTH CAUSE OF ACTION

*(Supervisory Liability Against Defendants Fottrell, Martin And Spencer)*

128.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

129.   Defendants Fottrell, Martin and Spencer were responsible for supervising the police officers who responded to the scene at Mr. Chamberlain's residence. Said Defendants failed to properly supervise said officers and took no actions that would have prevented the injuries sustained by Mr. Chamberlain.

130.   Both Fottrell and Martin, acting as supervisors personally participated in the assaults and batteries of Mr. Chamberlain.

131.   Both Fottrell and Martin failed to restrain their subordinates in the use of racial

slurs, curses, threats and taunts against Mr. Chamberlain.

132.   Both Fottrell and Martin failed to maintain firearm control over their subordinates.

133.   Both Fottrell and Martin, by their failure to take command and control their subordinates condoned or acquiesced in the violations of Mr. Chamberlain's rights.

134.   Spencer, by his failure to go to the scene was derelict in his duty to supervise, monitor and control his subordinates.

135.   Spencer by directing his subordinates to go to the scene in full tactical gear with deadly and other weapons, yet failing to instruct or supervise his subordinates as to the proper use of such devices, proximately caused the injuries aforesaid.

136.   Spencer by failing to advise his superiors as to the nature of the situation at Mr. Chamberlain's home, failing to advise his superiors as to the behavior of his officers, and failing to advise his superiors as to the efforts being made to forcibly enter Mr. Chamberlain's home, contributed to the causation of the injuries aforesaid, as no one in the chain of command was apprised of the exact nature of the siege, assaults and batteries that Mr. Chamberlain was subjected to in time to prevent same.

137.   As a direct and proximate cause of said Defendants failure to properly supervise their subordinates, Mr. Chamberlain's constitutional rights were violated as aforementioned in violation of 42 U.S.C. §1983.

## STATE CLAIMS FOR RELIEF

### FIFTH CAUSE OF ACTION

*(For Conscious Pain And Suffering Against All Defendants)*

138.   Plaintiff incorporates the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

139. Defendant Carelli without just cause, or provocation, used deadly physical force against Mr. Chamberlain, Sr. The use of such force was not justified or warranted under the circumstances and constituted unreasonable and unnecessary force.

140. The use of such force did not immediately cause Mr. Chamberlain's death. As a result, he suffered and experienced a fear of impending death, severe emotional distress, and conscious pain and suffering.

141. The Defendant White Plains is responsible for the actions of Defendant Carelli that were taken in the scope of his employment as a police officer.

142. The Housing Authority bears responsibility for the injuries aforesaid as a foreseeable result of its delivery of master keys for the apartments at the Winbrook Houses to police officers employed by White Plains, without the consent or knowledge of the tenants, without proper procedures as to how and when the keys would be used by the police to gain entry to the apartments, and in contravention of the right to exclusive control and occupancy in the leasehold agreement.

143. The actions aforesaid constitute a deprivation of the right to acquire, enjoy, own and dispose of property.

144. Defendant White Plains Housing Authority acts in a propriety capacity as a landlord to Housing Authority resident, Mr. Chamberlain, Sr.

145. Mr. Chamberlain, Sr.'s proprietary right to exclusive use and occupancy of his dwelling were violated when the White Plains Housing Authority provided Defendant officers the key to Mr. Chamberlain's apartment, granting Defendant officers access to the unit.

## SIXTH CAUSE OF ACTION

*(For Wrongful Death Against All Defendants)*

146.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

147.   Defendant Carelli, acting within the scope of this employment, caused the death of Mr. Chamberlain by the use of a firearm, without cause or justification.

148.   Said actions render him liable for the wrongful death of Mr. Chamberlain, Sr.

149.   The individual defendant police officers acted in concert with Defendant Carelli in the siege of Mr. Chamberlain, Sr.'s apartment, cooperated or assisted in the breach of his apartment door, used excessive force against Mr. Chamberlain, Sr. and/or taunted or assaulted him; thereby aiding in Defendant Carelli's wrongful actions, and are responsible for Mr. Chamberlain's death, in whole or in part.

150.   Defendant White Plains is responsible for the actions of Defendant Carelli and actions of the other individual police officer defendants that were taken in the scope of his employment as a police officer.

151.   The Housing Authority bears responsibility for the injuries aforesaid as a result of its delivery of master keys for the apartments at the Winbrook Houses to police officers employed by White Plains, without the consent or knowledge of the tenants and without proper procedures as to how and when the keys would be used by the police to gain entry to the apartments.

## SEVENTH CAUSE OF ACTION

*(Against Defendants Carelli, Hart, Love, Demchuk, Fottrell, Martin, Markowski, Spencer, and White Plains For Assault and Battery)*

152.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein

153.     The actions of Defendants Fottrell, Martin and Carelli, Hart, Love, Demchuk, Markowski, and Spencer were intentional, malicious and were committed with wanton disregard for the rights of Mr. Chamberlain, Sr.

154.     The actions of said Defendants were unjustified and unnecessary in the performance of their duties as police officers and were unreasonable and unwarranted and constituted an excessive use of force.

155.     The actions aforesaid constituted unlawful assaults and batteries upon Mr. Chamberlain, Sr.

156.     The said Defendants acted in concert and conspired to commit said assaults and batteries upon Mr. Chamberlain, Sr.

157.     As a result of said conduct of said Defendants, Mr. Chamberlain, Sr. sustained serious and severe injuries, both physical and emotional.

158.     Defendant White Plains is responsible for the actions of said Defendants as the acts were committed within the scope of their employment as police officers.

## NINTH CAUSE OF ACTION

*(For Negligence Against All Defendants)*

159.     Plaintiffs incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein

160.     The individual officers, acting within the scope of their employment, negligently discharged their duties and thereby caused Mr. Chamberlain, Sr. to sustain the injuries and deprivations aforementioned.

161.   The acts of negligence of said officers included, but are not limited to, taunting, mocking, using racial slurs, threatening language, displaying their weapons without cause, forcibly breaking the door of Mr. Chamberlain, Sr.'s door, negligently discharging the Taser, and other conduct that was improper under the circumstances and caused Mr. Chamberlain, Sr. to become agitated, non-cooperative, and emotionally distraught.

162.   Defendant White Plains is responsible for the negligence of its officers committed within the scope of their employment.

163.   Defendant White Plains was negligent by failing to properly train or supervise its officers in how to properly respond to service calls involving emergency medical situations or involving emotionally disturbed persons.

164.   Defendant White Plains was negligent by failing to properly train or supervise its police officers in the use of Tasers, physical force, deadly force, or the continuum of force.

165.   Defendant Housing Authority was negligent by providing master keys to the apartments of its tenants, without their knowledge or consent and without proper procedures to ensure that the master keys were not improperly used by police officers.

166.   Defendant Housing Authority's policy of providing master keys was an affirmative act creating a foreseeable high risk to the safety and well-being of tenants.

167.   The aforementioned acts of negligence proximately caused the injuries sustained by Mr. Chamberlain, Sr.

## PUNITIVE DAMAGES

168.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

169.   The acts of the individual Defendants were willful, wanton, malicious and

oppressive and were motivated solely by a desire to harm Mr. Chamberlain, Sr. without regard

for his well-being and were based on a lack of concern and ill-will towards Mr. Chamberlain, Sr.

Such acts therefore deserve an award of punitive damages

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against Defendants:

    a.  Compensatory damages in the amount of twenty one million dollars

    b.  Punitive damages;

    c.  Award costs of this action including attorneys' fees to the Plaintiff pursuant to 43

        U.S.C. §1988; and

    d.  Any such other and further relief as this Court may deem appropriate.

## A JURY TRIAL IS DEMANDED

DATED:      New York, New York
             November 19, 2012

                              **NEWMAN FERRARA LLP**

By: _____
                  Randolph M. McLaughlin
                  rmclaughlin@nfllp.com
                  Debra S. Cohen
                  dcohen@nfllp.com
                  Jeffrey M. Norton
                  jnorton@nfllp.com
                  1250 Broadway, 27th Floor
                  New York, New York 10001
                  Tel: 212-619-5400
                  Fax: 212-619-3090

Mayo Bartlett
bartlettlaw@hotmail.com
Abdulwali Muhammad
wm@walimuhammadlaw.com
81 Main Street
Suite 118
White Plains, N.Y.  10603
Tel: 914-285-1500

*Counsel for Plaintiff*

**EXHIBIT A**

# PR - 87

# MENTALLY / EMOTIONALLY DISTURBED PERSONS

## 8700   EVALUATIONS - WHITE PLAINS HOSPITAL

When a person is brought by the Police Department to White Plains Hospital for psychiatric evaluation, the following guidelines will apply:

1. Officers will stay with the citizen until such time as the hospital makes such evaluation and recommendation or Crisis Intervention arrives at the scene.

2. If the wait for Crisis Intervention transportation is longer than one 15/20 minute period, the police officer may leave and return to the hospital, when the hospital calls and says that the patient is ready for transportation to Westchester Medical Center.

3. Police Officers are authorized to transport psychiatric patients after admitting arrangements have been made by White Plains Hospital or the Crisis Intervention Team.

## 8701   COMMITMENTS - WESTCHESTER MEDICAL CENTER

For all patients brought by police or ambulance:

- Responsibility for the safety of the patient and others will remain with those who brought the patient until a physician has:

  a.   Observed patient
  b.   Spoken to police/attendants
  c.   Accepted responsibility

- Thee above must be accomplished with the minimum delay to maximize safety and to avoid tying up police and ambulances.

For patients brought to the Psychiatric ER in restraints:

- The ER Staff will contact the appropriate Resident immediately when a patient in restraints is brought to the ER.

- The Resident will respond immediately to the ER Staff's request to see such a patient.

- The Resident will begin his or her evaluation of the patient with the patient remaining in restraints. The initial focus of the evaluation should be on whether or not to maintain restraints.

- If the patient continues to be uncooperative, he or she will be taken directly to an in-patient unit where restraints can be safely removed, and further evaluation and treatment done.

- If the examining Resident believes the patient may be taken out of restraints in the ER, the following

Revised 9/06

000128

guidelines must be followed:

a. The decision to remove restraints may be made only by the examining physician(s).
b. The examining physician should consult with the ER Nursing Staff regarding the need for additional staff to help control the patient.
c. A first on-call Resident may not release a patient from restraints on his or her own authority. The Attending on-duty in the ER, or the second on-call, must also evaluate the patient before restraints may be removed.
d. Once the decision to remove restraints has been made, the ER door should be locked.

Police and ambulance personnel who have initial custodial responsibility for the patient will no longer be responsible once restraints are removed.

Revised 9/06

000129

**EXHIBIT B**

## PATROL GUIDE

| Section:  Aided Cases | | Procedure No:   216-05 | |
|---|---|---|---|
| **MENTALLY ILL OR EMOTIONALLY DISTURBED PERSONS** | | | |
| DATE ISSUED:<br>03/17/00 | DATE EFFECTIVE:<br>03/24/00 | REVISION NUMBER:<br>00-01 | PAGE:<br>1 of 6 |

**PURPOSE**

To safeguard a mentally ill or emotionally disturbed person who does not voluntarily seek medical assistance.

**SCOPE**

The primary duty of all members of the service is to preserve human life. The safety of ALL persons involved is paramount in cases involving emotionally disturbed persons. If such person is dangerous to himself or others, necessary force may be used to prevent serious physical injury or death. Physical force will be used ONLY to the extent necessary to restrain the subject until delivered to a hospital or detention facility. Deadly physical force will be used ONLY as a last resort to protect the life of the uniformed member of the service assigned or any other person present. If the emotionally disturbed person is armed or violent, no attempt will be made to take the EDP into custody without the specific direction of a supervisor unless there is an immediate threat of physical harm to the EDP or others are present. If an EDP is not immediately dangerous, the person should be contained until assistance arrives. If the EDP is unarmed, not violent and willing to leave voluntarily, a uniformed member of the service may take such person into custody. When there is time to negotiate, all the time necessary to ensure the safety of all individuals will be used.

**DEFINITIONS**

EMOTIONALLY DISTURBED PERSON (EDP) - A person who appears to be mentally ill or temporarily deranged and is conducting himself in a manner which a police officer reasonably believes is likely to result in serious injury to himself or others.

ZONE OF SAFETY - The distance to be maintained between the EDP and the responding member(s) of the service. This distance should be greater than the effective range of the weapon (other than a firearm), and it may vary with each situation (e.g., type of weapon possessed, condition of EDP, surrounding area, etc.). A minimum distance of twenty (20) feet is recommended. An attempt will be made to maintain the "zone of safety" if the EDP does not remain stationary.

**PROCEDURE**

When a uniformed member of the service reasonably believes that a person who is apparently mentally ill or emotionally disturbed, must be taken into protective custody because the person is conducting himself in a manner likely to result in a serious injury to himself or others:

**UNIFORMED MEMBER OF THE SERVICE**

1.  Upon arrival at scene, assess situation as to threat of immediate serious physical injury to EDP, other persons present, or members of the service. Take cover, utilize protective shield if available and request additional personnel, if necessary.
    a.  If emotionally disturbed person's actions constitute immediate threat of serious physical injury or death to himself or others:
        (1)  Take reasonable measures to terminate or prevent such behavior. Deadly physical force will be used only as a last resort to protect the life of persons or officers present.

## NEW • YORK • CITY • POLICE • DEPARTMENT

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 216-05 | 03/24/00 | 00-01 | 2 of 6 |

**NOTE**  *Damaging of property would <u>not</u> necessarily constitute an immediate threat of serious physical injury or death.*

**UNIFORMED**
**MEMBER OF**
**THE SERVICE**
**(continued)**

    b.   If EDP is unarmed, not violent and is willing to leave voluntarily:
        (1)   EDP may be taken into custody without the specific direction of a supervisor.

    c.   In all other cases, if EDP's actions do <u>not</u> constitute an <u>immediate</u> threat of serious physical injury or death to himself or others:
        (1)   Attempt to isolate and contain the EDP while maintaining a <u>zone of safety</u> until arrival of patrol supervisor and Emergency Service Unit personnel.
        (2)   <u>Do not attempt to take EDP into custody without the specific direction of a supervisor</u>.

  2.   Request ambulance, if one has not already been dispatched.
    a.   Ascertain if patrol supervisor is responding, and, if not, request response.

**NOTE**  *Communications Section will automatically direct the patrol supervisor and Emergency Service Unit to respond to scene in such cases.  Patrol supervisors' vehicles are equipped with non-lethal devices to assist in the containment and control of EDP's, and will be used at the supervisor's direction, if necessary.*

  3.   Establish police lines.
  4.   Take EDP into custody if EDP is unarmed, not violent and willing to leave voluntarily.

**PATROL**
**SUPERVISOR**

  5.   Verify that Emergency Service Unit is responding, if required.
    a.   Cancel response of Emergency Service Unit if services not required.
  6.   Direct uniformed members of the service to take EDP into custody if unarmed, not violent, and willing to leave voluntarily.

**NOTE**  *When aided is safeguarded and restrained comply with steps 25 to 32 inclusive.*

<u>WHEN AIDED IS ISOLATED/CONTAINED BUT WILL NOT LEAVE VOLUNTARILY:</u>

**PATROL**
**SUPERVISOR**

  7.   Establish firearms control.
    a.   Direct members concerned not to use their firearms or use any other deadly physical force unless their lives or the life of another is in imminent danger.
  8.   Deploy protective devices (shields, etc.).
    a.   Employ non-lethal devices to ensure the safety of all present (see *"ADDITIONAL DATA"* statement).
  9.   Comply with provisions of *P.G. 212-38, "Hostage/Barricaded Person(s),"* where appropriate.
  10.  Establish police lines if not already done.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 216-05 | 03/24/00 | 00-01 | 3 of 6 |

**PATROL**
**SUPERVISOR**
**(continued)**

11. Request response of hostage negotiation team and coordinator through Communications Section.
12. Notify desk officer that hostage negotiation team and coordinator have been notified and request response of precinct commander/duty captain.
13. Request Emergency Service Unit on scene to have supervisor respond.
14. If necessary, request assistance of:
   a. Interpreter, if language barrier
   b. Subject's family or friends
   c. Local clergyman
   d. Prominent local citizen
   e. Any public or private agency deemed appropriate for possible assistance.

*NOTE*

*The highest ranking uniformed police supervisor at the scene is in command and will coordinate police operations. If the mentally ill or EDP is contained and is believed to be armed or violent but due to containment poses no immediate threat of danger to any person, no additional action will be taken without the authorization of the commanding officer or duty captain at the scene.*

**EMERGENCY**
**SERVICE UNIT**
**SUPERVISOR**

15. Report to and confer with ranking patrol supervisor on scene.
   a. If there is no patrol supervisor present, request response forthwith, and perform duties of patrol supervisor pending his/her arrival.

*NOTE*

*The presence of a supervisor from any other police agency does not preclude the required response of the patrol supervisor.*

16. Evaluate the need and ensure that sufficient Emergency Service Unit personnel and equipment are present at the scene to deal with the situation.
17. Verify that hostage negotiation team and coordinator are responding, when necessary.
18. Devise plans and tactics to deal with the situation, after conferral with ranking patrol supervisor on scene.

**DESK OFFICER**

19. Verify that precinct commander/duty captain has been notified and is responding.
20. Notify Operations Unit and patrol borough command of facts.

**COMMANDING**
**OFFICER/**
**DUTY CAPTAIN**

21. Assume command, including firearms control.
22. Confer with ranking Emergency Service Unit supervisor on scene and develop plans and tactics to be utilized.
23. Direct whatever further action is necessary, including use of negotiators.
24. Direct use of alternate means of restraint, if appropriate, according to circumstances (OC Spray, tear gas, baton, restraining equipment, taser electronic stun device, or stun device).

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 216-05 | 03/24/00 | 00-01 | 4 of 6 |

### WHEN PERSON HAS BEEN RESTRAINED:

**UNIFORMED**    25.   Remove property that is dangerous to life or will aid escape.
**MEMBER OF**    26.   Have person removed to hospital in ambulance.
**THE SERVICE**
        a.   Restraining equipment including handcuffs may be used if patient is violent, resists, or upon direction of a physician examiner.
        b.   If unable to transport with reasonable restraint, ambulance attendant or doctor will request special ambulance.
        c.   When possible, a female patient being transported should be accompanied by another female or by an adult member of her immediate family.
    27.   Ride in body of ambulance with patient.
        a.   At least two (2) uniformed members of the service will safeguard if more than one (1) patient is being transported.

**NOTE**    *If an ambulance is <u>NOT</u> available and the situation warrants, transport the EDP to the hospital by RMP if able to do so with reasonable restraint, at the direction of a supervisor.  UNDER NO CIRCUMSTANCES WILL AN EDP BE TRANSPORTED TO A POLICE FACILITY.*

    28.   Inform examining physician, upon arrival at hospital, of use of non-lethal restraining devices, if applicable.
    29.   Safeguard patient at hospital until examined by psychiatrist.
        a.   When entering psychiatric ward of hospital, unload revolver at Firearm Safety Station, if available (see *P.G. 216-07, "Firearms Safety Stations At Psychiatric Wards And Admitting Areas"*).
    30.   Inform psychiatrist of circumstances which brought patient into police custody:
        a.   Inform relieving uniformed member of circumstances if safeguarding extends beyond expiration of tour.
        b.   Relieving uniformed member will inform psychiatrist of details.
    31.   Enter details in **ACTIVITY LOG (PD112-145)** and prepare **AIDED REPORT WORKSHEET (PD304-152b)**.
        a.   Indicate on **AIDED REPORT WORKSHEET**, name of psychiatrist.
    32.   Deliver **AIDED REPORT WORKSHEET** to desk officer.

**ADDITIONAL**    *Refer persons who voluntarily seek psychiatric treatment to proper facility.*
**DATA**

*Prior to interviewing a patient confined to a facility of the NYC Health and Hospitals Corporation, a uniformed member of the service must obtain permission from the hospital administrator who will ascertain if the patient is mentally competent to give a statement.*

*Upon receipt of a request from a qualified psychiatrist, or from a director of a general hospital or his/her designee, uniformed members of the service shall take into custody and transport an apparently mentally ill or emotionally disturbed person from a facility licensed or operated by the NYS Office of Mental Health which does not have an inpatient psychiatric service, or from a general hospital which does not have an inpatient psychiatric service, to a hospital approved under Section 9.39 of the Mental Hygiene Law.*

## NEW • YORK • CITY • POLICE • DEPARTMENT

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 216-05 | 09/28/07 | 07-05 | 5 of 6 |

**ADDITIONAL DATA (continued)**

*Uniformed members of the service will also comply with the above procedure upon direction of the Commissioner of Mental Health, Mental Retardation and Alcoholism Services or his/her designee.*

*USE OF NON-LETHAL DEVICES TO ASSIST IN RESTRAINING EMOTIONALLY DISTURBED PERSONS*

*Patrol supervisors or uniformed members of the service assigned to Emergency Service Unit may utilize a taser electronic stun device or stun device to assist in restraining emotionally disturbed persons if necessary. The taser/stun device may be used:*

a. *To restrain an EDP who is evincing behavior that might result in physical injury to himself or others, OR*

b. *To restrain person(s) who, through the use of drugs, alcohol or other mind-altering substances, are evincing behavior that might result in physical injury to himself or others.*

*Emergency Service Unit personnel will obtain the permission of the Emergency Service Unit supervisor prior to utilizing a taser/stun device, except in emergencies.*

*Patrol supervisor or Emergency Service Unit personnel using a taser/stun device will prepare a TASER/STUN DEVICE REPORT (PD304-150). It will be signed by the Emergency Service Unit supervisor/duty captain, as appropriate, and delivered to the precinct of occurrence.*

*The precinct commander/duty captain will conduct an investigation, prepare an UNUSUAL OCCURRENCE REPORT (PD370-152), attach a TASER/STUN DEVICE REPORT, and forward as per instructions on the TASER/STUN DEVICE REPORT form.*

*The Commanding Officer, Emergency Service Unit will have TASER/STUN DEVICE REPORTS maintained in a bound book.*

*NON-LETHAL RESTRAINING DEVICE/RESCUE EQUIPMENT REPORT (PD320-150) will be prepared whenever restraining devices, such as a taser, stun gun, water fire extinguisher, Velcro restraining straps, five (5) foot shield, four (4) foot shield, shepherd's crook or rescue equipment (sledge hammer, wrecking bar, come-along winch, etc.) are used by uniformed members of the service in the performance of duty.*

*NON-LETHAL RESTRAINING DEVICE/RESCUE EQUIPMENT REPORT will be prepared in addition to any other Department report required by the incident, including the TASER/STUN DEVICE REPORT.*

*The Commanding Officer, Investigation Review Section, will collate statistical information recorded on the REPORTS, and will forward a monthly report to the Office of the Chief of Department by the seventh (7th) business day of each month.*

**RELATED PROCEDURES**

*Investigation of Carjackings (P.G. 207-32)*
*Unusual Occurrence Reports (P.G. 212-09)*
*Hostage/Barricaded Person(s) (P.G. 212-38)*
*Unlawful Evictions (P.G. 214-12)*
*Aided Cases - General Procedure (P.G. 216-01)*
*Mental Health Removal Orders (P.G. 216-06)*

## NEW • YORK • CITY • POLICE • DEPARTMENT

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 216-05 | 09/28/07 | 07-05 | 6 of 6 |

*FORMS AND*     *ACTIVITY LOG (PD112-145)*
*REPORTS*          *AIDED REPORT WORKSHEET (PD304-152b)*
                *NON-LETHAL RESTRAINING DEVICE/RESCUE EQUIPMENT REPORT (PD320-150)*
                *TASER/STUN DEVICE REPORT (PD304-150)*
                *UNUSUAL OCCURRENCE REPORT (PD370-152)*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

EXHIBIT C

- ○ Two shotguns
- • Two first aid kits
- ○ Polaroid Camera
- ○ Flex cuffs
- ○ ID bracelets
- ○ Miscellaneous report equipment
- ○ CV-50 *see procedures for COMMUNICATIONS / CRIME SCENE VAN (CV-50)*
- • Mass arrest kit (kept in armory)
- • Mass Booking Kit (kept in the closet in the fingerprinting room)

## 8504   BARRICADE SITUATIONS AND BARRICADE SITUATIONS WITH HOSTAGES

*NOTE: See also the procedure SPECIAL RESPONSE TEAM (S.R.T.) PR-88*

The Emergency Services Unit **will be contacted immediately** on all barricaded situations or hostage incidents. They have the primary responsibility to handle such matters. They will work in coordination with trained hostage negotiators and the Special Response Team (when necessary) in any operation requiring the use of personnel from both units. The Tactical Incident Commander will have command of all ESU/SRT personnel on an incident or operation. This combined effort by both divisions will be responsible for the preparation and execution of all tactical plans.

### 8504.1   FIRST OFFICER(S) ON THE SCENE SHALL:

1. Take no direct action against the barricade.

2. Retire to a safe position(s) which permits viewing of any possible areas of escape and yet provides for the confinement of the suspect(s) to as small an area as possible.

3. Maintain firearms discipline. Gunfire by a barricaded suspect in the general direction of officers who are adequately covered does not justify the return of gunfire. If it is necessary to resort to gunfire, it should be limited to self defense or to the defense of another and then only when with-out risk or danger to any possible hostage(s).

4. Notify the Communications Section by the safest means available as to the:
   a. Location and physical description of the barricade.
   b. Number, description, and names (if known) of the barricaded suspect(s).
   c. Reason the suspect(s) is barricaded.
   d. Whether or not the suspect(s) is armed, and if armed, the type(s) of weapon(s) the suspect(s) is using.
   e. Number and description of any hostage(s) being held. The hostage's name(s), however, shall not be given out over the air.
   f. Any areas or streets which may be unsafe for additional units responding to the scene.
   g. Notify the Emergency Services Unit.

5. The telephone should be used whenever possible in order to prevent as much information as possible from going out over the air. In addition, this line should be kept open until a new line of communications is established either through CV-50 (*See the Procedures Section COMMUNICATIONS / CRIME SCENE VAN (CV-50) for further information.*) or the Department's Nextel phones.

### 8504.2   FIRST SUPERVISOR ON THE SCENE SHALL:

1. Upon arrival, evaluate the situation, have the Emergency Services respond and assign additional

000123

personnel to establish an outer perimeter beyond the line of sight of the barricaded location. Citizens and unauthorized vehicles shall not be allowed within this outer perimeter.

2. Determine the necessity to evacuate civilian personnel from areas of potential danger and assign patrol personnel to effect their removal, paying special consideration to their safety.
3. Ensure that all personnel maintain firearms discipline.
4. Update communications of any new information and coordinate with the Emergency Services Unit.
5. Designate a Staging Area at a safe location upwind and out of sight of the barricaded location to which additional units can respond. Advise the Communications section of its location.
6. Have all civilians who are evacuated from areas of potential danger, or who are leaving the inner perimeter on their own, held at a safe location for identity and debriefing by detectives.
7. Notify communications to make the necessary "All Call" notifications to the Command Staff.

## 8504.3 DUTIES OF THE CHIEF OF POLICE OR DESIGNATED SENIOR OFFICER

1. Notify the Commissioner of Public Safety.
2. Proceed to the scene immediately.
3. Establish a primary command post upwind and away from the tactical incident and arrange for personnel to be assigned.
4. Establish a perimeter around the scene and have personnel placed in strategic spots to prevent subjects from escaping.
5. Order the Senior Traffic Officer to route traffic away from the scene. Have him establish crowd control.
6. Have a designated Officer assist him at the command post.
7. Arrange for a Staging Area upwind and away from the tactical incident where personnel can report for briefing and assignments.
8. Arrange for a log book to be kept at the command post to record the events.
9. Issue instructions on fire control.
10. Evacuate injured and all civilians from areas of danger. Keep them at a safe location so they can be debriefed by detectives.
11. Recall off-duty personnel if needed (see the Procedures Section MOBILIZATION PLAN for Emergency Mobilization).
12. See that all personnel in the inner perimeter have the necessary weapons and protective armor (heavy vests and helmets).
13. Arrange for any special equipment that may be needed through the Operations Captain. This would include food, drink and medical care for the hostages and captor(s).
14. Arrange for direct communication with the Commissioner of Public Safety by telephone or radio contact. Radio usage should be designated to one frequency.
15. Give the orders to assault the premises and free the hostage(s) if he deems it necessary.

## 8504.4 DUTIES OF OPERATIONS COMMANDER

1. Confer with the Chief and set up a Staging Area outside of the inner perimeter. This Staging Area will act as a mobilization point for personnel who are waiting to be assigned to special duties.
2. Maintain an open line of communication with the primary command post and supply all the equipment needed for the operation.
3. Confer with the Department of Public Works and the Building Department for advice on turning off utilities and various methods of entering the occupied building and other buildings in the vicinity.
4. Have an officer contact the owner of the occupied building for information that is needed regarding the inside of the building and its contents.
5. Arrange to have photographs and videos taken as necessary.
6. Notify the necessary emergency vehicles to stand by in the event they are needed (Fire Department, Ambulances, Department of Public Works, etc.).
7. Establish strict accountability on weapons issued and investigative steps taken.
8. Notify the proper agencies (Medical Examiner, District Attorney, etc.) in the event of injury or death.
9. Have a list of home numbers of all City Officials that may become involved.

Revised 9/06

10. Coordinate activities of other agencies called to the scene.
11. Keep a log book to record the events and assignments of personnel.
12. Be ready to carry out instructions of the Commissioner of Public Safety and the Chief of Police.

## 8504.5  DUTIES OF THE DETECTIVE DIVISION COMMANDING OFFICER

1. Provide staff assistance to the Chief of Police.
2. Provide properly trained negotiators to handle negotiations (two officers to a team).
3. Handle all aspects of criminal investigation, i.e. identify captor(s) - investigate their background to determine home addresses, parents, children, relatives, medical history and religious association so that a profile can be made and used in the negotiating phase of the operation.
4. Assign personnel to locate and interview witnesses.
5. Debrief hostage(s) and witnesses.
6. Have a team of detectives ready after the arrest to process the crime scene and secure the evidence.
7. Set up and maintain an appropriate area for press briefings by the Public Information Officer.
8. Direct all investigative functions in connection with the hostage situation and the duties necessary to bring the action to a successful conclusion.

## 8504.6  DUTIES OF THE TOUR COMMANDER

1. Dispatch radio cars to the scene.
2. Notify the Commissioner and Deputy Commissioner's of Public Safety, the Chief of Police, and the appropriate command staff.
3. Keep in touch with the cars at the scene to determine the exact situation as it exists - the number of captors, hostages, dead and injured.
4. Stand by to receive and carry out the orders of the Superior Officer at the scene.

## 8505  IMMEDIATE ACTION TO ACTIVE SHOOTERS

Note: All procedures regarding Barricade Situations and Barricade Situations with Hostages (PR 8504) still apply, as do the Department policy and laws governing the use of force.

This section is designed to guide officers when death or injury is ongoing to multiple victims upon their arrival on scene and immediate action is required to save lives. This ongoing death or injury may be caused by one or more of the following; an active shooter, an attack with edged weapons, or the placing or detonating of explosives.

For the purposes of this procedure Immediate Action is defined as:

*The rapid and immediate deployment of police resources to ongoing, life threatening situations where delayed deployment could otherwise result in death or serious physical injury to innocent persons.*

Immediate action tactics are not substitute for conventional response to a barricaded gunman or barricaded gunman with hostages when there is no immediate threat to life and officers can take time to contain and de-escalate. (See PR- 8504)

The command priorities in a violent critical incident are as follows:
1. Safety of innocent civilians (victims and bystanders)
2. Safety of police officers
3. Safety of suspects

Police response to the active shooter does not allow time to gather special equipment or detailed information. In order to save lives we must stop the active shooter as soon as possible.

Revised 9/06

**EXHIBIT D**



## PATROL GUIDE

| Section:  Command Operations | Procedure No:   212-38 |
|---|---|
| **HOSTAGE/BARRICADED PERSON(S)** | |

| DATE ISSUED:<br>02/18/11 | DATE EFFECTIVE:<br>02/25/11 | REVISION NUMBER:<br>11-01 | PAGE:<br>1 of 5 |
|---|---|---|---|

**PURPOSE**  To handle hostage/barricaded persons' situations with maximum safety to all persons concerned.

**DEFINITIONS**  <u>HOSTAGE SITUATION</u> - A hostage situation begins the moment a suspect takes a person under his or her control and subjects that person to the risk of bodily harm for the purpose of furthering a criminal act or to facilitate escape. There are two (2) broad categories of hostage situations:

a.   The classic hostage situation, in which the hostage-taker is contained within a room, building, store, or other physically segregated area;

b.   The mobile hostage situation, in which the hostage-taker is on the street or another location where he or she is not restricted by clear physical boundaries.

<u>OUTER PERIMETER</u> - Area sufficiently removed from actual scene of incident to ensure the safety of all spectators, including members of the news media. The establishment of outer perimeters dictates the evacuation of all civilians and unnecessary police personnel from this area.

<u>INNER PERIMETER</u> - Frozen area, encompassing the incident location. No one will be permitted in this area without a protective vest appropriate to the level of threat present. No one will be allowed to enter the Inner Perimeter <u>except</u>:

a.   Patrol borough commander or duty chief;

b.   Commanding Officer, Special Operations Division, and personnel under his/her command;

c.   Commanding Officer, Emergency Service Unit, and personnel under his/her command;

d.   Hostage Negotiating Coordinator and personnel under his/her command;

e.   Technical Assistance Response Unit (TARU) supervisor and personnel under his/her command;

f.   Bomb Squad supervisor and one (1) technician, when bomb is present or suspected;

g.   Ranking patrol duty supervisor from affected operational bureau (Patrol Services, Housing or Transit) depending on location of incident;

h.   Any other person(s) with the permission of the patrol borough commander or duty chief.

<u>MASS REFLEXIVE RESPONSE</u> - Sometimes referred to as "contagious shooting," mass reflexive response is the phenomenon which occurs when a shot fired by one (1) officer sets off a chain reaction of shooting by other personnel on the scene. It involves reacting based on one's instinct rather than on a rational assessment of the situation.

<u>FIREARMS CONTROL</u> - Firearms control requires that no member of the service on the scene will discharge a firearm unless and until directed to do so by the supervisory officer in charge, unless discharging a firearm is absolutely necessary for self-defense or the defense of another and there is no other alternative.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-38 | 02/25/11 | 11-01 | 2 of 5 |

**PROCEDURE** When responding to the scene of an incident in which persons are being held hostage or barricaded persons will not voluntarily surrender, <u>or</u> when persons are taken hostage during the course of an ongoing police incident, pursuit, etc.

**UNIFORMED**
**MEMBER OF**
**THE SERVICE**

1. Request through communications dispatcher that the patrol supervisor, Emergency Services Unit (ESU), Hostage Negotiation Team (H.N.T.) and the Technical Assistance Response Unit (T.A.R.U.) respond to the incident.
2. Seek cover and attempt to isolate and contain the subject and the hostage.

**NOTE** *When there is time to negotiate, all the time necessary to ensure the safety of all individuals concerned will be used. Once a hostage or hostages are taken, all members of the service at the scene will attempt to contain the subject(s) and hostage(s) and implement hostage negotiation procedures. Note that the safety and well-being of the hostage as well as all persons present is our paramount concern. Any action which endangers the hostage will be avoided, if possible.*

3. Be cognizant of the danger of "Mass Reflexive Response."
  a. The first officers on the scene will <u>immediately</u> establish and maintain firearms control.

**NOTE** *Uniformed members of the service should be aware that, although the New York State Penal Law and Department procedures may authorize the use of deadly physical force in a given situation, they will <u>not</u> be subject to criticism or disciplinary action for choosing not to discharge their firearms.*

4. Attempt to slow the pace of the incident and establish a dialogue with the subject while awaiting the arrival of specialized personnel.
  a. Any action which might agitate or provoke the subject should be avoided.
5. Refrain from any action which would unnecessarily jeopardize the safety of the hostage.
6. Establish police lines to control subject's mobility and to prevent uninvolved persons from entering the area.

**NOTE** *Street situations, or mobile hostage situations, present added hazards. The ability to control the subject's movement, and the prevention of uninvolved persons unwittingly entering the inner perimeter, are limited by the setting in which the incident occurs. The proper deployment of personnel will aim to control access to the inner perimeter as well as to control the subject's mobility. Natural boundaries, such as fences, building lines, parked cars, and walls, should be used to contain the subject. Department vehicles, strategically placed, can be used to contain the incident or to block escape routes.*

**PATROL**
**SUPERVISOR**

7. Assume command of the situation.
8. Ensure that all members of the service present are directed to maintain firearms control.
  a. As soon as circumstances permit, designate one (1) or more uniformed members of the service who will act as the designated shooter(s) if the use of <u>deadly physical force</u> becomes unavoidable.
  b. Designate a uniformed member of the service to maintain radio contact with the Communications Section dispatcher, so that the dispatcher and responding personnel are kept apprised of the situation as it develops.

# NEW • YORK • CITY • POLICE • DEPARTMENT

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-38 | 02/25/11 | 11-01 | 3 of 5 |

**NOTE**  *The ranking officer in charge will personally assume responsibility for firearms control. To maintain firearms control, he or she must be able to immediately assess conditions as they develop, and to give appropriate direction instantaneously. Therefore, the ranking officer in charge will assume a position within the inner perimeter, at the focal point of the situation.*

**PATROL SUPERVISOR**

9.  Assess situation and ensure sufficient patrol response pending arrival of Emergency Service Unit.

10. Verify through the communications dispatcher that ESU, H.N.T. and T.A.R.U. are enroute to the incident scene and if not, request their immediate response.

**NOTE**  *Only the ranking patrol duty incident commander (i.e., patrol borough commander/duty inspector/duty captain) has the authorization to cancel the services of the H.N.T. and T.A.R.U. via the communications dispatcher.  The communications dispatcher is NOT authorized to cancel the services of H.N.T. and/or T.A.R.U. without the aforementioned consent of the ranking patrol duty incident commander on the scene.*

11. Request response of precinct commander/duty captain.

12. Implement hostage negotiation procedures, beginning with the establishment of inner and outer perimeters.

   a.  The inner perimeter should contain only those personnel necessary to accomplish the mission; all others will be directed to the outer perimeter.

   b.  Uninvolved civilians should be evacuated, if safety permits.  They should be properly identified and detained for questioning to obtain pertinent information about the incident.

   c.  Once the inner perimeter is established, only authorized personnel will be permitted to enter it.

   d.  An outer perimeter will be established to serve as a staging area for additional police personnel and for other agencies (i.e., Fire Department, Emergency Medical Service, etc.)

   e.  The Communications Section should advise all units responding to the incident to avoid the inner perimeter, and not to use lights and sirens as they approach the scene.

13. Confer with the Emergency Service Unit upon their arrival to evaluate location and coverage of inner and outer perimeters, as well as necessity for evacuation of area.

   a.  Request response of Emergency Service Unit supervisor, if not present.

14. Establish field command post outside of inner perimeter and the potential line of fire.

15. Have desk officer, precinct of occurrence, and Operations Unit apprised of situation and provide telephone numbers of field command post.

**NOTE**  *The ranking patrol supervisor on the scene is in command and will coordinate police operations.  If a barricaded person is contained and poses no immediate threat or danger to any person, no additional action will be taken without the authorization of the precinct commander/duty captain at the scene.*

## NEW • YORK • CITY • POLICE • DEPARTMENT

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-38 | 02/25/11 | 11-01 | 4 of 5 |

| | | |
|---|---|---|
| **PRECINCT/**<br>**PSA/DISTRICT**<br>**COMMANDER/**<br>**DUTY**<br>**CAPTAIN** | 16.<br>17.<br>18.<br><br>19.<br><br>20.<br>21. | Assume command of the incident.<br>Ascertain that firearms control has been established.<br>Confer with patrol supervisor and Emergency Service Unit Supervisor to determine if sufficient personnel are present to maintain inner and outer perimeters.<br>Ensure that field command post is established outside inner perimeter and potential line of fire.<br>Assign sufficient personnel to maintain outer perimeter.<br>Have duty inspector and patrol borough commander or duty chief notified to respond in verified hostage or barricade situation. |
| **EMERGENCY**<br>**SERVICE UNIT**<br>**SUPERVISOR** | 22.<br>23. | Ensure that a clearly delineated inner perimeter has been established.<br>Ensure that only properly equipped and designated personnel enter the inner perimeter. |
| **PATROL**<br>**BOROUGH**<br>**COMMANDER/**<br>**DUTY**<br>**INSPECTOR/**<br>**DUTY CAPTAIN** | 24.<br><br>25.<br><br><br>26.<br>27. | Assume overall command and ascertain that the outer perimeter and inner perimeter have been established.<br>Ensure through the communications dispatcher that H.N.T. (with coordinator) and T.A.R.U. are enroute to or are already present at the incident scene and if not, then request their immediate response.<br>Ensure that detective borough commander is notified.<br>Attempt to establish contact with the person holding hostages or the barricaded person, pending arrival of hostage negotiator(s).<br>   a.    Determine who may speak to hostage taker or barricaded person. |
| **HOSTAGE**<br>**NEGOTIATION**<br>**COORDINATOR** | 28.<br>29. | Report to ranking patrol duty incident commander present.<br>Commence hostage/barricaded persons procedures. |

| | |
|---|---|
| *ADDITIONAL*<br>*DATA* | *Although the primary goals in a developing hostage situation are to isolate and contain the subject, the safety of the hostage, and of all persons present, is the overriding concern. The Communications Section must be kept apprised of the situation as it develops so that information can be relayed to personnel at the scene as well as others who may be responding. It is impossible to create a set of guidelines which will cover all potential hostage situations. These basic guidelines must be tailored to the situation at hand. However, in any hostage situation, there are three constants:* |

   *a.    When there is time to negotiate, all the time necessary to ensure the safety of all concerned will be used*
   *b.    Deadly physical force will be used only as a last resort to protect the life of persons present*
   *c.    The overriding goal is the safe release of the hostage.*

*Uniformed members of the service are reminded that, although the New York State Penal Law and Department procedures may authorize the use of deadly physical force in a given situation, they will not be subject to criticism or disciplinary action for choosing not to discharge their weapons. Hostage-takers often maintain close physical proximity to their hostage(s). For that reason, uniformed members of the service must be especially aware of the risk involved in attempting to shoot a small, moving target, and the possibility of further jeopardizing the safety of the hostage.*

# NEW • YORK • CITY • POLICE • DEPARTMENT

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-38 | 02/25/11 | 11-01 | 5 of 5 |

**ADDITIONAL DATA (continued)**
*In addition to the above, uniformed members of the service in the ranks of captain and above will be cognizant of the provisions of the Department tactical manual entitled, "Hostage Negotiations - Organizational and Tactical Guide."*

**RELATED PROCEDURES**
*Mentally Ill or Emotionally Disturbed Persons (P.G. 216-05)*
*Metal Health Removal Orders (P.G. 216-06)*
*Citywide Incident Management System (P.G. 220 Series)*
*Emergency Incidents (P.G. 213-02)*
*Rapid Mobilization (P.G. 213-03)*
*Unusual Occurrence Reports (P.G. 212-09)*
*Evictions, Repossessions, and Other Civil Process (P.G. 214-13)*
*Unlawful Evictions (P.G. 214-12)*
*Bomb Threats/Unattended Articles - Suspected/Reported Explosive Devices and Post Explosion Bomb Scenes (P.G. 212-40)*

**NEW • YORK • CITY • POLICE • DEPARTMENT**