# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

KENNETH CHAMBERLAIN, JR., AS THE
ADMINISTRATOR OF THE ESTATE OF
KENNETH CHAMBERLAIN, SR.,

                    Plaintiff,

        vs.

CITY OF WHITE PLAINS; WHITE PLAINS
HOUSING AUTHORITY;  P.O. ANTHONY
CARELLI; P.O. STEVEN HART; P.O. MAURICE
LOVE; P.O. STEVEN DEMCHUK; P.O. MAREK
MARKOWSKI; SERGEANT STEPHEN
FOTTRELL; SARGEANT KEITH MARTIN; and
LIEUTENANT JAMES SPENCER,

                    Defendants.

Civil Action No. 12 CV 5412 (CS)

## PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT

NEWMAN FERRARA LLP
*Counsel for Plaintiff*
Randolph M. McLaughlin
Debra S. Cohen
Jeffrey M. Norton
1250 Broadway, 27th Floor
New York, New York 10001
Tel: 212-619-5400
Fax: 212-619-3090

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

ARGUMENT ...................................................................................................................... 19

I. PLAINTIFF'S AMENDED COMPLAINT ALLEGES SUFFICIENT FACTUAL DETAIL TO PLAUSIBLY STATE CLAIMS FOR RELIEF ..................................................................... 19

II. PLAINTIFF'S FIRST CAUSE OF ACTION FOR VIOLATION OF CONSTITUTIONAL RIGHTS HAS BEEN PLEADED SUFFICIENTLY TO PLAUSIBLY STATE A CLAIM FOR RELIEF ......................................................................................................................... 20

    A. Plaintiff Sufficiently Alleges the Direct Participation of Each Individual Defendant in the Violation of Mr. Chamberlain Sr.'s Constitutional Rights ................................................ 20

    B. The City Defendants, Carelli, and Hart Are Not Entitled To Qualified Immunity ........... 22

    C. Defendants' Unreasonable Entry Violated Mr. Chamberlain Sr.'s Constitutional Rights . 24

III. PLAINTIFF'S §1983 CONSPIRACY CLAIMS ARE SUFFICIENTLY PLEADED ............. 26

IV. PLAINTIFF HAS SUFFICIENTLY PLEADED A MONELL CLAIM AGAINST THE CITY OF WHITE PLAINS AND WHITE PLAINS HOUSING AUTHORITY ................. 33

    A. Plaintiff Sufficiently Pleaded The Municipal Liability Of White Plains ...................... 33

    B. Plaintiff Sufficiently Pleaded The Municipal Liability Of The White Plains Housing Authority ........................................................................................................................... 38

V. PLAINTIFF HAS SUFFICIENTLY PLEADED A SUPERVISORY LIABILITY CLAIM AGAINST DEFENDANTS SPENCER, MARTIN, AND FOTRELL ................................. 46

VI. PLAINTIFF HAS SUFFICIENTLY PLEADED HIS STATE LAW CLAIMS ...................... 50

VII. PLAINTIFF HAS SUFFICIENTLY PLEADED ASSAULT AND BATTERY AND CLAIMS AGAINST THE INDIVIDUAL CITY DEFENDANTS ....................................... 51

VIII. THE ASSAULT CLAIMS AGAINST THE CITY OF WHITE PLAINS ARE PLAUSIBLY PLEAD ........................................................................................................ 52

IX. PLAINTIFF IS PERMITTED TO ASSERT ALTERNATIVE CAUSES OF ACTION .......... 53

X. PLAINTIFF'S WRONGFUL DEATH AND CONSCIOUS PAIN AND SUFFERING CLAIMS ARE SUFFICIENTLY PLEADED ....................................................................... 54

XI. PLAINTIF'S STATE LAW CLAIMS AGAINST WHITE PLAINS HOUSING
    AUTHORITY SHOULD NOT BE DISMISSED...................................................................56

    A.  Supplemental Jurisdiction .....................................................................................56

    B.  Negligence .............................................................................................................56

    C.  Conscious Pain & Suffering ..................................................................................57

CONCLUSION.......................................................................................................................59

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page**

*Adler v. Pataki,*
185 F.3d 35 (2d Cir. 1999).................................................................54

*Alvarez v. City of New York,*
11 Civ. 5464 (LAK), 2012 WL 6212612 (S.D.N.Y. 2012) ..........................28

*Amnesty Am. v. Town of W. Hartford*,
361 F.3d 113 (2d Cir. 2004)................................................................20

*Anderson v. Branen*,
17 F.3d 552 (2d Cir. 1994)..................................................................31

*Anthony v. City of New York,*
339 F.3d 129 (2d Cir. 2003)............................................................25, 26

*Arista Records, LLC v. Doe 3,*
604 F.3d 110 (2d Cir. 2010)................................................................19

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)..........................................................................19

*Beal v. City of New York*,
92 Civ. 0718 (KMW), 1994 WL 163954 (S.D.N.Y. Apr. 22, 1994).............31, 32

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)..........................................................................19

*Bernhard v. Dutchess Cmty. Coll.*,
80 Civ. 4871, 1982 WL 193 (S.D.N.Y. Feb. 19, 1982).............................50

*Black Spotted Horse v. Else,*
767 F.2d 516 (8th Cir. 1985) ..............................................................32

*Board of Regents of State Colleges v. Roth,*
408 U.S. 564 (1972)..........................................................................45

*Bouche v. City of Mount Vernon,*
11 Civ. 5246 (SAS), 2012 WL 987592 (S.D.N.Y. Mar. 23, 2012) ...............40

*Brandon v. City of New York,*
705 F. Supp. 2d 261, 267 (S.D.N.Y. 2010) ........................................14, 53

*Bristol v. Queens County,*
CV 09-5544 (JFB)(AKT), 2013 WL 1121264 (E.D.N.Y. 2013) ................................30

*Burton v. Livingston,*
791 F.2d 97 (8th Cir. 1986) ................................................................32

*Caruolo v. John Crane, Inc.,*
226 F.3d 46 (2d. Cir. 2000)................................................................42

*Chin v. N.Y.C. Hous. Auth.,*
575 F. Supp. 2d 554 (S.D.N.Y. 2008) ................................................39

*City of Canton, Ohio v. Harris,*
489 U.S. 378 (1989)................................................34, 35, 36, 38, 39, 42, 43

*City of Okla. City v. Tuttle,*
471 U.S. 808 (1985)................................................................39, 42, 43

*Crespo v. N.Y.C Police Comm'r,*
930 F. Supp. 109 (S.D.N.Y. 1996)................................................27, 28

*Derdiarian v. Felix Contracting Corp.,*
434 N.Y.S.2d 166 (N.Y. 1980) ................................................56, 57

*Dineen ex rel. Dineen v. Stramka,*
228 F. Supp. 2d 447 (S.D.N.Y. 2002)................................................53

*Farrell Family Ventures, LLC v. Sekas & Assocs., LLC,*
863 F. Supp. 2d 324 (S.D.N.Y. 2012)................................................42

*Ferran v. Town of Nassau,*
11 F.3d 21 (2d Cir. 1993), *cert. denied*, 513 U.S. 1014 (1994)................................27

*Finnigan v. Lasher,*
935 N.Y.S.2d 669 (3d Dep't 2011)................................................58

*Garcia v. Bloomberg,*
865 F. Supp. 2d 478 (S.D.N.Y. 2012)................................................37

*Greenidge v. HRH Constr. Corp.,*
720 N.Y.S.2d 46 (1st Dep't 2001) ................................................21, 55

*Green v. Maraio,*
722 F.2d 1013 (2d Cir. 1983)................................................23

*Guzman v. United States,*

11 Civ. 5834 (JPO), 2013 WL 543343 (S.D.N.Y. Feb. 14, 2013)............................................37, 39

*Hampton v. Hanrahan,*
600 F.2d 600, 620-24, (7th Cir. 1979), *cert. granted in part, judgment rev'd in part on other
    grounds,* 446 U.S. 754 (1980)..........................................................................................27

*Hand v. Stray Haven Humane Soc'y,*
799 N.Y.S.2d 628 (3d Dep't 2005)......................................................................................57

*Henry v. Daytop Vill., Inc.,*
 42 F.3d 89 (2d Cir. 1994)...................................................................................................54

*Hill v. Edmonds*,
270 N.Y.S.2d 1020 (2d Dep't 1966)..............................................................................21, 56

*Hill v. City of New York*,
03 Civ. 1283 (ARR), 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005) ...................................28, 29

*Jean-Laurent v. Wilkerson,*
438 F. Supp. 2d 318, 327 (S.D.N.Y. 2006) *aff'd,* 461 F. App'x 18 (2d Cir. 2012)......................31

*Jones v. Simeone,*
492 N.Y.S.2d 270 (4th Dep't 1985)......................................................................................57

*Lamitie v. Emerson Elec. Co. White Rodgers Div.*,
660 N.Y.S.2d 209 (3d Dep't 1997)......................................................................................21

*Lawrence v. Texas,*
539 U.S. 558, 562 (2003)...................................................................................................26

*Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,*
507 U.S. 163 (1993)...........................................................................................................39

*Lewis v. Havernack,*
CV–0031 (GLS/DEP), 2013 WL 1294606 (S.D.N.Y. 2013)  ....................................................28

*Malay v. City of Syracuse*,
638 F. Supp. 2d 303 (N.D.N.Y. 2009)..................................................................................19

*Maltz v. Union Carbide Chemicals & Plastics Co., Inc.*,
992 F. Supp. 286, 310 (S.D.N.Y. 1998) ...............................................................................52

*McKinnon v. Patterson,*
568 F.2d 930 (2d Cir. 1977)................................................................................................20

*Milosevic v. O'Donnell,*

934 N.Y.S.2d 375 (1st Dep't 2011) ..................................................................53

*Miro v. City of New York*,
95 Civ. 4331 (TPG), 2002 WL 1163580 (S.D.N.Y. June 3, 2002) ...........................32

*Monge v. City of New York Dept. of Soc. Services*,
95 A.D.2d 848, 849 (2nd Dep't 1983) .................................................................50

*Monroe v. Pape*,
365 U.S. 167 (1961)...........................................................................................21

*O'Neill v. Krzeminski*,
839 F.2d 9 (2d Cir. 1988) ..................................................................................31

*Pangburn v. Culbertson*,
200 F.3d 65 (2d Cir. 1999).................................................................................27

*Park W. Mgmt. Corp. v. Mitchell*,
391 N.E.2d 1288 (N.Y. 1979)........................................................................46, 56

*Parsons v. Honeywell, Inc.*,
929 F.2d 901 (2d Cir. 1991)...............................................................................57

*Paulin v. Figlia*,
11 CV 9634 (VB), 2013 WL 120167 (S.D.N.Y. Jan. 10, 2013)...............................23

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986)...............................................................................38, 39, 41

*People v. Guins*,
569 N.Y.S.2d 541 (4th Dep't 1991)......................................................................25

*People v. James*,
2001 N.Y. Misc. LEXIS 392 (Sup. Ct. Bronx Co. May 21, 2001)............................26

*People v. Rossi*,
952 N.Y.S.2d 285 (2d Dep't 2012)......................................................................26

*Perry v. Cnty. of Westchester*,
09 Civ. 9391 (NRB), 2011 WL 5978544 (S.D.N.Y. Nov. 29, 2011) ..........................32

*Posr v. Doherty*,
944 F.2d 91 (2d Cir. 1991).................................................................................52

*Provost v. City of Newburgh*,
262 F.3d 146 (2d Cir. 2001).........................................................................20, 46

*Ramos v. Shah,*
740 N.Y.S.2d 376 (2d Dep't 2002)......................................................................57

*Rheingold v. Harrison Town Police Dep't,*
568 F. Supp. 2d 384 (S.D.N.Y. 2008).................................................................31

*Rounseville v. Zahl,*
13 F.3d 625 (2d Cir. 1994)..................................................................................27

*Sales v. N.Y.C. Transit Auth.,*
08 Civ. 3420, 2011 U.S. Dist. LEXIS 99048, 2011 WL 4000988 (S.D.N.Y. Aug. 26, 2011)......28

*Sinisgallo v. Town of Islip Hous. Auth.,*
865 F. Supp. 2d 307 (E.D.N.Y. 2012) ...............................................................45

*Sweeney v. City of New York,*
125 N.E. 243 (N.Y. 1919)...................................................................................50

*Taylor v. Vt. Dep't of Educ.,*
313 F.3d 768 (2d Cir. 2002)...............................................................................23

*Torres v. Vill. of Sleepy Hollow,*
379 F. Supp. 2d 478 (S.D.N.Y. 2005).................................................................23

*Tyrell v. Seaford Union Free Sch. Dist.,*
CV-08-4811 (SJF)(MLO), 2010 WL 1198055 (E.D.N.Y. Mar. 25, 2010) .................................50

*United Mine Workers of Am. v. Gibbs,*
383 U.S. 715 (1966)...........................................................................................56

*V.E.C. Corp. of Del. v. Hilliard,*
10 CV 2542 (VB), 2011 WL 7101236 (S.D.N.Y. Dec. 13, 2011)................................................19

*Vladamis v. Kiernan,*
837 F. Supp.2d 131, 157 (E.D.N.Y. 2011)) ........................................................30

*Wade v. Fisk,*
575 N.Y.S.2d 394 (3rd Dep't 1991) ...................................................................32

*Walker v. City of New York,*
974 F.2d 293 (2d Cir. 1992)...............................................................................35

*Westchester Cnty. v. Welton Becket Assocs.,*
478 N.Y.S.2d 305 (2d Dep't 1984)......................................................................21

*Wilson v. Town of Mendon,*
294 F.3d 1 (1st Cir. 2002)...................................................................................20

*Wims v. N.Y.C. Police Dep't,*
10 Civ. 6128 PKC, 2011 WL 2946369 (S.D.N.Y. July 20, 2011)................................32

*Yang Feng Zhao v. City of New York,*
656 F. Supp. 2d 375 (S.D.N.Y. 2009)................................................................50, 51

## STATUTES

28 U.S.C. § 1367.................................................................................................56

42 U.S.C. § 1983...................................................................................... *passim*

42 U.S.C. §1985...........................................................................................27, 28

New York General Municipal Law § 50-e ............................................................16

New York General Municipal Law § 50-e(6)........................................................50

Fed. R. Civ. P. 8(e)(2) .......................................................................................54

## **PRELIMINARY STATEMENT**

Kenneth Chamberlain, Jr., as the Administrator of the Estate of Kenneth Chamberlain, Sr. ("Plaintiff"), respectfully submits this Omnibus Memorandum of Law in Opposition to the Motions to Dismiss of Defendants: City of White Plains ("White Plains" or the "City"), Maurice Love ("Love"), Steven Demchuk ("Demchuk"), Marek Markowski ("Markowski"), Stephen Fottrell ("Fottrell"), Keith Martin ("Martin"), James Spencer ("Spencer") (collectively, "City Defendants"); and Anthony Carelli ("Carelli"), Steven Hart ("Hart"), and the White Plains Housing Authority ("WPHA").

The arguments of the Defendants can be reduced to the following proposition: When police officers respond to a home-monitored medical alert, engaged accidentally by an individuall who neither needed nor requested medical assistance, and where that alert is shortly thereafter cancelled by the monitoring company and the individual indicates his desire to be left alone and refuses to open his door, the police have license to harangue, torment, and verbally abuse the person for over one hour and to the point of delusion, use racial slurs and refuse to allow him access to his family, and then force his door open (with a key unlawfully provided by the landlord), Taser him, shoot him with a bean bag loaded shotgun, and then shoot him to death with a handgun, all in an effort to "render aid." Surely, such cannot be the state of the law. The Fourth and Fourteenth Amendment stand as bulwarks against such a gross abuse of power by municipal agents. Consequently, this Court should reject the Defendants' unjustified and meritless arguments and compel them to explain their actions through the crucible of discovery and trial.

## STATEMENT OF FACTS

### The Siege of Kenneth Chamberlain Sr.'s Home

On November 19, 2011, at approximately 5:00 a.m., 68 year old Marine Corps veteran Kenneth Chamberlain, Sr. was in his apartment at 135 S. Lexington Avenue in White Plains, New York, when his medical aid device triggered accidentally. Amended Complaint ("AC") ¶10. Due to Mr. Chamberlain, Sr.'s health problems, the medical aid device was provided to Mr. Chamberlain, Sr., and monitored 24 hours a day, by Life Aid, a home medical monitoring company. AC ¶11. Life Aid attempted unsuccessfully to contact Mr. Chamberlain, Sr. via a two way communication device that immediately began recording communications to and from his apartment. AC ¶12. When Mr. Chamberlain, Sr. did not respond to the Life Aid operator's queries, Life Aid contacted the White Plains Department of Public Safety ("WPDPS"), which directs and controls White Plains' police, firefighters, emergency technicians, and emergency service unit personnel. AC ¶13.

At approximately 5:05 a.m., Police Officer Cianci received the call from Life Aid and forwarded the call to Police Officer Battaglia ("Battaglia"), who was assigned to the radio dispatch console in the communications room of the WPDPS. AC ¶14. Upon receiving the call, Battaglia dispatched an ambulance to the scene along with Defendant Love's patrol car. AC ¶15.

After dispatching Love and the ambulance, Battaglia conducted a computer history check of Mr. Chamberlain, Sr. and his home location, from which he determined that there had been several emotionally disturbed persons ("EDP") calls involving Mr. Chamberlain, Sr. AC ¶16. Specifically, Battaglia learned that on June 5, 2011, officers had been dispatched to Mr. Chamberlain, Sr.'s apartment for a welfare check involving an EDP at the location. *Id.* With this information, Battaglia downgraded the ambulance call response, dispatched Defendants

Markowski and Martin to the scene, and advised all units there had been several previous EDP calls at the location. *Id.*

Defendant Fottrell, who was aware that an EDP had activated his Life Alert system and was refusing entry to officers and paramedics, was at headquarters when Defendant Spencer received a call from Defendant Martin who requested tactical officers to respond to the scene. AC ¶17.   Defendant Spencer directed Defendants Fottrell and Demchuk to respond to the scene with their tactical gear. *Id.*   Prior to departing headquarters together, Defendant Fottrell retrieved an orange shotgun and loaded it with five bean bag rounds, and Defendant Demchuk retrieved a plastic riot shield. AC ¶18.   Defendant Spencer further ordered Defendants Carelli and Hart to respond, with tactical gear, to Mr. Chamberlain, Sr.'s home because they had a master key to the Winbrook Housing apartments, where Mr. Chamberlain, Sr. resided. AC ¶19. Defendant WPHA, without the residents' knowledge or permission, had provided to the Neighborhood Conditions Unit ("NCU"), a unit of the WPDPS, a master key affording them access to all of the apartments in the Winbrook Houses, including Mr. Chamberlain Sr.'s apartment. AC ¶25.   Defendants Fottrell, Carelli and Hart were members NCU.[1] AC ¶¶23, 102.  The NCU is a tactical unit of the White Plains Police Department assigned to patrol the commercial district along Mamaroneck Avenue, where several bars and restaurants are located, and the Winbrook Houses, a residential property operated by Defendant WPHA, where Mr. Chamberlain Sr. resided. AC ¶24.

At the scene, Defendants Fottrell and Martin were the supervisory officers. AC ¶22.  At headquarters, Defendant Spencer was the highest ranking officer on duty, who, upon information

---

[1] At or about the time of the incident involving Mr. Chamberlain, Defendants Fottrell, Carelli, and Hart, respectively had federal civil rights lawsuits filed against him wherein it was alleged that each had, *inter alia*, used excessive force, racial or ethnic slurs, and engaged in other deprivations of the constitutional rights of African-Americans, Latinos, and other minority group members while working under color of law as a member of the NCU. AC ¶103.

and belief never came to the scene. *Id.* At the scene, the officers wore tactical gear and had the following tactical instruments: bean bag shot gun, riot police shield, halligan tool, axe, Taser, handguns, and pepper spray. AC ¶21. Defendant Martin advised Defendant Fottrell that Mr. Chamberlain Sr. was in his sixties. AC ¶20.

Immediately after the police officers arrived at Mr. Chamberlain, Sr.'s home, they began banging loudly on his door and ordering him to let them in. AC ¶26. Mr. Chamberlain, Sr. told the officers, through the door, that he did not call them and that he was okay. AC ¶27. Nevertheless, the police officers continued to bang on his door, insisting he open it. AC ¶28.

Throughout Mr. Chamberlain Sr.'s interaction with the Defendant officers, the Life Aid operators, through the two-way communication device in the apartment, could hear the loud banging of the officers and Mr. Chamberlain Sr.'s expressions of reluctance to open the door. AC ¶29. The Life Aid operators told Mr. Chamberlain that if the officers could tell that he was okay they would go away. AC ¶30. In response, Mr. Chamberlain, Sr. continued to speak to both the Life Aid operators and the police officers, without opening his door, insisting that he was okay and not in need of assistance. AC ¶31.

On the Life Aid recording of the conversation with Mr. Chamberlain, Sr., he told them that he needed help and that the White Plains Police Department was banging on his door, that he did not call them, and that he was not sick. Exhibit A, p. 4, Clip 201; a copy of Plaintiff's transcript of the Life Aid recording is attached as Exhibit A and copy of Plaintiff's transcript of the Taser recording is attached as Exhibit B to the Declaration of Randolph M. McLaughlin ("McLaughlin Decl."), submitted herewith. During the initial interaction with the police officers, Mr. Chamberlain, Sr. continually told Defendant Martin, who was at Mr. Chamberlain, Sr.'s door, that he was fine, that he did not call them, that he would not open the door, and expressed

his fear of the officers. Exhibit A, p. 4-6, Clip 202.

To this point, Mr. Chamberlain, Sr. remained in his home, his door remained closed, and he was not a danger to himself or the officers. AC ¶32. The Life Aid operator, reassured by Mr. Chamberlain, Sr. that he was not in need of assistance, attempted to cancel the medical aid call with the WPDPS dispatcher, Officer Cianci. AC ¶33; Exhibit A, p. 7, Clip 203. The operator advised Cianci that she could hear the officers banging on Mr. Chamberlain, Sr.'s door. Exhibit A, p. 7, Clip 203. However, Cianci advised Life Aid that the officers had a key and were going to open the door. *Id.* Despite Mr. Chamberlain, Sr.'s and Life Aid's attempts to cancel the medical aid call, the police continued relentlessly in their attempts to forcibly gain entry to the apartment. AC ¶¶ 33-4.

When Life Aid's attempt to cancel the initial call failed, Life Aid, using Mr. Chamberlain, Sr.'s emergency contact list, called his sister who advised Life Aid that Tonyia Greenhill, Mr. Chamberlain, Sr.'s niece, lived in the same apartment building. AC ¶35. Ms. Greenhill arrived on the scene but her pleas that officers allow her to speak with her frightened uncle were denied. AC ¶¶36, 37.

During the time that the police were outside Mr. Chamberlain, Sr.'s home, they continued to bang loudly on his door and on an outside window, cursed at him, and continued to speak to him loudly, threateningly, disrespectfully, and mockingly. AC ¶39. At least one officer, Defendant Hart, taunted Mr. Chamberlain, Sr. with a racial slur. *Id.* Defendant Hart, ordered by the sergeants to go to Mr. Chamberlain, Sr.'s window to "distract" him, stood outside of Mr. Chamberlain, Sr.'s first floor apartment and called him a "nigger." AC ¶40. On the Life Aid recording an unknown officer is recorded saying the following: "I don't give a fuck, nigger." Exhibit A, p. 31, Clip 209. Throughout the encounter with the police, the Life Aid recordings

document Mr. Chamberlain, Sr.'s growing fear, agitation, and disorientation as the onslaught continued and escalated for over one hour. AC ¶38.

In the officers' attempts to enter Mr. Chamberlain, Sr.'s home, Defendant Martin and/or Defendant Hart unlocked Mr. Chamberlain, Sr.'s door with the master key provided by Defendant WPHA to the NCU, but a safety lock prevented the door from being fully opened. AC ¶41.  However, the door opened sufficiently for the officers to confirm that Mr. Chamberlain, Sr. was not in need of medical assistance. *Id.*  Despite this visual confirmation, Defendant Martin proceeded to wedge a halligan tool into the partially open door, widening the opening, made accessible with the key, and kicking the door several times, to prevent Mr. Chamberlain, Sr. from closing it. AC ¶42.  Defendant Fottrell was then able to order Defendant Carelli to remove the slap lock on the door with a bolt cutter. *Id.*  After over one hour of the police unsuccessfully attempting to gain entry into the apartment, Defendant Demchuk was ordered to violently breach Mr. Chamberlain, Sr.'s door, assisted by Defendant Love. *Id.*

As the officers forced his door open fully, Mr. Chamberlain, Sr. communicated to the Life Aid operators that he was in fear for his life and that he had observed several officers outside his door, with shotguns and handguns drawn. AC ¶44.  The Life Aid recordings clearly indicate that as the incident progressed and escalated, so did Mr. Chamberlain, Sr.'s fear and agitation, culminating to the point where he suffered delusions and hallucinations. AC ¶45.  Mr. Chamberlain, Sr. called out to God to protect him and begged Life Aid to continue recording because he believed the police were going to kill him. *Id.*  Mr. Chamberlain, Sr. warned that they should leave his door alone and not enter his apartment, clearly indicating to the police that he believed they were going to kill him, that they had kidnapped his wife and raped his daughter. AC ¶46.  He repeatedly expressed the belief that the officers were there to hurt him and he

needed to protect himself. AC ¶47.  Mr. Chamberlain, Sr. repeatedly begged the officers to stop their actions, expressing fear that the police officers were going to take him to White Plains police headquarters, beat him and kill him. AC ¶48.

After the door had been removed from its hinges and the slap lock cut, Defendants Demchuk, Martin, and Fottrell pushed the door several times, and Mr. Chamberlain, Sr. was struck by the door with each push. AC ¶43.  Once the door was down, Mr. Chamberlain, Sr. was exposed to the full view of officers. *Id.*  As the door fell open, a camera on a Taser being held by Defendant Fottrell recorded Mr. Chamberlain, Sr. standing approximately six to eight feet away from the doorway wearing only a pair of boxer shorts. AC ¶49.

Defendant Fottrell stood in the doorway and prepared to discharge his Taser at Mr. Chamberlain, Sr., who at all times remained in his apartment.  AC ¶50.  Prior to the discharge of the Taser, Defendants Carelli and Hart stood in the hallway with their guns drawn and Defendant Demchuk retrieved the police shield in anticipation of entry. AC ¶51.

The plan, to the extent that there was one, was for Defendant Fottrell to use the Taser to knock Mr. Chamberlain, Sr. down and to use the shield to disarm him. *Id.*  At no time did Defendants Fottrell or Martin or any supervisory officer, consider using pepper spray to distract Mr. Chamberlain, Sr., or the shield to immobilize Mr. Chamberlain, Sr., instead of the electrical charge from the Taser. *Id.*  No tactical plan was devised to use the shield, batons, or a combination thereof to attempt to disarm or contain Mr. Chamberlain, Sr. once the door was down. *Id.*

Defendant Fottrell discharged the Taser, but did so in a negligent manner, whereby both electrical prongs did not enter Mr. Chamberlain, Sr.'s body. AC ¶52. Mr. Chamberlain, Sr.'s flesh was severely burned and electric shocks were repeatedly sent throughout his body; video

7

from the Taser recorded its tortious and torturous effects on Mr. Chamberlain, Sr. AC ¶¶53, 54. After the improper use of the Taser by Defendant Fottrell failed to fell Mr. Chamberlain, Sr., Defendant Martin grabbed a shotgun being held by Defendant Markowski that contained bean bag ammunition. AC ¶55.

Prior to entering the apartment, Defendant Martin, while he stood in the hallway, fired several bean bag shots at Mr. Chamberlain, Sr. that struck his thigh and his chest. AC ¶56.  After the bean bags were deployed, Mr. Chamberlain, Sr. went down, but there was no effort to contain him using the shield, batons, or proportional physical force. *Id.*

Immediately after the bean bag shots, Defendant Carelli discharged his handgun twice and fatally injured Mr. Chamberlain, Sr. AC ¶57.  *After* the gunshots were fired, Defendants Martin, Fottrell, Carelli and Demchuk entered the apartment. *Id.*  Defendant Demchuk grabbed Mr. Chamberlain, Sr.'s feet and dragged him into the hallway. AC ¶58.

At no time was the manner and/or degree of force used by the officers justified by the circumstances. AC ¶63. At no time did Mr. Chamberlain, Sr. leave his apartment or initiate contact with any of the police officers. AC ¶64.  The Defendant police officers failed to reasonably respond to Mr. Chamberlain, Sr.'s continuous expressions of fear for his safety and life, and ignored his repeated communications that he was okay and wished the officers to leave him alone, and that he feared for his safety. AC ¶¶66, 67.

At all times, the individual Defendants knew that Mr. Chamberlain, Sr. was an EDP whose Life Alert system had been activated accidentally. Nonetheless, once it became clear that their actions were causing Mr. Chamberlain, Sr. to become increasingly fearful and agitated, culminating in delusions, hallucinations and flashbacks from his military service, these Defendants took no actions to defuse and resolve the situation that their own actions had brought

8

about. AC ¶45.  Instead, the individual Defendants took actions that recklessly and unnecessarily exacerbated the situation, used excessive force that was grossly disproportionate to any threat posed by Mr. Chamberlain, Sr., and, ultimately caused Mr. Chamberlain, Sr.'s senseless death. AC ¶¶68-69.

**White Plains Police Procedures and Practices**

White Plains' policy regarding Mentally/Emotionally Disturbed Persons (PR-87) provides no guidance to police officers with respect to responding to an incident involving or interacting with an EDP.  AC ¶75; a copy of said policy was annexed to the Amended Complaint as Exhibit A.  The White Plains policy is inadequate because it only instructs officers on what is to be done when a person is brought by the Police Department to the White Plains Hospital for psychiatric evaluation. AC ¶76.  The policy fails to provide procedures for confronting an EDP, what steps should be taken to contain or restrain an EDP, or how to otherwise render aid. *Id.*

The failure to adopt an adequate policy or appropriate guidelines for officer / EDP interaction contributed in whole or in part to the circumstances of Mr. Chamberlain, Sr.'s death. AC ¶¶3, 89, 90, 93.  In stark contrast, the New York City Police Department ("NYPD") EDP policy provides a benchmark for appropriate guidelines and procedures for handling situations involving EDPs. AC ¶77; a copy of the NYPD's EDP policy was annexed as Exhibit B to the Amended Complaint.

A comparison of the White Plains and NYPD policies demonstrates the inadequacies of the White Plains EDP policy.  The NYPD policy clearly states that its purpose is to "safeguard a mentally ill or emotionally disturbed person who does not voluntarily seek medical assistance." AC ¶78.  The White Plains policy contains so such statement. *Id.*  The NYPD policy provides that if the EDP's actions do not constitute an immediate threat of serious physical injury or death

to others, police officers should attempt to isolate and contain the EDP until the arrival of a patrol supervisor or ESU unit. AC ¶79.  The White Plains policy contains no such procedure. *Id.*

The NYPD policy states that when the EDP is isolated or contained, but will not leave the premises voluntarily, the patrol supervisor is to maintain firearms control and to direct members not to use their firearms or any other deadly physical force unless their lives are in imminent danger. AC ¶80.  No such directive is contained in the White Plains policy and no such directive was given by the patrol supervisors to the officers who responded to Mr. Chamberlain, Sr.'s apartment. *Id.*

The NYPD policy dictates what where the EDP is contained, protective devices (shields) are to be deployed and the police are required to deploy non-lethal devices to ensure the safety of all present. AC ¶81.   Such non-lethal devices include the following: Taser, stun gun, water fire extinguisher, Velcro restraining straps, shields, or a shepherd's crook. *Id.*   The White Plains policy contains no such requirement or procedure. *Id.*

The NYPD policy dictates that the patrol supervisor is to request the assistance of the EDP's family or friends, or any public or private agency deemed appropriate for assistance. AC ¶82.  The White Plains policy contains no such requirement or procedure. *Id.*  In glaring contrast to the NYPD policy, when Mr. Chamberlain, Sr.'s niece pleaded with the officers to allow her to speak with her frightened uncle the officers refused her request and Mr. Chamberlain, Sr. remained isolated, alone, and afraid in his apartment. AC ¶¶35-37.  The White Plains policy, nor the Defendant officers, afforded Mr. Chamberlain, Sr.'s niece the opportunity to have potentially defused the situation before it was escalated by Defendant officers' forced entry and use of deadly force.

The NYPD policy requires that the commanding officer or duty captain should direct the

use of alternate means of restraint such as pepper spray, tear gas, baton, restraining equipment, Taser, and/or electronic stun device or stun device. AC ¶83.   The White Plains policy contains no such requirement. *Id.*   In fact, no commands were given by Lt. Spencer, who on information and belief, was the commanding officer on the night in question, to use alternate means of restraint.  In fact, the only command he gave to the officers who responded was to obtain tactical gear. AC ¶¶17, 19.  Despite the fact that the Defendant officers had pepper spray and a riot police shield at the scene, neither was used before force was applied to Mr. Chamberlain, Sr. by the improperly discharged Taser and bean bag shot gun. AC ¶51.

In addition to the complete lack of a policy or training with respect to how to handle situations involving EDPs, the White Plains policy regarding police interaction with a barricaded person also remains woefully inadequate for its failure to define terms or properly instruct officers or supervisors as to how to respond to barricaded situations. AC ¶84; a copy of the barricade policy was annexed as Exhibit C to the Amended Complaint.  In contrast, the NYPD barricaded persons policy provides adequate guidance to its officers. AC ¶85; a copy of the NYPD policy was annexed as Exhibit D to the Amended Complaint.

The NYPD policy states that "where there is time to negotiate, all the time necessary to ensure the safety of the individuals concerned will be used." AC ¶86. The White Plains policy contains no such instruction. *Id.*   In the case of the siege of Mr. Chamberlain, Sr.'s home there was no urgency that dictated that the police break in by wedging open and then removing his door.  Mr. Chamberlain, Sr. was contained and there was no indication that he was a danger to himself or others, locked in his own apartment.  It was only when the Defendant officers, using the master key they had obtained unlawfully from Defendant WPHA, and other tools they had with them, sought to forcibly open Mr. Chamberlain, Sr.'s door against his wishes that

difficulties arose, escalating to his death.

The NYPD policy states that "any action which might agitate or provoke the subject should be avoided." AC ¶87.  The White Plains policy contains no such provision. *Id.*   In the case of Mr. Chamberlain, Sr. the police engaged in numerous actions that were either designed to agitate and provoke him or predictably had that effect, including, but not limited to, using a racial slur, calling him a "grown-ass man," banging on his door for over an hour, cursing at him, and mocking his military service. AC ¶39.  Throughout the Life Aid and Taser recordings, words were spoken and actions were taken that clearly agitated Mr. Chamberlain, Sr. to the point that he began to experience delusions and hallucinations. AC ¶45.

The NYPD policy states that if the barricaded person is contained and poses no immediate threat or danger to any person, no additional action will be taken without the authorization of the precinct commander or duty captain at the scene. AC ¶88.  The White Plains policy contains no such requirement or procedure. *Id.*   In fact, the officer in charge, Lt. Spencer, never gave any instructions to his subordinates or the supervisors on the scene, other than that they should bring tactical gear. AC ¶¶74, 139.  He failed to go to the scene to ensure that no actions were taken that would endanger the lives of his officers or Mr. Chamberlain, Sr. AC ¶134.

At or about the time of the incident complained of herein, the Commissioner of Public Safety was David E. Chong, who had served for over 22 years in the NYC Police Department, and retired as Lieutenant Commander of Detectives. AC ¶89.  He had also served as the police commissioner of Mt. Vernon and the deputy commissioner of public safety in White Plains. *Id.* Given his background, and prior employment history with the NYPD, he knew or should have known of the aforementioned policies of the NYPD. *Id.*  Yet he failed to adopt or recommend the

12

adoption of policies similar to the NYPD's regarding EDPs or barricaded persons. *Id.*

As a result of the failure to adopt an adequate policy for responding to EDPs or barricaded persons, White Plains had a policy or custom of not training or properly supervising its police officers or supervisors in responding to situations involving EDPs or barricaded persons. AC ¶90. Said policies, training, and/or failure to adopt policies or to adequately train its employees aforementioned resulted in the physical and psychological torture, and killing, of Mr. Chamberlain, Sr. AC ¶93. The failure to adopt adequate policies as aforementioned or to properly train its officers regarding the appropriate manner to respond to situations involving barricaded EDPs contributed to the circumstances that led to Mr. Chamberlain, Sr.'s death. AC ¶91. The fact that White Plains had adopted an inadequate policy indicates that City officials were aware that their officers were likely to encounter situations involving EDPs and barricaded persons, but failed to adopt appropriate policies, appropriately train its officers in responding to such situations, and failed to supervise the officers who responded to Mr. Chamberlain, Sr.'s home.

**The Life Aid and Taser Recordings**

Throughout Defendants Carelli, Hart, and City Defendants' Motions and Plaintiff's Omnibus Opposition references are made to the Life Aid and Taser recordings, and the statements that they captured. At the conference held on September 13, 2012, the Court directed the parties to attempt to prepare a joint transcript of the Life Aid and Taser recordings. The Court further instructed that any disagreements should be flagged so that the transcript would indicate competing interpretations. Accordingly, Plaintiff has submitted his additions and/or corrections to the draft prepared by Defendants to the Court. *See* McLaughlin Decl. Exhibits A, B, and cover letter accompanying transcript submissions, annexed to the McLaughlin Decl. as

13

Exhibit C.  Defendants Carelli, Hart, and City Defendants respectively produced their version of the transcripts, relying on the same throughout their Motions to Dismiss.  However, each of said Defendants' transcripts omits the substance of Plaintiff's transcriptions where the Defendant does not agree.  While in the main there is agreement, there remain significant differences. Where these differences arise, and if the transcripts are incorporated by reference as Defendants allege, then Plaintiff's transcription is nonetheless entitled to the presumption of truth and all favorable inferences. *Brandon v. City of New York,* 705 F. Supp. 2d 261, 267 (S.D.N.Y. 2010) ("First, a court must accept a plaintiff's factual allegations as true and draw all reasonable inferences from those allegations in plaintiff's favor.") (*internal citations omitted*).

Said Defendants omit the following statements on the Life Aid and Taser recordings that are attributed to unknown police officers:  1. "What the fuck is going on here." (Exhibit A, p.16); 2. "…motherfucker." (*Id.*, p. 17); 3. "motherfuckers. So, . . . what the fuck." (*Id.,* p. 18); 4. (audible laughter) "What the fuck is going on here?" (*Id.,* p. 20); 5. "the fuck he's saying?" (*Id.* p.22); 6. "They're not allowed to do that" (*Id.* p.28); "I don't give a fuck, nigger." (*Id.,* p. 31). City Defendants[2] omit the following statements on the Life Aid and Taser recordings that are attributed to unknown police officers:  1. "…and that door cannot get in the way of bullshit…" (*Id.,* p. 3); 2. "I didn't come out here to sit around and do nothing." (Exhibit B, p. 4); 3. "Gonna get this fucker he comes flying out." (*Id.* at p. 8); 4. "Come on, motherfucker." (*Id.,* at p. 9).  The last statement was made after the Taser had been deployed the second time.  The use of such language demonstrates the mindset of the Defendant officers, their lack of professionalism; their frustration with the fact that Mr. Chamberlain, Sr. would not open his door, despite their orders;

---

[2] Defendant Hart does not include the Taser transcripts in the Declaration of Albert W.  Cornachio III, and Defendant Carelli includes Plaintiff's version of the Taser transcripts at Exhibit D of the Declaration of Andrew C. Quinn.

and the resultant escalation of Mr. Chamberlain's fear and agitation.

While the City Defendants, Carelli, and Hart make several references to statements attributed to police officers regarding a knife that Mr. Chamberlain, Sr. is alleged to hold at various times during the standoff, there are no allegations or statements that he, in fact, lunged at the officers, attempted to strike the officers with a knife, or used it to injure himself or others during the over one hour standoff.  Nor are there any allegations that he exited or attempted to exit his apartment with a knife at any time.

As stated in the Amended Complaint and reasonably inferred from the recordings, at all times during this tragedy, Mr. Chamberlain, Sr. remained within the confines of his apartment and never crossed the threshold. AC ¶50.  Also, as stated in the Amended Complaint and reasonably inferred from the recordings, the Taser, bean bags, and the fatal bullet were all discharged while the officers remained in the hallway. AC ¶57.  No officer entered Mr. Chamberlain, Sr.'s apartment until after he was shot with a handgun. *Id*.  In fact, if the officers reasonably believed that Mr. Chamberlain, Sr. had a knife at or about the time the door was removed, that would suggest the need for a tactical plan, using the shield, batons, or pepper spray to disarm a senior citizen with a heart condition.  Thus, as reasonably inferred from the recordings, and contrary to the arguments raised by the Defendants, Mr. Chamberlain, Sr. was contained in his apartment at all times, and police tactics or methods, other than force, could have been used to restrain him.  Instead, due to their frustration, anger, and racial animus, the officers chose to employ force, including deadly force.

**WPHA Lease**

Defendant WPHA produced a copy of Mr. Chamberlain, Sr.'s lease at Exhibit B to the

Declaration of Lance H. Klein In Support of Defendant WPHA's Motion to Dismiss, arguing that it was incorporated by reference in the Amended Complaint.  The following sections of the lease are relevant to consideration of the issues before the Court and establish a close nexus between WPHA and Defendant City of White Plains.  Section XII (3) of the lease states, "The Authority may enter the Resident's dwelling unit at any time without advance notification when there is reasonable cause to believe that an emergency exists." Section XIV of the lease states that the WPHA had a policy of "partnering with the local Department of Public Safety for neighborhood watch training and routine surveillance by uniformed and non-uniformed personnel."  However, nowhere does the lease put residents on notice that the WPDPS was provided a master key to all of the Winbrook Houses, that police officers, without warning, were authorized to open their doors and/or enter the resident's apartments, or the process and conditions under which the authority to use the master key would be exercised. AC ¶124.

**<u>Notice of Claim</u>**

Plaintiff served a timely Notice of Claim pursuant to New York General Municipal Law § 50-e upon Defendant White Plains and the White Plains Housing Authority on February 15, 2012. AC ¶94.  The Notice of Claim provided detailed information regarding the actions that the officers took at Mr. Chamberlain, Sr.'s home and was sufficient to put the officers and the City on notice of the conduct that they were alleged to have engaged in. *Id.*  The Notice was sufficiently detailed that the City had sufficient information to be able to identify the officers who were involved in the incident and to investigate same. *Id.*  In fact, the names of the officers who were involved in the incidents herein were known to the City as each had prepared a report of their actions during the incident.  Prior to the filing of the Notice of Claim, the events at Mr. Chamberlain, Sr.'s home were under investigation by the Westchester County District Attorney's

Office and the WPPD itself conducted the investigation.  The Notice of Claim did not list the names of the individual Defendants, because at the time the notice was filed the City had refused to release their names. AC ¶95.

White Plains Public Safety Commissioner David Chong did not release Officer Carelli's name to the public until April 5, 2012, the day after The Daily News' Juan Gonzalez leaked the officer's identity. *Id*.  The April 4, 2012, Daily News story identifying Carelli was the first identification provided to Mr. Chamberlain, Sr.'s family and their counsel. *Id*.  Thereafter, White Plains responded to Plaintiff's FOIL request for information on May 3, 2012, and provided information regarding the identity of the officers involved in the incident discussed herein at that time. AC ¶96.

### The Amended Complaint

Based on the foregoing facts, Plaintiff filed the Amended Complaint on or about November 21, 2012.  The first cause of action, against the individual Defendants, alleges that the actions of said Defendants constituted excessive, unreasonable and unnecessary force and unlawful entry into Mr. Chamberlain, Sr.'s home in deprivation of his constitutional rights. AC ¶¶98-100. The second cause of action alleges that the individual Defendants entered into a conspiracy to deprive Mr. Chamberlain, Sr. of his constitutional rights through use of excessive force, unlawful entry, deadly force, racial slurs, and other words designed to demean, agitate, humiliate, and cause him severe emotional distress, and to place him in fear for his life. AC ¶¶101-108.

The third cause of action alleges *Monell* claims against the City and WPHA. AC ¶¶109-127.  Specifically, it is alleged that the injuries sustained by Mr. Chamberlain, Sr. were the result of the City's adoption of inadequate policies regarding EDPs and barricaded persons and

WPHA's policy, practice, usage, or custom of providing the police a master key to the Winbrook Houses without the knowledge or consent of residents and without practices or policies regarding appropriate usage. AC ¶¶110-111, 125-126.

The fourth cause of action alleges that Defendants Fottrell, Martin and Spencer failed to properly supervise the officers at the scene. AC ¶¶128-137.  Moreover, Plaintiff alleges that Defendants Fottrell and Martin, acting as supervisors: (a) personally participated in the assaults and batteries of Mr. Chamberlain, Sr.; (b) failed to restrain their subordinates in the use of racial slurs, curses, threats and taunts; (c) failed to maintain firearm control over their subordinates; and (d) failed to take command and control their subordinates during the siege of Mr. Chamberlain, Sr.'s home. AC ¶¶130-33.  With respect to Defendant Spencer, Plaintiff alleges that he failed to: (a) supervise, monitor or control his subordinates who responded to Mr. Chamberlain, Sr.'s home; (b) properly instruct or supervise his subordinates as to the proper use of the tactical gear that he ordered them to take when the subordinates responded to Mr. Chamberlain, Sr.'s home; (c) advise his superiors as to the nature of the situation at Mr. Chamberlain, Sr.'s home or the behavior of his officers who were trying to and did forcibly enter Mr. Chamberlain, Sr.'s home. AC ¶¶134-36.  These failures contributed to the causation of the injuries aforesaid, as no one in the chain of command was apprised of the exact nature of the siege, assaults and batteries in time to prevent same. *Id.*

The remaining causes of action are for state claims: the fifth cause of action against all defendants for conscious pain and suffering (AC ¶¶138-145); the sixth cause of action against all defendants for wrongful death (AC ¶¶146-151); the seventh cause of action against the individual officers and the City for assault and battery (AC ¶¶152-158); and the ninth cause of action against all Defendants for negligence, including the City under the doctrine of *respondeat*

*superior* (AC ¶¶159-167).

## ARGUMENT

## I.   PLAINTIFF'S AMENDED COMPLAINT ALLEGES SUFFICIENT FACTUAL DETAIL TO PLAUSIBLY STATE CLAIMS FOR RELIEF

The City Defendants and Defendants Carelli and Hart contend that the Amended Complaint does not satisfy the pleading burden articulated by the United States Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). City Dfs. Mem. at 4; Carelli Mem. at 10; Hart Mem. at 5-6.   Contrary to their arguments, the function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered to support" the legal claims. *V.E.C. Corp. of Del. v. Hilliard,* 10 CV 2542 (VB), 2011 WL 7101236, *3 (S.D.N.Y. 2011) *(internal citations omitted)*.   As the *Twombly* Court itself noted "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief which is plausible on its face." 550 U.S. at 570, n.14; *accord Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) ("The notion that *Twombly* imposed a heightened standard . . . is belied by the *Twombly* opinion itself.").   Additionally, "dismissal is not appropriate when the relevant facts are solely within the possession and control of the defendants." *V.E.C. Corp. of Delaware,* 2011 WL 7101236 at *3 (citing *Arista Records, LLC,* 604 F.3d at 120).   This is especially the case with respect to a failure to train claim where "[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage, and therefore need only plead that the city's failure to train caused the constitutional violation." *Malay v. City of Syracuse*, 638 F. Supp. 2d 303, 315 (N.D.N.Y. 2009) (denying motion to dismiss a failure to train claim where "the issue of whether such a failure stems from a deliberate

or conscious choice by the City will be left to be resolved after discovery.") (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004)).

As demonstrated above, the Amended Complaint is replete with factual details sufficient, at this stage of the proceeding, to demonstrate the existence of plausible claims for relief. Plaintiff has provided detailed factual allegations regarding the actions or inactions of the individual Defendants, and the policies or lack thereof employed during the fatal standoff to sufficiently support the claims asserted against all Defendants.   Accordingly, Defendants' motions should be denied.

## II.   PLAINTIFF'S FIRST CAUSE OF ACTION FOR VIOLATION OF CONSTITUTIONAL RIGHTS HAS BEEN PLEADED SUFFICIENTLY TO PLAUSIBLY STATE A CLAIM FOR RELIEF

### A.   Plaintiff Sufficiently Alleges the Direct Participation of Each Individual Defendant in the Violation of Mr. Chamberlain Sr.'s Constitutional Rights

City Defendants and Defendant Hart contend that Plaintiff has failed to plead the participation of Love, Demchuk, Markowski, Spencer, and Hart sufficient to sustain causes of action against them under § 1983. City Dfs. Mem. at 5-6; Hart Mem. at 7.  While it is true that direct participation in the alleged deprivation is generally required (*see McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977)), the Second Circuit has cautioned that this requirement "does not foreclose the liability of a person who, with knowledge of the illegality, participates in bringing about a violation of the victim's rights but does so in a manner that might be said to be 'indirect' – such as ordering or helping others to do the unlawful acts, rather than doing them him[self]." *Provost v. City of Newburgh,* 262 F.3d 146, 154-55 (2d Cir. 2001) (cited by the City Dfs. Mem. at 5).

Alternatively, police officers may be considered joint tortfeasors, when some or all of the officers engage in constitutional violations. *See Wilson v. Town of Mendon,* 294 F.3d 1, 15 (1st

Cir. 2002) (onlooker officers and aggressor officers are essentially joint tortfeasors and may incur shared constitutional liability); *Monroe v. Pape,* 365 U.S. 167, 187 (1961) (advising courts to read §1983 against the backdrop of historical tort liability); *Hill v. Edmonds*, 270 N.Y.S.2d 1020, 1021 (2d Dep't 1966)  ("Where separate acts of negligence combine to produce directly a single injury each tortfeasor is responsible for the entire result, even though his act alone might not have caused it."); *Greenidge v. HRH Constr. Corp.*, 720 N.Y.S.2d 46, 48-49 (1st Dep't 2001) ("Principles of joint and several liability require that a party with even minimal culpability be held responsible to an innocent tort victim.").  Further, even if one defendant alleges that another is "100% responsible for the damages claimed . . . [a]n injured party is free to seek a 100% recovery against any individual wrongdoer among joint wrongdoers." *Westchester Cnty. v. Welton Becket Assocs.*, 478 N.Y.S.2d 305, 315 (2d Dep't 1984).  And, if there is uncertainty as to which defendant ultimately caused the injury, "the burden is upon each defendant to prove that it did not cause the harm [otherwise] each are jointly and severally liable." *Lamitie v. Emerson Elec. Co. White Rodgers Div.*, 660 N.Y.S.2d 209, 211 (3d Dep't 1997).

Contrary to the contention of the said Defendants, the Amended Complaint provides sufficient factual detail to demonstrate the existence of a plausible claim against Defendants Love, Demchuk, Markowski, Hart, and Spencer under either the direct participation or joint tortfeasor theories of liability.   With respect to Defendants Love, Demchuk, Hart, and Markowski, each of them was at the scene and directly participated in the constitutional deprivations alleged in the Amended Complaint.  The Amended Complaint alleged that Hart and Carelli went to Mr. Chamberlain, Sr.'s apartment with a master key and either Martin and/or Hart used the key to open the door. AC ¶41.   Hart is also alleged to have called Mr. Chamberlain, Sr. a "nigger" as a police tactic to distract him. AC ¶¶19, 40, 41.   It was alleged

that Love assisted in the removal of Mr. Chamberlain, Sr.'s door and that Demchuk was ordered to violently breach Mr. Chamberlain, Sr.'s door. AC ¶42.   It was alleged also that Markowski held the beanbag shot gun that was used by Defendant Martin. AC ¶55.   Ultimately, all Defendant officers failed to intercede at any point in the hour long ordeal to the violations of Mr. Chamberlain, Sr.'s civil rights. AC ¶73.  The Amended Complaint also includes an allegation that the police who were present outside of Mr. Chamberlain, Sr.'s apartment, including Hart, Love, Markowski, and Demchuk, continuously banged loudly on his door, cursed at him, and continued for well over an hour, to speak to him loudly, threateningly, disrespectfully and mockingly, with at least one officer using racial slurs. AC ¶39.

Based on these facts, the Amended Complaint presents sufficient facts to state a claim for relief.  At this early stage in the proceeding, it is impossible to know the full extent of each individual officer's role in the tragedy that befell Mr. Chamberlain, Sr.  What is known is that Hart, Love, Markowski, and Demchuk were personally and directly involved.   Although discovery will reveal the extent of their individual involvement, at this juncture, Plaintiff has put forth allegations that demonstrate sufficiently that these officers were involved in the deprivation of Mr. Chamberlain, Sr.'s rights, privileges, and immunities secured by the Fourth, Fifth, and Fourteenth Amendments.[3]

### B.   The City Defendants, Carelli, and Hart Are Not Entitled To Qualified Immunity

Defendants Fottrell, Martin, Carelli, and Hart contend erroneously that they are entitled to a defense of qualified immunity. City Dfs. Mem. at 6-10; Carelli Mem. at 12; Hart Mem. at 25.  However, where, as here, a case involves allegations of wide-spread police misconduct,

---

[3] The claims asserted against Defendant Spencer will be considered *infra.* under supervisory liability.

dismissal on qualified immunity grounds is disfavored prior to discovery. *Taylor v. Vt. Dep't of Educ.,* 313 F.3d 768, 793 (2d Cir. 2002) (Whether an official's actions were objectively reasonable turns on factual questions that cannot be resolved at this stage of the proceedings.); *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir. 1983) ("Usually, the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion for failure to state a claim upon which relief can be granted."); *Paulin v. Figlia,* 11 CV 9634 (VB), 2013 WL 120167 (S.D.N.Y. Jan. 10, 2013) (Given the allegations in plaintiff's amended complaint, additional facts are required to determine whether a reasonable officer could have believed defendants were acting reasonably); *Torres v. Vill. of Sleepy Hollow,* 379 F. Supp. 2d 478, 483 (S.D.N.Y. 2005) ("At this early stage of a lawsuit, before discovery takes place, we are presuming that the plaintiff's version of event is true, so a court cannot take into account assertions by the accused officer that contradict the plaintiff's allegations.").

In *Torres,* this Court provided an apt example of how a court should consider a motion to dismiss on qualified immunity grounds:

> [I]n this case, as is in so many others, plaintiff alleges that the defendant used excessive force against him. The right to be free from the use of more force than is reasonably necessary to effect a lawful arrest is certainly well-settled and no reasonable officer could possibly believe otherwise. Therefore, unless the facts asserted by plaintiff in the complaint . . . could never be found by a reasonable trier of fact to constitute excessive force . . . an officer accused of using excessive force will ordinarily not be able to get out of a lawsuit prior to discovery on the ground of qualified immunity. If the officer's defense is that the force he used was not excessive . . . then the officer is asserting that he did not violate plaintiff's constitutional rights, and while he may ultimately prevail on the merits, he is not entitled to dismissal of the lawsuit at an early stage.

379 F.Supp. at 483-84. Essentially, these Defendants are arguing that the force Carelli and others used was justified and not excessive and thus did not violate Mr. Chamberlain, Sr.'s

23

constitutional rights.  Following the Court's reasoning in *Torres*, however, these are factual determinations that are inappropriate for determination on the pleadings. *See id*.

The factual disputes advanced by Defendant Carelli that Mr. Chamberlain, Sr. had a knife and that that fact alone justified the degree of force that was used, are refuted by, *inter alia,* the fact that at no time did Mr. Chamberlain, Sr. attempt to use a knife to threaten the life of any officer or leave his apartment with a knife to threaten an officer.  Further, these are factual disputes.  The most that can be gleaned from recordings of the event is that Mr. Chamberlain, Sr. used a metal object to prevent the officers from removing his door. What Defendants ignore, however, is that despite there being no real emergency at all, they engaged in an over hour-long siege of Mr. Chamberlain, Sr.'s home, tormenting and emotionally torturing him relentlessly, creating the very situation they argue justified their killing of Mr. Chamberlain, Sr. AC ¶¶38, 39.

Defendant Fottrell suggests that Plaintiff's claim that Fottrell used the Taser negligently establishes that no §1983 claim can be had.  City Dfs. Mem. at 9.  However, Defendant Fottrell mischaracterizes the nature of the claim.  It was not his negligence in discharging the Taser but rather his unnecessary infliction of pain by sending repeated charges into Mr. Chamberlain, Sr., after knowing he had negligently fired the weapon. AC ¶53. Indeed, the Taser video shows Fottrell repeatedly discharging the Taser, causing numerous electrical charges to be sent through Mr. Chamberlain, Sr.'s body, causing his flesh to be severely burned. AC ¶¶52-54.

Clearly, these highly disputed questions of fact underscore the inappropriateness of dismissal at this stage on qualified immunity grounds.

### C.   Defendants' Unreasonable Entry Violated Mr. Chamberlain, Sr.'s Constitutional Rights

The City Defendants, Carelli, and Hart argue that Plaintiff's claim for unlawful entry into Mr. Chamberlain, Sr.'s apartment should be dismissed because the police can enter a home

without a warrant where there are indications that the person could harm himself or others. City Dfs. Mem. at 10; Carelli Mem. at 15; Hart Mem. at 7.   As previously addressed and amply pleaded, each of the individual Defendants took some action that facilitated entry into Mr. Chamberlain, Sr.'s home.   However, even under the exigency exception to the warrant requirement, their arguments fail.  In *Anthony v. City of New York,* 339 F.3d 129 (2d Cir. 2003), the Court recognized that the Fourth Amendment protects individuals against unreasonable searches and seizures, but that "the warrant requirement must yield to those situations were exigent circumstances" exist. *Id.* at 135 *(citations omitted).* The *Anthony* court went on to conclude that the essential question is "whether law enforcement agents are confronted by an urgent need to render aid or take action." *Id. (internal citations omitted).*

In the instant case, the Amended Complaint alleges that Mr. Chamberlain, Sr. *accidently* triggered his Life Aid device. AC ¶¶10, 71.  Within the first approximately 15 minutes into the incident, Mr. Chamberlain, Sr. had already told the responding officers that he was alright and not in need of any assistance (AC ¶¶27, 31, 34) and the Life Aid company, who was in constant contact with Mr. Chamberlain, Sr., contacted the WPPD and cancelled the medical alert call (AC ¶¶33, 34).  While Mr. Chamberlain, Sr. did become increasingly agitated and delusional by the end of the hour-long debacle, this was by no means a situation where police were faced with an "urgent need" or exigent circumstance.  Certainly, if one creates the exigency intentionally, he cannot then claim he was confronted with it.  As the court cautioned in *People v. Guins*, 569 N.Y.S.2d 541, 543 (4th Dep't 1991), the emergency exception "must be narrowly construed because is it susceptible of abuse."  To allow the City Defendants to evade Plaintiff's claims based on their allegation of an emergency situation of their own making would be to countenance an abuse of the doctrine.

25

City Defendants rely on three cases in support of their argument that a warrantless entry was appropriate.  However, these cases do not support that conclusion in this case. *See Anthony,* 339 F.3d at 131 (Plaintiff reported "she was being attacked by a man with a knife and gun."); *People v. Rossi*, 952 N.Y.S.2d 285, 288 (2d Dep't 2012) (Police "received a 911 call regarding a shooting and had confirmed that information with a person who was outside the house."); *People v. James*, NY Slip Op 40035U, 2001 N.Y. Misc. LEXIS 392, at *11, 12 (Sup. Ct. Bronx Co. May 21, 2001) ("By dialing 911 for emergency medical aid, Ms. James impliedly consented to the subsequent entry by police" to her home.").  These cases are not only distinguishable, they are simply incomparable to a situation where there is an accidentally triggered medical alert call that was subsequently cancelled and where the purported victim has indicated clearly that he did not intend to summon the police, nor did he need or desire emergency assistance.

Finally, Defendant Carelli argues erroneously that Plaintiff's right to be free from forced entry was not clearly established. Carelli Mem. at 15.  However, this ignores completely the Fourth Amendment's guarantee to be free from unreasonable searches and seizures, and the warrant requirement, that flows therefrom, which guarantees the right to be secure in our homes. There can be no question that that right was clearly established.  *Lawrence v. Texas*, 539 U.S. 558, 562 (2003).  Plaintiff's claim is that the entry into Mr. Chamberlain, Sr.'s home was unreasonable under the Fourth Amendment.  While the emergency exception allows for warrantless entry under limited circumstances, whether such a circumstance existed is a factual question.

## III.     PLAINTIFF'S §1983 CONSPIRACY CLAIMS ARE SUFFICIENTLY PLEADED

The City Defendants, Carelli, and Hart contend that the allegations contained in the Amended Complaint are insufficient to establish, at the pleading stage, a plausible claim of a

conspiracy to violate the constitutional rights of Mr. Chamberlain, Sr. City Dfs. Mem. at 10-11;

Carelli Mem. at 20; Hart Mem. at 16.[4]  Plaintiff submits that at this early stage in the proceeding,

he has pled sufficient facts to establish the plausibility of his claims.  The Second Circuit has

recognized that civil "conspiracies are by their very nature secretive operations," *Pangburn v.*

*Culbertson,* 200 F.3d 65, 73 (2d Cir. 1999), and "may have to be proven by circumstantial, rather

than direct, evidence." *Rounseville v. Zahl,* 13 F.3d 625, 632 (2d Cir. 1994); *Crespo v. N.Y.C*

*Police Comm'r*, 930 F. Supp. 109, 118 (S.D.N.Y. 1996) (At the motion to dismiss stage, a

plaintiff usually does not have access to the facts surrounding a conspiracy claim and that

conspiracies are seldom proven with direct evidence); *see also Hampton v. Hanrahan,* 600 F.2d

600, 620-24, (7th Cir. 1979), *cert. granted in part, judgment rev'd in part on other grounds,* 446

U.S. 754 (1980) ("Absent the testimony of a coconspirator, it is unlikely that direct evidence of a

conspiratorial agreement will exist.").

Here, it is alleged in the Amended Complaint that Defendants Fottrell, Carelli, and Hart

were members of the NCU and that they had, as members of that unit, engaged in prior acts

involving members of minority groups wherein they used excessive force and racial/ethnic slurs.

AC ¶¶102-08.  It is further alleged that they, and the other individual officers at the scene,

conspired to deprive Mr. Chamberlain, Sr. of his constitutional rights. AC ¶104.  There can be no

question that the individual officers acted in concert where each officer, as alleged in the

Amended Complaint, took specific actions to aid and abet the others in the use of force and the

unlawful entry into Mr. Chamberlain, Sr.'s home, at which time, Defendant Carelli fired the fatal

---

[4] Hart makes the specious argument that Plaintiff's conspiracy claim "under 42 U.S.C. §1983 should be stated as a claim under Section 1985, which applies to conspiracies." Hart Mem. at 16.  Having constructed a straw man, Hart goes on to argue why the conspiracy alleged herein would not satisfy 42 U.S.C. §1985.  Plaintiff's conspiracy claim was pled, properly so, under §1983 and courts have recognized such a claim.  *E.g. Ferran v. Town of Nassau,* 11 F.3d 21 (2d Cir. 1993), *cert. denied,* 513 U.S. 1014 (1994).  A §1983 conspiracy does not require a class based animus as does a §1985 conspiracy.

shot.  It was alleged that these actions were taken in furtherance of the conspiracy.  At this stage, to require more of the Plaintiff, without the opportunity for discovery, would be to bar such actions from being filed.  *See Crespo,* 930 F. Supp. at 118 ("[P]laintiff usually does not have access to the facts surrounding a conspiracy claim and that conspiracies are seldom proven with direct evidence, the Court finds that the factual allegations contained in [plaintiff's] Amended Complaint are sufficient to state a claim for conspiracy under § 1983.").

### **Intracorporate Conspiracy Doctrine**

Defendants further contend that Plaintiff's 42 U.S.C. §1983 conspiracy claims involving the individual City Defendants should be dismissed under the intracorporate conspiracy doctrine, citing *Sales v. N.Y.C. Transit Auth.,* 08 Civ. 3420, 2011 U.S. Dist. LEXIS 99048 (S.D.N.Y. Aug. 26, 2011). City Defs. Mem. at 12; Carelli Mem. at 20.  Several district courts have observed that while the Second Circuit has recognized the intracorporate conspiracy doctrine in the context of 42 U.S.C. §1985, the Circuit has not yet extended the application of the doctrine to conspiracies under 42 U.S.C. §1983. *E.g., Lewis v. Havernack,* CV–0031 (GLS/DEP), 2013 WL 1294606 (S.D.N.Y. 2013); *Alvarez v. City of New York,* 11 Civ. 5464 (LAK), 2012 WL 6212612 (S.D.N.Y. 2012); *Hill v. City of New York,* 03 Civ. 1283 (ARR), 2005 WL 3591719 (S.D.N.Y. 2005).

The district courts that have considered whether the intracorporate doctrine applies to 42 U.S.C. §1983 have all recognized that the personal stake exception can be used to defeat the doctrine's applicability to a §1983 conspiracy.  *E.g., Alvarez* at *3 (Where . . . a group of defendants allegedly maintained the pretense of serving the state while in fact pursuing their own ends. . ., it is entirely consistent to conclude that they acted both under color of state law and with an independent stake barring application of the intracorporate conspiracy doctrine); *Hill* at

*6; *Lewis* at *13.  The Court in *Hill* explained that "[u]nder the 'personal stake' exception, the intracorporate conspiracy doctrine does not apply 'to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity.'" *Hill* at *6 (citations omitted). The Court further noted that the plaintiff must allege that the officers acted other than in the normal course of their corporate duties. *Id.*  The plaintiff in *Hill* alleged that a police detective conspired with other police officers to cover up the detective's alleged use of excessive force. *Id.*  In light of this allegation, the Court denied summary judgment on the conspiracy claim.

In the Amended Complaint, Plaintiff alleged that Defendants Fottrell, Carelli and Hart were members of the NCU. AC ¶102.  The Amended Complaint alleges further that at the time of the incident complained of herein, said Officers had pending separate federal civil rights lawsuits against them wherein it was alleged that they had, *inter alia*, used excessive force, racial and ethnic slurs, and engaged in other deprivations of the constitutional rights of minority group members. AC ¶114.  The Amended Complaint also alleges that Defendants Fottrell, Carelli, and Hart conspired with the other Defendant officers to deprive Mr. Chamberlain, Sr. of his constitutional rights and took actions in furtherance of said conspiracy, to wit: unlawful entry, excessive force, the use of racial slurs, and other words designed to provoke, demean, humiliate and cause him severe emotional distress and fear of impending death. AC ¶¶39-56.  Based on the foregoing, Plaintiff adequately alleges that the officers who terrorized Mr. Chamberlain, Sr. expressed personal animus and racial animus, that they engaged in separate discriminatory acts, and that their behavior and actions were part of a pattern and practice of racist policing.

Moreover, the individual Defendants, while acting under color of law, were acting out of a personal stake or interest and not the legitimate interest of the WPDPS. The Department's

interest would be to render aid to an emotionally disturbed person who may be a danger to himself.  The actions aforesaid of the officers would be contrary to that interest.  Instead of acting to defuse the situation so that aid could be rendered, if warranted, the officers engaged in a number of discrete, discriminatory actions that were designed or had the effect of exacerbating the situation such that Mr. Chamberlain, Sr. was driven to delusions and hallucinations that ultimately led to his death.  Thus, under the aforementioned precedent, the intracorporate doctrine would not bar Plaintiff's conspiracy claims against the individual Defendants.

Additionally, as discussed further in regard to the *Monell* claim against Defendant WPHA, the allegations of the Amended Complaint (particularly when considered in conjunction with the lease between the WPHA and Mr. Chamberlain, Sr., annexed as an exhibit to Defendant WPHA's motion to dismiss), a conspiracy between the WPHA, WPDPS and/or individual officers can be reasonably inferred.  The lease explicitly states that the WPHA and WPDPS had a "partnering" relationship in regard to security activities at the Winbrook Houses. The Amended Complaint alleges that (apparently arising from this "partnering" relationship), WPHA provided a master key to all apartments in the complex, including Mr. Chamberlain, Sr.'s apartment. This key was in the possession of Defendants Hart and Carelli on the night in question. AC ¶41. Although they were off-duty, they were specifically dispatched from headquarters to Mr. Chamberlain, Sr.'s apartment with the WPHA master key so that it could be used to gain entry. *Id.*  As WPHA is a separate entity from WPDPS, the intracorporate conspiracy doctrine is inapplicable to all acts that can be reasonably inferred to arise from a conspiracy between any of the City Defendants and the WPHA.  *See Bristol v. Queens County,* CV 09-5544 (JFB)(AKT), 2013 WL 1121264 at *14 (E.D.N.Y. 2013) (citing *Vladamis v. Kiernan,* 837 F. Supp.2d 131, 157 (E.D.N.Y. 2011)).

### Duty to Intervene

City Defendants and Hart argue that the claims against the individual officers who failed to intervene in the deprivations of Mr. Chamberlain, Sr.'s constitutional rights should be dismissed because there was not a realistic opportunity to prevent the harm from occurring. City Defs. Mem. at 12; Hart Mem. at 20.  With respect to whether an officer has sufficient time to intervene, the Second Circuit has held that "[w]hether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  On that basis alone, Defendants' motions to dismiss Plaintiff's failure to intervene claim should fail.

Moreover, contrary to the Defendants' narrow view of the facts alleged in the Amended Complaint, this was not a situation where police officers were required to make a split second decision as to how to proceed.  Indeed, the siege of Mr. Chamberlain, Sr.'s home lasted over an hour and is incomparable to a situation where officers need to make split second decisions.[5]  At any time during this scene unraveling, the officers who were present and/or participating in these events had multiple opportunities to intervene in order to put a stop to the escalating actions that culminated in the shooting death of Mr. Chamberlain, Sr.  Accordingly, there was ample time for

---

[5] Due to the factual nature of this claim, City Defendants' reliance on *Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 327 (S.D.N.Y. 2006) *aff'd,* 461 F. App'x 18 (2d Cir. 2012) (issue decided on appeal, from a jury verdict) and *Anderson,* 17 F.3d 552 (issue decided on appeal, from a final verdict) is misplaced on a motion to dismiss.  Further, Defendants' reliance on *O'Neill v. Krzeminski*, 839 F.2d 9, 10 (2d Cir. 1988) is factually inapposite as intervention could not be reasonably expected when Plaintiff was punched in the face "three times in rapid succession" by the same officer.  Similarly, in *Jean-Laurent*, defendant officers were not liable for failing to intercede where one office grabbed plaintiff by the collar "and then slammed him against the wall."  438 F. Supp. 2d at 327.  Conversely, the Court held that the same defendant officers had the opportunity to intercede in the "the second strip search and second assault observed by [defendant officers]. *Id.*

31

the officers who were not engaged in the violations, or who played a limited role, to intervene and take remedial steps.

**Racial Slurs**

Defendant Hart's argument that the allegation that he called Mr. Chamberlain, Sr. a "nigger" was merely a police tactic to distract him and thus does not constitute a basis for a §1983 claim does not resolve the issue in his favor. Hart Mem. at 19.  In fact, this Court in *Beal v. City of New York*, 92 Civ. 0718 (KMW), 1994 WL 163954 (S.D.N.Y. Apr. 22, 1994) (also cited in Hart Mem. at 19) recognized that the use of racist language could, under certain circumstances, give rise to a §1983 claim where threats or such language was 'inspired by malice rather than merely careless or unwise excess of zeal so that [they] amounted to an abuse of official power that shocks the conscience." *Id.* at *6 (citations omitted).  The *Beal* Court approvingly cited a decision of the Eighth Circuit where a prison guard stated "[N]igger run so I can blow your Goddamm brains out," finding defendant officer's statement a basis to sustain §1983 liability. *Id.* (citing *Burton v. Livingston,* 791 F.2d 97, 99 (8th Cir. 1986)); *see also Black Spotted Horse v. Else,* 767 F.2d 516, 517 (8th Cir. 1985) ("discriminatory statements" reflecting racial prejudice not actionable under §1983 where <u>not</u> shown to be connected with physical injury.).

Moreover, unlike the facts of this case, Defendant Hart relies only on cases which do not allege a physical injury accompanied a racially discriminatory statement. *See Miro v. City of New York*, 95 Civ. 4331 (TPG), 2002 WL 1163580 (S.D.N.Y. June 3, 2002) (where officer was accused of calling plaintiff "a piece of shit," no racial animus was implicated); *Wade v. Fisk*, 575 N.Y.S.2d 394, 396 (3rd Dep't 1991) (plaintiff pleaded a delay in trial coupled with a racial epithet); *Wims v. N.Y.C. Police Dep't*, 10 Civ. 6128 (PKC), 2011 WL 2946369 (S.D.N.Y. July

20, 2011) (court determined that plaintiff's allegations did "not rise to the level of force that is more than de minimis.").[6] Applying this precedent to the instant case, Hart's alleged use of the word "nigger" or "fucking nigger" in regards to Mr. Chamberlain, Sr., coupled with the over one hour siege of his home, the curses, mocking language, loud bangs on his door, and ultimately the use of escalating physical force and death constitute a colorable claim. At this juncture, we do not know whether he was ordered by a superior to use the slur or came up with this purported strategy on his own. Either way, the use of the derogatory word, in conjunction with the actions of Hart, Carelli, and the other Defendant officers, crossed the line from offensive language to racist policing which further provoked an already emotionally distraught African-American senior citizen.

## IV. PLAINTIFF HAS SUFFICIENTLY PLEADED A MONELL CLAIM AGAINST THE CITY OF WHITE PLAINS AND THE WHITE PLAINS HOUSING AUTHORITY

### A. Plaintiff Sufficiently Pleaded The Municipal Liability Of White Plains

Defendant White Plains misstates both Plaintiff's *Monell* claim as alleged in the Amended Complaint and well-settled law regarding the elements required to adequately allege municipal liability. City Dfs. Mem. at 13. The City cites only to Paragraphs 110-11 of the Amended Complaint as the basis for Plaintiff's *Monell* claim and inaccurately paraphrases those paragraphs as stating that the *Monell* claim is "based on the allegation that White Plains had inadequate policies and failed to train its officers to interact properly with emotionally disturbed persons." City Dfs. Mem. at 13. Misstated as such, the City then asserts that the Amended

---

[6] Additionally, Defendant Hart's reliance on *Perry v. Cnty. of Westchester*, 09 Civ. 9391 (NRB), 2011 WL 5978544 (S.D.N.Y. Nov. 29, 2011) is disingenuous where plaintiff did not even allege his failure to intercede claim in his Complaint, and only alleged the racial epithet used by the officer who failed to intervene "for the first time in his opposition to defendants' motion for summary judgment." As a result, the *Perry* court did not evaluate the underlying merits of the failure to intervene or racial epithet, because it was not properly before the Court. *Id.*

Complaint fails to allege a claim against the municipality pursuant to 42 USC § 1983 because it fails to adequately allege a *Monell* violation based on a failure to train that amounts to "deliberate indifference to the rights to whom [untrained employees] come into contact." City Defs. Mem. at 13-15.

Paragraphs 110-11 of the Amended Complaint provide:

110.    The injuries sustained by Kenneth Chamberlain, Sr. were the result of the City's adoption of inadequate policies regarding EDPs and barricaded persons. The policies failed to provide any guidance to officers in responding to situations involving EDPs, or barricaded persons.

111.    As a result of the failure of the City to adopt adequate policies, it also failed to properly train its officers how to handle EDP or barricaded situations. The failures aforementioned evidence a deliberate indifference on the part[] of the City to the constitutional rights of EDPs or barricaded person. As a result of said deliberate indifference, the officers and supervisors responding to Mr. Chamberlain's apartment violated his constitutional rights.

Notably *missing* from Defendant's motion is any reference to the twelve additional paragraphs of the Amended Complaint, beyond paragraphs 110 and 111, which further plead the factual basis for Plaintiff's *Monell* claims against the City Defendant. AC ¶¶112-123. These allegations include, but are not limited to, the City's failure to screen officers for racial animus and propensity for violence; failure to investigate, retrain, or discipline officers for use of excessive force and racially motivated conduct or behaviors; failure to adequately supervise officers in connection with service calls involving health emergences or emotionally disturbed person, and failure to train adequately train officers in the continuum of force, the use of physical force, deadly force and Tasers in responding to situations involving EDP's or barricaded persons. *Id.*

In *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388 (1989), the Supreme Court addressed the dimensions of municipal liability for failure to train or supervise, stating that a

claim of inadequate training will trigger municipal liability where the failure to train amounts to deliberate indifference to the rights of those with whom the municipal employees will come into contact. Deliberate indifference requires that city policymakers have made a deliberate choice from among various alternatives not to fully train employees. *Id. at 389.* The deliberate choice can be shown where in light of the duties assigned to particular employees, the need for more or different training is so obvious, and this inadequacy is likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to be deliberately different to the need. *Id.* 398-390.

Plaintiff adequately alleges deliberate indifference by including and comparing in the Amended Complaint the EDP and barricaded persons policies of Defendant White Plains and the NYPD policy. AC ¶¶75-97. The fact that White Plains created EDP policies, albeit deficient ones, is sufficient to establish acknowledgement that their police officers are likely to come into contact with EDPs in situations where the need for training and supervision is required. The Amended Complaint elucidates how the White Plains policy is inadequate by comparing it with the much more comprehensive polices of the NYPD. *Id.* Finally, it is obvious that a failure to have adequate policies to deal with EDP situations, and to provide adequate training and supervision of police officers, will likely result in the violation of constitutional rights.

City Defendants incorrectly assert that in order to adequately plead *Monell* claims arising from White Plains deliberate indifference for failing to create adequate EDP policies or to adequately train and supervise its police officers, Plaintiff is required to make specific allegations of prior situations involving other emotionally disturbed or barricaded persons whose rights were violated. Defendant asserts that in the absence of such allegations, "the complaint fails to allege a necessary factual component of the *Monell* claim." City Defs. Mem. at 14. However, in *City of*

*Canton,* the Supreme Court left open the possibility that in a narrow set of circumstances, a pattern of similar violations is not required to show deliberate indifference, under an alternative single-incident theory. 489 U.S. at 390.  In *Walker v. City of New York,* 974 F.2d 293, 297-298 (2d. Cir. 1992), a case noticeably not referenced by the City, the Second Circuit establishes the requirements that must be satisfied by a plaintiff under the single-incident liability theory recognized in *City of Canton.* First, "the plaintiff must show that a policymaker knows to a 'moral certainty' that her employees will confront a given situation." *Id.* at 297.  Second, "the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." *Id.*  Finally, "the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of citizen's constitutional rights." *Id.* at 298 Thus, where the plaintiff can establish all three elements, "it can be said with confidence that the policymaker should have known that inadequate training or supervision was so likely to result in the violation of constitutional rights, that the policymakers can reasonably be said to have been deliberately indifferent to the need." *Id.*

Further, the example advanced by the Court in *City of Canton* is analogous to the allegations here. *See* 489 U.S. at n. 10.  In *City of Canton,* the Court provided the illustration of a city that arms its police force with firearms, deploys the armed officers into the public to capture fleeing felons, and yet fails to train the officers in the constitutional limitation on the use of force. *Id.* Given the known frequency with which police attempt to arrest fleeing felons and the predictability that an officer lacking specific tools to handle the situation will violate the citizens' rights, the Court theorized that a city's decision not to train the officers about the constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly

predictable consequence" *to wit* the violation of constitutional rights.  *Id.*  If it is considered "so obvious" a failure that police use of force in encounters with citizens who are not emotionally disturbed will result in constitutional violations if the officers are not adequately trained, as set forth in the Supreme Court's hypothetical in *City of Canton*, it is axiomatic that a highly predictable consequence of untrained police encounters with EDP's, will lead to unconstitutional consequences.

Here, White Plains armed its officers with guns, bean bag shotguns, Tasers *and* an unlawfully obtained key to Mr. Chamberlain, Sr.'s apartment.  It is clear that the City knew that, while armed with these weapons, their officers were likely to encounter emotionally disturbed and barricaded persons, as evidenced by the meager policies provided.  It is equally clear from reviewing White Plains' policies and comparing them with the NYPD EDP policies that White Plains failed to adequately instruct their officers how to properly handle such situations to avoid violating the constitutional rights of EDPs that they encountered.[7]  Further supporting that White Plains was deliberately indifferent to the rights of emotionally disturbed persons, including Mr. Chamberlain, Sr., are the allegations of the Amended Complaint that White Plains' chief policymaker (Public Safety Commissioner Chong) was at one time a high ranking New York City police official who knew or should have known that White Plains' policies were inadequate to avoid constitutional violations. AC ¶89.

---

[7] To further dispute that a causal link between a constitutional deprivations and the challenged policy or custom exists, City Defendants cite *Garcia* v. *Bloomberg,* 865 F. Supp. 2d 478 (S.D.N.Y. 2012).  However, the *Garcia* plaintiffs drew no comparison between the hodgepodge of factual complaints (*e.g.,* the Disorder Control Guidelines initiated the use of orange netting to contain protesters and rioters) and an actual policy of "conducting mass false arrests." *Id.* at 491.  Distinguishably, Plaintiff's factual claims in the instant action "bridge the gap" by drawing the reasonable and rational inference that a policy which fails to address EDP interaction, fails to prevent excessive force, misuse of force, and wrongful injury of an EDP when that interaction occurs. *Id.* at 492.

Based on the foregoing, Plaintiff has, at this pleading stage, adequately alleged facts that would support a finding that the polices and/or customs of White Plains regarding handling EDP situations had a direct causal connection with the constitutional violations inflicted upon Mr. Chamberlain, Sr. *See Guzman v. United States, 11 Civ. 5834 (JPO),* 2013 WL 543343, *12 (S.D.N.Y. Feb. 14, 2013) (denying motion to dismiss *Monell* claim because plaintiff not required to do more than plead a single instance of misconduct).   While Plaintiff intends to pursue discovery, including a review of White Plains police officer's responses to other calls involving EDPs and barricaded persons that may well demonstrate a pattern of similar violations, under *City of Canton*, Plaintiff's Amended Complaint adequately alleges *Monell* claims against White Plains based on the incidents that resulted in Mr. Chamberlain, Sr.'s death.

### B.     Plaintiff Sufficiently Pleaded The Municipal Liability Of The White Plains Housing Authority

Much like the City, Defendant WPHA wrongly asserts that the Amended Complaint "fails to plead a viable *Monell* claim for relief" because "the Amended Complaint fails to allege any similar constitutional violations involving the purported misuse of the [WPHA's] master key or the apartments at Winbrook Houses." WPHA Mem. at 12.   Defendant's assertion obfuscates the allegations of the Amended Complaint, the nature of Plaintiff's claims, and the standard of review the Court should apply to Plaintiff's pleading.

In *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986), the Supreme Court held that "it is plain that municipal liability may be imposed for a single decision under appropriate circumstances."   There, the Supreme Court noted that "*Monell's* language makes clear that it expressly envisioned other officials "whose acts or edicts may fairly be said to represent official policy and whose decisions therefore may give rise to municipal liability." *Id.*   Municipal liability will attach where a "a deliberate choice to follow a course of action is made from among

various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483.  A municipal entity may be sued where the execution of the government policy or custom inflicts the injury. Official policy traditionally takes the form of an "ordinance, regulation or decision officially adopted and promulgated by the municipality's officers" while a qualifying custom consists of a 'longstanding practice' that constitutes the 'operating standard procedure' of the local government entity." *Chin v. N.Y.C. Hous. Auth.,* 575 F. Supp. 2d 554, 561 (S.D.N.Y. 2008).

Further, as applied to the City, it is well established that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. *Pembaur*, 475 U.S. at 480.  Contrary to the WPHA's assertion that Plaintiff cannot succeed at the pleading stage because Plaintiff's *Monell* claim is based on a single isolated incident of unconstitutional activity, "the Supreme Court has specifically rejected the argument that a plaintiff must do more than plead a single instance of misconduct to establish municipal liability under section 1983." *Guzman,* 11 Civ. 5834 (JPO), 2013 WL 543343 (citing *Rheingold v. Harrison Town Police Dep't,* 568 F. Supp. 2d 384, 394 (S.D.N.Y. 2008) (citing *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 167 (1993))); *see also City of Canton*, 489 U.S. at 390 (The Court left open the possibility of a single incident giving rise to municipal liability on a deliberate indifference theory).

Although Defendant WPHA briefly acknowledges that a single incident may be sufficient to impose liability under *Monell* (citing to *City of Okla. City v. Tuttle,* 471 U.S. 808, 823-24 (1985)), it simply ignores that the facts alleged in the Amended Complaint that demonstrate a claim clearly within those contours. WPHA Mem. at 12.  To wit, WPHA cites <u>only</u> to Paragraph

125 of the Amended Complaint as the singular basis for Plaintiff's *Monell* claim (WPHA Mem.

at 10) but tellingly omits any reference to Paragraphs 124 and 126 which state:

> 124.    The injuries sustained by Mr. Chamberlain, Sr. were the result of the policy, practice, custom or usage of the Defendant Housing authority to provide to the NCU or other police officers the master keys to the apartments of its tenants, without their knowledge or consent, and without procedures for how such keys were to be used.

> 126.    By providing a master key to the Winbrook Apartments, including Mr. Chamberlain's apartment, without knowledge or consent of their tenants, the Housing Authority adopted a policy, custom, practice or usage that resulted in the deprivation of the right to quiet enjoyment, and/or use and occupancy of said apartments without due process of law in violation of the 14th Amendment.

WPHA wrongly asserts that the Amended Complaint must allege other similar

constitutional violations involving the purported misuse of Defendant WPHA's master key for

the apartments at the Winbrook Houses.  Defendant's argument would arguably only have merit

if Plaintiff's *Monell* claim was singularly dependent upon the legal theory that the WPHA's

municipal liability arises from its "deliberate indifference."  That is not the gravamen of the

Amended Complaint's allegations in regard to the WPHA. Indeed, the *Monell* claim against the

WPHA is not based on the allegation of a <u>failure</u> to adopt a policy but rather on the <u>consequence</u>

of an existing policy, practice, custom and/or usage; *to wit,* providing the WPDPS NCU or other

police officers the masters keys to the apartments of tenants, without their knowledge or consent,

and without procedures for how such keys were to be used. AC ¶124.

In addition to referencing the allegations of the Amended Complaint in the instant

motion, WPHA included as Exhibit B to the Declaration of Lance H. Klein In Support of

Defendant WPHA's Motion to Dismiss, a copy of Mr. Chamberlain, Sr.'s lease with the WPHA,

arguing that it was incorporated by reference in the Amended Complaint. *See also* WPHA Mem.

at 9.  Although Plaintiff disputes that contention, he nonetheless does not object to the Court's

consideration of the actual lease terms, particularly because they support the allegations of the

Amended Complaint and Plaintiff's *Monell* claims against WPHA. To wit, the lease specifically references a "partnership" between the WPDPS and the WPHA, and indisputably sets forth facts that indicate that the WPHA could be considered as jointly participating with the WPDPS in the improper policies, practices, customs and/or usages that caused the constitutional injuries alleged in the Amended Complaint. *See Bouche v. City of Mount Vernon,* 11 Civ. 5246 (SAS), 2012 WL 987592, *9 (S.D.N.Y. Mar. 23, 2012).

The following sections of the lease are relevant to consideration of the issues before the Court and establish a close nexus between WPHA and Defendant City of White Plains.  Section XII (3) of the lease states, "The Authority may enter the Resident's dwelling unit at any time without advance notification when there is reasonable cause to believe that an emergency exists." Section XIV of the lease states that the WPHA had a policy of "partnering with the local Department of Public Safety for neighborhood watch training and routine surveillance by uniformed and non-uniformed personnel."  However, nowhere does the lease put residents on notice that the WPDPS was provided a master key to all of the Winbrook Houses, that police officers, without warning, were authorized to open their doors and/or enter the resident's apartments, or the process and conditions under which the authority to use the master key would be exercised. AC ¶124.  A reasonable inference can be made that the decision to provide the master key to the WPDPS was made by a WPHA official with final decision-making authority sufficient to ascribe that decision to the WPHA pursuant to *Monell* and under the *Pembaur* final authority analysis. *See Pembaur,* 475 U.S. at 480.  What is not known, and cannot be known without discovery, is the identity of final decision-maker(s) for Defendant WPHA who made the decision to give the master key to the WPDPS and authorized its use by the NCU and other

police officers.  By providing a key to the WPDPS (but without any guidance, training, or supervision) WPHA delegated authority to the WPDPS to act on its behalf.

It should also be noted that during the course of discovery Plaintiff will learn whether the use of the master key was supervised and what training, if any, the police officers authorized to use the master key were given to insure that its use did not result in constitutional violations such as those inflicted upon Mr. Chamberlain, Sr. Proof of WPHA's, and the City of White Plains', deliberate indifference may well arise from evidence that the training was so inadequate that it was likely to result in the violation of constitutional rights of residents of WPHA apartments, including Mr. Chamberlain, Sr., in light of the tasks the White Plains police officers performed as "partners" with the WPHA and the likelihood of constitutional violations occurring if the officers are not adequately trained in when and how to use the master key. *See City of Canton,* 489 U.S. at 390-39 (1989).

Defendant WPHA asserts that Plaintiff's Amended Complaint has failed to allege that the WPHA's customs or policies were "the moving force" behind the constitutional rights violations sufficient to plead a *Monell* claim against the WPHA.  WPHA Mem. at 13, 14.  Additionally, WPHA wrongly asserts that the Amended Complaint "merely makes conclusory allegations of *Monell* liability without applying any facts indicative of a causal connection between WPHA's alleged deliberate indifference and the alleged violation of Mr. Chamberlain, Sr.'s constitutional rights." *Id.* at 14.

As a threshold matter, it is well settled under New York Law that an injury can have more than one proximate cause. *See Farrell Family Ventures, LLC v. Sekas & Assocs., LLC,* 863 F. Supp. 2d 324, 333 (S.D.N.Y. 2012) (citing *Caruolo v. John Crane, Inc.,* 226 F.3d 46, 56 (2d. Cir. 2000) (it is not necessary for a defendant to be the sole or even dominant cause of the

Plaintiff's injuries in order to be considered proximate cause).  It is equally well settled that in alleging a constitutional tort the Plaintiff is not required to plead that the municipal policy, practice, custom or usage is the *only* causative factor. *See City of Okla. City,* 471 U.S. at 828 (holding that under the "broad causal language" of § 1983, plaintiff must prove that a policy or custom of the city subjected him to the deprivation of constitutional rights.)  The allegations of, and the reasonable inferences from, the Amended Complaint are sufficient to establish, as a matter of law at the pleading stage, the requisite "affirmative link" between the WPHA's policy, practice, custom, and/or usage of the master key and the alleged violations of Mr. Chamberlain, Sr.'s constitutional rights.  *See Id.* at 823 (at a minimum, Plaintiff must allege an affirmative link between the policy and alleged violation); *City of Canton,* 489 U.S. at 391 (the identified deficiency must be closely related to the ultimate injury).

It is also relevant to this issue to again note that Defendant WPHA mischaracterizes Plaintiff's *Monell* claim as relying solely on a theory of "deliberate indifference" when in fact the Amended Complaint alleges the existence of a policy, practice, custom and/or usage with a clear causal connection to the constitutional injuries alleged. AC ¶124.  The Amended Complaint alleges facts sufficient for the Court to reasonably infer that the WPHA had a policy or custom of providing the master key to the WPDPS as part of their "partnering" relationship, and that this policy was a moving force behind the police officers' actions of opening Mr. Chamberlain, Sr.'s door, entering his apartment over his express objections and violating his bodily integrity, the use and enjoyment of his home, and privacy rights from their positions both inside and outside the opened door.

The Amended Complaint also pleads sufficient facts to show how the master key's use contributed to the set of circumstances that led to Mr. Chamberlain, Sr.'s death. The Amended

Complaint alleges that the WPHA provided the WPDPS's NCU a master key affording access to all apartments in the Winbrook Houses, including Mr. Chamberlain, Sr.'s, without the residents' knowledge or permission. AC ¶25. It is alleged that the master key provided by Defendant WPHA was used by police officers to unlock and open Mr. Chamberlain, Sr.'s door. AC ¶41. The police officers then opened the door a few inches, before the safety lock prevented it from opening further. *Id.* The door opening was sufficient for the police officers to visually confirm Mr. Chamberlain, Sr. was not in need of medical assistance. *Id.*

Of manifest importance to the causation question is the fact that after the door was opened with the master key, Mr. Chamberlain, Sr. could see for the first time that the hallway outside his door was filled with heavily armed police officers. AC ¶44. After the door was initially opened, Mr. Chamberlain, Sr. became increasingly fearful, agitated and even delusional. AC ¶45.  Before, during and after the police officers opened the door with the master key, Mr. Chamberlain, Sr. repeatedly denied them permission to open his door or enter his apartment. Because the police officers were able to open the door a few inches with the master key, Defendant Martin was able to wedge a halligan tool into the door opening to prevent Mr. Chamberlain, Sr. from closing it. AC ¶42.  The police officers then used a bolt cutter to attempt to remove the safety lock. AC ¶43.  After approximately one hour of attempting to further breach the opened door, the door was violently breached by removal of its hinges and the cutting of the slap lock. AC ¶¶43, 48. Within seconds of the door being fully opened, Mr. Chamberlain, Sr. was Tasered, struck with bean bags and fatally shot by officers positioned both inside and outside his apartment. AC ¶¶49-57.  Contrary to Defendant's assertion, it was a foreseeable consequence that constitutional injuries would result if police officers opened the door of a resident's home without notice to the resident that they possessed a key, over the resident's

vociferous and express objections and, particularly, when the resident may be emotionally distraught or disturbed and expressing fear for his life.

Equally erroneous is WPHA's assertion that the use of the master key was "useless" in terms of the police gaining access to Mr. Chamberlain, Sr. and his apartment. WPHA Mem. at 15. As noted above, but for the master key in the hands of the police officers, the door would not have been initially opened over Mr. Chamberlain, Sr.'s objections and the police would have had to continue to communicate with Mr. Chamberlain, Sr. through a closed door and with him safely ensconced within his home. The opening of the door was an initial and fundamental element of the escalating actions that ultimately resulted in Mr. Chamberlain, Sr.'s death.

Additionally, WPHA asserts that the only constitutional right Plaintiff alleges that the WPHA violated was his alleged right to the quiet enjoyment and/or use and occupancy of his apartment without due process of law. WPHA Mem. at 16-17. WPHA too narrowly construes the allegations of the Amended Complaint wherein each cause of action incorporates by reference those preceding it. WPHA also ignores the reasonable inference to be drawn from the Amended Complaint that the WPHA's partnering with the WPDPS, which included providing their "partners" with a master key that was used to open Mr. Chamberlain, Sr.'s door, inextricably intertwines them with the resulting constitutional injuries inflicted by their "partners" which violated Mr. Chamberlain, Sr.'s Fourth Amendment and due process rights under the Fourteenth Amendment.

WPHA asserts erroneously that Plaintiff's right to the use and enjoyment of property is solely a contractual right derived from the lease and cannot be a right guaranteed by the Constitution. WPHA Mem. at 17. A property interest arises where one has a "legitimate claim of entitlement" to the benefit. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577

(1972). It is indisputable that Mr. Chamberlain, Sr. as a public housing tenant, had a constitutionally protected property interest in the continued use and enjoyment of his apartment and that this property interest was entitled to the protection of due process. *Sinisgallo v. Town of Islip Hous. Auth.,* 865 F. Supp. 2d 307, 330-31 (E.D.N.Y. 2012).  Mr. Chamberlain, Sr.'s use, enjoyment and occupancy of his apartment was infringed upon, and ultimately terminated by his death and the actions of the various Defendants, including the WPHA.  Federal courts will look to state law, as well as federal law, to determine the existence of a protectable property interest. New York State law afforded Mr. Chamberlain, Sr. property interests that are protected from governmental intrusion by the Due Process Clause because, under New York law, a residential lease is effectively deemed a sale and shelter of services by the landlord who impliedly warrants that tenants are not subjected to any conditions endangering or detrimental to their life or safety. *Park W. Mgmt. Corp. v. Mitchell,* 391 N.E.2d 1288 (N.Y. 1979).  Based on the foregoing, Defendant's assertion that Plaintiff has failed to plead that Mr. Chamberlain, Sr. had a protectable property interest in the use and enjoyment of his home is unavailing and unsupported by law.

## V.      PLAINTIFF HAS SUFFICIENTLY PLEADED A SUPERVISORY LIABILITY CLAIM AGAINST DEFENDANTS SPENCER, MARTIN, AND FOTRELL

The City Defendants urge the Court to dismiss Plaintiffs' claims against the supervisory defendants because they assert the claims are not plausible. City Defs. Mem. at 16.  The parties do not dispute the standard to be employed in determining whether a supervisor can be held liable under a failure to supervise.  The case law clearly establishes three potential bases for such liability: (1) personal involvement in the constitutional deprivation; (2) gross negligence in supervising subordinates; and (3) deliberate indifference to the rights of the plaintiff. *E.g., Provost,* 262 F.3d. at 154 (2d Cir. 2001).   The Second Circuit has distinguished direct

participation (personal involvement) from other bases of supervisory liability, such as gross negligence or deliberate indifference, stating, "[i]t does not foreclose the liability of a person who, with knowledge of the illegality, participates in bringing about a violation of the victim's rights but does so in a manner that might be said to be 'indirect' such as *ordering* or helping others to do the unlawful acts, rather than doing them him-or herself.'' *Id.* at 155 (*emphasis added).*

There is no question that Defendants Martin and Fottrell directly participated by taking part in the actions complained of herein. Indeed, the Amended Complaint alleges the following actions of these defendants: (a) Martin and/or Hart used a master key to unlock Mr. Chamberlain, Sr.'s door, thus permitting the door to be opened partially without Mr. Chamberlain, Sr.'s permission and with no need to render aid (AC ¶41); (b) Martin wedged a halligan tool into the door opening to prevent Mr. Chamberlain, Sr. from closing it (AC ¶42); (c) Martin kicked the door several times (AC ¶42); (d) Fottrell ordered Carelli to use a bolter cutter to remove the slap lock from the door; and (e) after the lock had been cut, Martin and Fottrell, aided by Demchuk, pushed the door several times, striking Mr. Chamberlain, Sr. several times (AC ¶43).  These actions were taken after Mr. Chamberlain, Sr. had advised the officers that he was okay and Life Aid had contacted the WPPD to cancel the medical alert call; thus, removing any claim that there were exigent circumstances or a need to render aid. Thus, these actions alone provide enough factual detail to establish the plausibility of a claim under the direct participation or personal involvement theory of supervisory liability. However, there is more.

Defendant supervisors were also grossly negligent in supervising their subordinates. During the over one hour standoff, Martin and Fottrell were the supervising officers at the scene and both men were present when racial slurs were used to purportedly "distract" Mr.

Chamberlain, Sr. and when their subordinates cursed at Mr. Chamberlain, Sr., pounded on his door, mocked his military service, and generally spoke to him in an offensive and disrespectful manner.   In light of these allegations, Fottrell and Martin failed to supervise their subordinates who engaged in unprofessional conduct that was either designed to agitate and confuse Mr. Chamberlain, Sr. or had that effect.   Both Fottrell and Martin knew that Mr. Chamberlain, Sr. was a man in his sixties and was considered an EDP.   Despite their knowledge of same, they took no actions to control their subordinates, in what can only be described, as a campaign of provocation, harassment, and intimidation.

In addition to the foregoing gross negligence, Fottrell and Martin were grossly negligent in how they effectuated the entry into Mr. Chamberlain, Sr.'s apartment once his door had been removed.   It should be recalled that the supervisors had at least one hour to plan how to enter the apartment once the door was removed.   The complete failure to plan or engage in a proper tactical plan contributed to the events leading to Mr. Chamberlain, Sr.'s death.   It is alleged in the Amended Complaint, that prior to the discharge of the Taser, Carelli and Hart stood in the doorway with their guns drawn and Demchuk retrieved the police shield in anticipation of entry. AC ¶51.   The plan, to the extent that there was a plan, was for Fottrell to use the Taser to knock Mr. Chamberlain, Sr. down and the shield would be used to disarm him, in the event he had a weapon. *Id.* At no time did Fottrell or Martin consider using pepper spray to distract Mr. Chamberlain, Sr., nor was any tactical plan devised by the supervisors to use the shield as cover for the other officers as they proceeded to engage Mr. Chamberlain, Sr.   Nor was there any plan to use the batons, in combination with the shield, to attempt to disarm Mr. Chamberlain, Sr. once the door was down. *Id.*   The Amended Complaint also alleges that after Martin deployed the

bean bags, Mr. Chamberlain, Sr. went down, but there was no direction from the supervisors to use batons or the shield to restrain Mr. Chamberlain, Sr.

The failure of the supervisors to develop a tactical plan that would have avoided using force to enter the apartment constituted gross negligence.  The officers who were under their direct supervision followed the lead and direction of the supervisors.  The supervisors did not develop any plan other than the use of escalating force.  The supervisors were aware that Carelli and Hart were in the hall with their guns drawn, yet failed to give any instructions to Carelli or Hart as to how or when to discharge their firearms.  In fact, Fottrell's use of the Taser and Martin' use of the bean bag contributed to the escalation of force, which ultimately led to Carelli's use of his firearm.

With respect to Spencer, there are indications in the tape recordings that he was in contact with his subordinates on the scene and was aware of the actions they were taking during the encounter with Mr. Chamberlain, Sr. *See* Ex. A, p. 26 ("Desk to Patrol 1 - 21."), 31 ("Desk to Patrol 1, Patrol 2, - 21").  These recordings indicate that Spencer was in contact with the police units that were interacting with Mr. Chamberlain, Sr. at the scene.  The Taser recording, which was made at the end of the siege, indicates that Spencer was advised as to the actions his subordinates were taking, and the information he had regarding the unfolding situation, before the door was forced open.  What is unknown is what, if any, instructions were given by Spencer during the hour long siege and before the door was removed.  However, what can be said, at this stage in the proceeding, is that Spencer was more than just a passive supervisor in a location remote from the scene. AC ¶¶134-136.  He was directly participating in the events as they unfolded, and either gave instructions that contributed to the violations or failed to give proper instructions to prevent the tragedy. *Id.*

Additionally, Spencer was aware that his subordinates were responding to a scene involving an EDP and ordered them to bring tactical gear with them when they responded. AC ¶17. He ordered Carelli and Hart to respond to the scene with the master key. AC ¶19. Despite his knowledge that this situation involved an EDP and that his officers were being sent there with numerous types of weapons, he failed to instruct or supervise his subordinates as to the proper use of such devices. He also knew or should have known of the White Plains EDP policy and that it was inadequate to provide any guidance to his officers who responded to Mr. Chamberlain, Sr.'s apartment. As such, it can be plausibly claimed that he either participated or was deliberately indifferent to the rights of the plaintiff by failing to instruct his subordinates in the use of force.

## VI.    PLAINTIFF HAS SUFFICIENTLY PLEADED HIS STATE LAW CLAIMS

Defendant Carelli and the City Defendants erroneously contend that Plaintiff's state law claims against the individual Defendants should be dismissed because the individual officers were not named in the Notice of Claim filed with the City. However, in *Bernhard v. Dutchess Cmty. Coll.*, 80 Civ. 4871, 1982 WL 193, at *2 (S.D.N.Y. Feb. 19, 1982), the Court observed that the New York Court of Appeals "has pointed out that the 'notice of claim concept' is in *derogation* of a claimant's common law rights against a municipal employee . . . [and] should be construed in favor of a claimant." (citing *Sweeney v. City of New York,* 125 N.E. 243, 244 (N.Y. 1919)). A notice of claim should not be construed to require information not yet released to the public or know to the plaintiff. *See Monge v. City of New York Dept. of Soc. Services*, 95 A.D.2d 848, 849 (2nd Dep't 1983) (Leave to file a late notice of claim granted where "petitioner had no knowledge …until March 24, 1982 at the earliest when the Queens District Attorney's press release indicating [the facts of Plaintiff's claim] was issued."). Moreover, any defects in a notice

of claim may be corrected, supplied or disregarded in the discretion of the court.   General

Municipal Law §50-e (6) (omissions may be disregarded if made in good faith and no prejudice

to other party); *Yang Feng Zhao v. City of New York,* 656 F. Supp. 2d 375, 402 n.25 (S.D.N.Y.

2009) (court can disregard error if made in good faith and no prejudice); *Tyrell v. Seaford Union

Free Sch. Dist.,* CV-08-4811 (SJF)(MLO), 2010 WL 1198055 (E.D.N.Y. Mar. 25, 2010) (where

an error is made in good faith and without prejudice it can be disregarded).

Here, at the time of the service of the Notice of Claim, the City had refused to release the

names of the police officers involved in the incident, despite Plaintiff's service of request for that

information under New York State's Freedom of Information Law ("FOIL"). AC ¶94-97; *see

also* FOIL request, annexed to the McLaughlin Decl. as Exhibit D.   The Notice of Claim was

served on February 15, 2012, and the City did not release the information sought via FOIL until

May 3, 2012.   AC ¶94-97.   Additionally, the Notice provided great detail regarding the actions of

the police officers such that the City knew or should have known the identities of the officers

referred to in Plaintiff's Notice.   A copy of the Notice of Claim was annexed as Exhibit B to the

Affirmation of Lalit K. Loomba.   Additionally, the individual officers were not prejudiced by the

failure to include their names in the Notice as they were certainly aware of the fact that they had

engaged in certain actions involving Mr. Chamberlain, Sr. and there was extensive press

coverage of the filing of the Notice. *See* copy of press articles regarding the filing of the Notice,

annexed collectively as Exhibit E to the McLaughlin Decl.   Moreover, the individual officers

have been named as defendants under 42 U.S.C. §1983 for the very same actions that were

mentioned in the Notice of Claim.   As such, the Police Officers have not been prejudiced as they

will have to defend their conduct in this action arising under the federal claims.   Accordingly,

any purported defect should be disregarded by the Court. *See Yang Feng Zhao*, 656 F. Supp. 2d at 402, n.5.

## VII.   PLAINTIFF HAS SUFFICIENTLY PLEADED ASSAULT AND BATTERY AND CLAIMS AGAINST THE INDIVIDUAL CITY DEFENDANTS

Defendants Hart, Carelli and the City Defendants on behalf of Love, Demchuk, Markowski, Fottrell and Martin contend that Plaintiff has failed to state plausible claims for assault and/or battery.  Dfs. Mem. at 20-22; Carelli Mem. at 23; Hart Mem. at 23.  However, the City Defendants concede that "putting the state action requirement aside, the essential elements of [excessive force and state law assault and battery claims] are substantially similar." City Dfs. Mem. at 20-21 (citing *Posr v. Doherty,* 944 F.2d 91, 94-95 (2d Cir. 1991)).  As Plaintiff has demonstrated above, with respect to the claim for excessive force, the Amended Complaint states plausible claims against each of these officers under state law for assault and battery. Each of these defendants took actions that reasonably caused Plaintiff's decedent to suffer fear of imminent harmful bodily contact, and they all acted in concert, one aiding and abetting the other. Under the conspiracy claim, each would be responsible for the actions of their co-conspirators committed in furtherance of the conspiracy.  *Maltz v. Union Carbide Chemicals & Plastics Co., Inc.*, 992 F. Supp. 286, 310 (S.D.N.Y. 1998) ("[C]ivil conspiracy is an agreement to commit the wrongful act, it need not be alleged that each co-conspirator committed the underlying tort, so long as they share with the immediate tortfeasor a common plan or design in its perpetration."). Finally, under state law as the individual defendants acted in concert they can considered joint tortfeasors.

Additionally, the City Defendants argue that Defendants Fottrell and Martin are entitled to qualified immunity on the state law claims for excessive force.  Plaintiff has refuted that claim

*inter alia*, in Point I.  At best, the determination of the contours of that defense should await discovery given the highly factual nature of such a defense.

## VIII.  THE ASSAULT CLAIMS AGAINST THE CITY OF WHITE PLAINS ARE PLAUSIBLY PLEAD

The City Defendants contend that the assault claims plead against it fail under the theory of *respondeat superior* because there are no allegations that Mr. Chamberlain, Sr. saw Carelli's gun or that he intended to shoot him. City Defs. Mem. at 22.  Once again, they fail to appreciate the gravity of the claims asserted.  The assault claim, as discussed above, involves what each of the individual officers did during the over one hour siege of Mr. Chamberlain, Sr.'s home.  The threatening language, the banging on his door, the breaking down of his door, the use of the bolt cutter, the pushing and kicking his door so that it fell onto Mr. Chamberlain, Sr., the use of the Taser (there can be no question that Mr. Chamberlain, Sr. was aware that the Taser was about to be used.  He can be seen on the video staring in the direction of the camera), the bean bags that were used more than once (Mr. Chamberlain, Sr. even states on the tape that he sees that they have shot guns), and he sees the officers with their guns drawn.  It can be reasonably inferred that Mr. Chamberlain, Sr. saw the instruments plainly in front of him, which he verbally describes, before Defendant officers used them to injure and kill him. *See Brandon v. City of New York,* 705 F. Supp. 2d 261, 267 (S.D.N.Y. 2010) ("First, a court must accept a plaintiff's factual allegations as true and draw all reasonable inferences from those allegations in plaintiff's favor.") (*internal citations omitted*).  The very notion that he was not afraid for his life due to the various actions of this group of unprofessional, poorly trained officers is ludicrous.  The City does not argue that any officer acted outside the scope of his employ, or that the acts were not "condoned, instigated or authorized by the employer." *Milosevic v. O'Donnell*, 934 N.Y.S.2d

375, 376 (1st Dep't 2011).  Therefore, the City can be held responsible for the assault and/or battery claims by committed by its employees.

## IX.  PLAINTIFF IS PERMITTED TO ASSERT ALTERNATIVE CAUSES OF ACTION

Defendant Carelli and the City Defendants contend that Plaintiff's negligence claims should be dismissed because they cannot coexist with claims of intentional conduct.  City Defs. Mem. at 22; Carelli Mem. at 24.  In support of that proposition Defendants cite *Dineen ex rel. Dineen v. Stramka*, 228 F. Supp. 2d 447 (S.D.N.Y. 2002).  That decision is procedurally inapposite as the Court there was considering a summary judgment motion, after discovery, and not a motion to dismiss.  Contrary to Defendants' argument, under Fed. R. Civ. P. 8(e)(2) a plaintiff is permitted to "plead two or more statements of a claim . . . regardless of consistency." *Henry v. Daytop Vill., Inc.,* 42 F.3d 89, 95 (2d Cir. 1994).  The Court in *Henry* noted that "[t]he flexibility afforded under Rule 8(e)(2) is especially appropriate in civil rights cases, in which complex inquiries into the parties' intent may sometimes justify raising multiple, inconsistent claims." *Id.; accord Adler v. Pataki,* 185 F.3d 35, 41 (2d Cir. 1999) ("[W]e have ruled that Rule 8(e)(2) offers sufficient latitude to construe separate allegations in a complaint as alternative theories.").  Here, Plaintiff has pleaded claims arising from both negligence and intentional tort. At this stage of the proceedings, such alternative pleading is permitted by the Federal Rules and Second Circuit precedent.

## X.  PLAINTIFF'S WRONGFUL DEATH AND CONSCIOUS PAIN AND SUFFERING CLAIMS ARE SUFFICIENTLY PLEADED

Defendants Carelli, Hart, and the City Defendants contend that the claims for wrongful death and conscious pain and suffering are not sufficiently pleaded.  City Dfs. Mem. at 23; Carelli Mem. at 22; Hart Mem. at 21-22.  Their theory appears to rest on two grounds.  First, relying on their earlier arguments, they contend that no wrongful act was committed against Mr.

Chamberlain, Sr.   As Plaintiff has amply demonstrated above numerous wrongful acts were taken against Mr. Chamberlain, Sr., including, but not limited to, deprivation of his constitutional rights, assault, battery, and other acts constituting negligence on the part of the individual defendants and/or the City.   Second, the City Defendants contend that the Amended Complaint does not state that any distributees survived his death.   In fact, the Amended Complaint mentions at least two potential distributees – his son, Kenneth Chamberlain, Jr. (AC ¶4) and his daughter (AC ¶46).   Under New York law Mr. Chamberlain, Sr.'s children would be distributees in the event that Mr. Chamberlain, Sr. died intestate.   The fact that Kenneth Chamberlain, Jr. has been appointed as the Administrator of the Estate indicates that Mr. Chamberlain, Sr., died intestate. Thus, the Amended Complaint adequately states the necessary elements for both a wrongful death claim and a conscious pain and suffering claim.

Additionally, it is alleged that the individual defendants acted in concert in the events that transpired at Mr. Chamberlain's home that ultimately resulted in his death.   Under either a joint tortfeasor theory, acting in concert theory, or conspiracy theory each officer would be responsible for the acts of the others.   Thus, while Hart may not have pulled the trigger, he along with the other officers engaged in a joint enterprise and are equally responsible along with the shooter.   As Plaintiff has demonstrated above, with respect to the claim for excessive force, the Amended Complaint states plausible claims against each of these officers under state law for assault and battery.   Each of these Defendants took actions that reasonably caused Plaintiff's decedent to suffer fear of imminent harmful bodily contact, and they all acted in concert, one aiding and abetting the other.   Under the conspiracy claim, each would be responsible for the actions of their co-conspirators committed in furtherance of the conspiracy.   Finally, under state law, as the individual defendants acted in concert they can be considered joint tortfeasors.   *See*

*Hill*, 270 N.Y.S.2d at 1021 ("Where separate acts of negligence combine to produce directly a single injury each tortfeasor is responsible for the entire result, even though his act alone might not have caused it."); *Greenidge*, 720 N.Y.S.2d at 48-49 ("Principles of joint and several liability require that a party with even minimal culpability be held responsible to an innocent tort victim.").

## XI. PLAINTIF'S STATE LAW CLAIMS AGAINST WHITE PLAINS HOUSING AUTHORITY SHOULD NOT BE DISMISSED

### A. Supplemental Jurisdiction

WPHA asserts that the Court should dismiss Plaintiff's *Monell* claim and thereupon decline to exercise supplemental jurisdiction over Plaintiff's state law claims against the WPHA. For the reasons stated above, Plaintiff's *Monell* claims should not be dismissed, and the Court should therefore exercise supplemental jurisdiction over the state law claims because these claims clearly "derive from a common nucleus of operative fact" and are "such that [a plaintiff would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725 (1966). In the unlikely event that the Court were to dismiss Plaintiff's *Monell* claim against the WPHA, the Court would still have supplemental jurisdiction over the WPHA pursuant to 28 USC § 1367.

### B. Negligence

WPHA asserts that Plaintiff's allegations as to its negligence is without merit because of the absence of a duty of the WPHA to Mr. Chamberlain, Sr.  Contrary to this assertion, WPHA clearly had the duty of a landlord to a tenant clearly established under New York law. A residential lease is effectively deemed a sale and shelter of services by the landlord who impliedly warrants that tenants are not subjected to any conditions endangering or detrimental to their life, safety or safety. *Park W. Mgmt. Corp.,* 391 N.E.2d 1288.

56

WPHA further disputes that the acts alleged were a proximate cause of Mr. Chamberlain, Sr.'s injuries.  The very case WPHA relies upon provides that "[t]he question of superseding cause itself generally is one for the jury". *Derdiarian v. Felix Contracting Corp.*, 434 N.Y.S.2d 166, 169-70 (N.Y. 1980).  Further, "[o]nly in rare instances can the question be decided as a matter of law." *Parsons v. Honeywell, Inc*., 929 F.2d 901, 905 (2d Cir. 1991) (citing *Derdiarian* 434 N.Y.S.2d at 170).

### C.    Conscious Pain and Suffering

WPHA further disputes the allegations regarding Mr. Chamberlain, Sr.'s conscious pain and suffering, relying on *Ramos v. Shah*, 740 N.Y.S.2d 376 (2d Dep't 2002) and *Jones v. Simeone,* 492 N.Y.S.2d 270 (4th Dep't 1985).   However, both *Ramos* and *Jones* are distinguishable in that proof was considered upon appeal of a jury verdict and after judgment was entered respectively, and not at the motion to dismiss stage.  *Jones* is further distinguishable from the instant matter in that Plaintiff's Amended Complaint clearly pleads that Mr. Chamberlain, Sr. was fearful for his life and expressed the same on multiple occasions. AC ¶¶ 47,67.  Mr. Chamberlain, Sr. vocalized this fear, which was only escalated by use of the WHPA master key by the officer Defendants to open Mr. Chamberlain, Sr.'s apartment door and maintain its open state with use of the halligan tool.

WPHA further claims that "New York common law holds that law enforcement personnel acting in the furtherance of their duty are excused from what may be otherwise trespassory acts." *Hand v. Stray Haven Humane Soc'y,* 799 N.Y.S.2d 628 (3d Dep't 2005).  However, this general grant is not unfettered.  The exigency which may have justified initial police interaction with Mr. Chamberlain, Sr. ended when he advised them he did not require assistance.   Any subsequent arguable "exigency" was the product of Defendants' own

wrongdoing which escalated rather than resolved the situation which culminated in Mr. Chamberlain, Sr.'s death.

WPHA disputes liability further by claiming that its provision of the master key to a third party without protocol and in contravention of the lease could not foreseeably result in unlawful entry and injury to a resident.  Plaintiff has clearly pleaded, and WPHA does not dispute, that the master key was given to the WPDPS, without residents' knowledge or permission and that the key was used.  As discussed above, it was a foreseeable consequence that injuries would result if police officers opened the door of a resident's home without notice to the resident that they possessed a key, over the resident's vociferous and express objections and, particularly, when the resident may be emotionally distraught or disturbed and expressing fear for his life. Any further forseeability inquiry is "subject to varying inferences, creating issues that generally are for the fact finder to resolve." *Finnigan v. Lasher*, 935 N.Y.S.2d 669, 670 (3d Dep't 2011).

For these reasons, Plaintiff has sufficiently pleaded facts necessary to substantiate his state law claims at this time.  Further inquiries into the facts are inappropriate on a motion to dismiss and are better suited for the finder of fact, after discovery is permitted.

## CONCLUSION

For the reasons set forth herein, Plaintiff submits that the Court should deny Defendants' Motions to Dismiss in their entirety.  In the event the Court finds the Amended Complaint does not adequately state plausible claims against any Defendant, on any basis, Plaintiff would respectfully request an opportunity to cure such purported defect.

Dated:  New York, New York
        April 12, 2013

NEWMAN FERRARA LLP

By: _____
Randolph M. McLaughlin
rmclaughlin@nfllp.com
Debra S. Cohen
dcohen@nfllp.com
Jeffrey M. Norton
jnorton@nfllp.com
1250 Broadway, 27th Floor
New York, New York 10001
Tel: 212-619-5400
Fax: 212-619-3090

*Counsel for Plaintiff*