UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
KENNETH CHAMBERLAIN, JR., as the Administrator of
the Estate of Kenneth Chamberlain, Sr.,

                                        Plaintiff,


        - against -

                                                                    **OPINION AND ORDER**
CITY OF WHITE PLAINS, WHITE PLAINS HOUSING
AUTHORITY, POLICE OFFICER ANTHONY CARELLI,                           No. 12-CV-5142 (CS)
POLICE OFFICER STEVEN HART, POLICE OFFICER
MAURICE LOVE, POLICE OFFICER STEVEN DEMCHUK,
POLICE OFFICER MAREK MARKOWSKI, SERGEANT
STEPHEN FOTTRELL, SERGEANT KEITH MARTIN, and
LIEUTENANT JAMES SPENCER,

                                        Defendants.
-----------------------------------------------------------------------x

<u>Appearances:</u>
Randolph M. McLaughlin
Debra S. Cohen
Jeffrey M. Norton
Newman Ferrara LLP
New York, New York
*Counsel for Plaintiff*

Peter A. Meisels
John M. Flannery
Lalit K. Loomba
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
White Plains, New York
*Counsel for Defendants City of White Plains, Love,*
*Demchuk, Markowski, Fottrell, Martin, and Spencer*

Lance H. Klein
Jaclyn G. Bernstein
Keane & Beane, P.C.
White Plains, New York
*Counsel for Defendant White Plains Housing Authority*

Albert W. Cornachio III
Pappalardo & Pappalardo, LLP
Rye Brook, New York
*Counsel for Defendant Hart*

Andrew C. Quinn
The Quinn Law Firm, PLLC
White Plains, New York
*Counsel for Defendant Carelli*

Seibel, J.

Before the Court are the Motions to Dismiss of Defendants City of White Plains (the "City"), Police Officers Maurice Love, Steven Demchuk, and Marek Markowski, Sergeants Stephen Fottrell and Keith Martin, and Lieutenant James Spencer (collectively, the "City Defendants"), (Doc. 45), Defendant White Plains Housing Authority ("WPHA"), (Doc. 58), Defendant Police Officer Anthony Carelli, (Doc. 65), and Defendant Police Officer Steven Hart, (Doc. 62). For the reasons set forth below, the City Defendants' Motion is GRANTED IN PART and DENIED IN PART, WPHA's Motion is GRANTED, Carelli's Motion is GRANTED IN PART and DENIED IN PART, and Hart's Motion is GRANTED.

## I.  **BACKGROUND**

For the purposes of the instant Motions to Dismiss, I accept as true the facts, but not the conclusions, as set forth in the Amended Complaint ("Complaint" or "AC"), (Doc. 36), and accompanying audio and video recordings of the incident in question.[1]

---

[1] I consider several audio and video recordings of the incident, as they are integral to the Complaint and were relied on heavily in drafting it. (*See* Part II.B below; Affirmation [of Lalit K. Loomba] in Support of Motion for Partial Dismissal of Plaintiff's First Amended Complaint ("Loomba Aff."), (Doc. 46), Ex. E (CD-ROM containing audio and video files).) At the September 13, 2012 conference, I directed the parties to prepare preliminary transcripts of the recordings solely for the convenience of the Court in deciding the instant Motions. (*See id.* Ex. C (Defendants' transcription of Life Aid audio recordings); *Id.* Ex. D (Defendants' transcription of Taser video recordings); Declaration of Randolph M. McLaughlin in Support of Plaintiff's Opposition to Defendants' Motions to Dismiss the Amended Complaint ("McLaughlin Decl."), (Doc. 70), Ex. A ("Life Aid Transcript") (Plaintiff's transcription of Life Aid audio recordings); *Id.* Ex. B ("Taser Transcript") (Plaintiff's transcription of Taser video recordings).) The recordings themselves are the controlling evidence, not the transcripts, and all parties may later vary from these preliminary transcripts. The vast majority of the transcription is undisputed, and as to disputed portions I have given

On the morning of November 19, 2011, Kenneth Chamberlain, Sr. ("Chamberlain") was in his apartment at 135 South Lexington Ave., part of the Winbrook Houses development, in White Plains, New York.  (AC ¶ 10.)  Chamberlain, a 68-year-old man with serious health problems, had a "Life Aid" medical alert device that was monitored around the clock.  (*Id.* ¶¶ 10-11.)  At approximately 5:00 a.m., Chamberlain's alert device was accidentally triggered, sending a notification to the Life Aid monitoring center and activating a two-way communication device in his apartment that immediately began recording communications between the monitoring center and the apartment.  (*Id.* ¶¶ 10, 12.)  Chamberlain can be heard in the background stating, "You can't hide from me.  What I'm gonna do is give you a good ass wuppin . . . Give you a good . . . Well, I'll give you a good ass wuppin."  (Life Aid Transcript 1.)  When Chamberlain did not respond to the Life Aid operator over the communication device, Life Aid contacted the White Plains Department of Public Safety ("WPDPS") to report the unanswered medical alert, and an ambulance was dispatched along with Defendant Love.  (AC ¶¶ 13-15.)  Upon running a computer check on Chamberlain and his home address, the WPDPS dispatch officer learned that there had been several "emotionally disturbed person calls" involving Chamberlain and his address, and he dispatched Defendants Markowski and Martin to join Love at the scene, advising the responding officers of the possibility of encountering an emotionally disturbed person ("EDP").  (*Id.* ¶ 16.)

Chamberlain refused entry to the responding officers and paramedics, telling them through his door that he had not called for them and was not in need of assistance.  (*Id.* ¶¶ 17, 27,

---

Plaintiff the benefit of the doubt.  No disputed portions affect the outcome of the instant Motions.  For simplicity, I will cite to Plaintiff's transcript instead of a time stamp on the recordings themselves.

31.)  Nevertheless, the officers banged on the door,[2] demanding that Chamberlain admit them because they had to visually confirm that he was not in need of assistance.  (*Id.* ¶¶ 26, 28, 30.) The Life Aid operator established contact with Chamberlain, and repeatedly advised him to open the door for the police so that they could confirm he was all right.  (Life Aid Transcript 4-5.) Chamberlain steadfastly refused, stating, "I did not call the police.  I did not call the police . . . I will not open my door . . . . No, I will not open my door.  I will not open my door.  I will not open my door.  This is an alert . . .  This is an alert . . . This is an alert, this is an alert from Washington, D.C.  An all points bulletin all areas.  I am being overrun by the White Plains Police Department.  They're pounding on my door and I did not call for them."  (*Id.*)

After Chamberlain's continued refusal to open the door, Martin contacted Defendant Spencer, the ranking officer at police headquarters, and requested that tactical officers respond to the scene.  (AC ¶¶ 17, 22.)  Spencer dispatched Defendants Carelli, Demchuk, Fottrell, and Hart, directing them to take tactical gear with them.  (*Id.* ¶¶ 17, 19.)  Carelli and Hart were part of the Neighborhood Conditions Unit, a tactical unit of the White Plains Police Department assigned to patrol the area including the Winbrook Houses.  (*Id.* ¶¶ 23-24.)  WPHA, the municipal agency responsible for the Winbrook Houses, had previously provided the Neighborhood Conditions Unit with a master key to that complex, affording the police the ability to access apartments when necessary without resorting to forced entry.  (*Id.* ¶¶ 6, 25.)  In addition to this master key, the officers outside Chamberlain's apartment were now equipped with an axe, a Halligan tool (similar to a crowbar), pepper spray, a riot shield, Tasers, a beanbag shotgun, and their standard sidearms.  (*Id.* ¶ 21.)

---

[2] The Complaint describes the banging as continuous for over an hour.  (AC ¶ 39.)  The Life Aid recording reveals spurts of banging, not continuous banging.  Further, some of it seems to be a result of efforts to open the door or a window with a tool (as opposed to the officers banging in order to get Chamberlain to open the door himself).

The encounter between Chamberlain and the police continued to be recorded by the Life Aid communication device in Chamberlain's apartment, even as the Life Aid operator repeatedly urged him to open the door so the police could see that no one was in need of medical attention. (*Id.* ¶¶ 29-31.)  Chamberlain repeatedly stated to the police and the Life Aid operator that he had not activated his alert device and that he was fine and wanted the police to leave, and so the Life Aid operator called WPDPS again in an attempt to cancel the medical alert.  (*Id.* ¶¶ 31, 33.)  The police refused to abide by Life Aid's request to cancel the call and informed the Life Aid operator that they intended to enter the apartment using the master key.  (*Id.* ¶¶ 33-34; Life Aid Transcript 7.)  Either Hart or Martin used the key to open the door to Chamberlain's apartment, but Chamberlain had engaged his safety chain lock that prevented the officers from opening the door more than a few inches.  (AC ¶¶ 41.)[3]  Martin wedged the Halligan tool through the partially open door to keep it ajar.  (*Id.* ¶ 42.)

Life Aid was able to make contact with Chamberlain's sister Carol Matthew, his emergency contact, who informed the operator that her daughter Tonyia Greenhill,[4] Chamberlain's niece, lived in the same building.  (*Id.* ¶ 35.)  While on the phone with the Life Aid operator, Matthew called Greenhill, who went to Chamberlain's door.  (Life Aid Transcript 11-12.)  The officers would not allow Greenhill to speak to Chamberlain, (AC ¶¶ 36-37), but Greenhill told her mother and the Life Aid operator that "Uncle Kenny is going crazy in there . . . he's talking like real crazy out of his head," (Life Aid Transcript 11).  Greenhill handed her cell phone to Officer Carelli, and Matthew informed him that Chamberlain "does have a mental problem," to which Carelli responded, "Ok, yeah, that's what we kinda wanna check out we just

---

[3] The Amended Complaint refers to "a few inches."  (AC ¶ 41.)  The Taser video (made later in the episode) shows the door about two inches from the door jamb.

[4] Chamberlain's niece is referred to as "Tonyia Greenhill" in the Amended Complaint and "Tanya Richardson" in the Life Aid and Taser Transcripts.  I will refer to her as Ms. Greenhill.

wanna make sure he's ok." (*Id.*)  Later, the Life Aid operator speaks to Matthew again, who states that "he's on medication . . . psychiatric medication." (*Id.* at 37-38.)

As the confrontation continued for more than an hour, the Life Aid recordings capture how Chamberlain became increasingly agitated, having multiple delusions or hallucinations. (AC ¶¶ 38, 45.)  At one point Chamberlain stated, "Go the fuck on home, go home . . . . Go home to your wives, go home to your wives and your children . . . . You kidnapped my grandchildren, you kidnapped my wife, you, you, you, raped my daughter." (Life Aid Transcript 15.)  The officers are alleged to have continued to speak loudly and threateningly to Chamberlain through the door, mocking him, disrespecting him, and using at least one racial slur.  (AC ¶¶ 39-40.)[5]  The recordings indicate that Chamberlain made several threats to the officers outside his door.  (*See* Life Aid Transcript 15 ("C'mon in, shoot me if you want to, shoot me but I'm gonna get one of you motherfuckers.  I'm gonna get one of you motherfuckers."); *id.* at 16 ("The first one coming through that door I'm gonna kill."); *id.* at 17 ("[Y]ou see I'm standing here with the coup de gras."); *id.* at 22 ("Ok. Somebody's gonna die tonight.  It may be me, but somebody else is gonna die."); *id.* at 35 ("That shield you got ain't gonna stop nothing.").)

Martin kicked the door several times without succeeding at breaking it open.  (AC ¶ 42.)  During this time, Chamberlain was continuing to hallucinate and threaten the officers, stating, "They are trying to break in to murder me . . . You can talk that shit if you wanna.  I know what the deal is.  I've talked to the President and Vice President Biden . . . . Secret Service is on their way . . . . Check with Judge Leak.  Judge Leak knows what's going on . . . You hear that Mr. President and Mr. Attorney General.  I never called the police department." (Life Aid Transcript 21-23; *see also id.* at 25-26 ("Ay, ay.  Blackfoot.  Blackfoot, USMC, Blackfoot, Semper Fi, do or

---

[5] The Life Aid recordings reveal one use of a racial slur, but aside from that inexcusable statement, the Amended Complaint's characterization of the police statements as mocking, taunting, or threatening is not borne out by the recordings.

die.  Run 'em hard, run 'em high . . . . I'm a Nomad . . . . But I'm in God's hands.  If I have to be

sacrificed for the good of many, alright . . . . My marines will be here shortly."); *id.* at 31

("[W]orld wide alert.  You have my sworn testimony . . . CME Church, Mount Cavalry, CME

Church, you hear that Fran, Ella, Sister Mott, Sister Celia, CME Church, Pastor Wheeler, Pastor

Clayton, the CME, the CME Church gets that money.  You have sworn testimony from me.  As

God is my witness that's where I want that money to go.").)  Chamberlain can also be heard

talking at several points as if someone else was in the apartment.  (*See, e.g., id.* at 23 ("Lynette,

you better keep quite [*sic*].  That's right."); *id.* at 25 ("Don't take Loretta.").)

At some point, Chamberlain armed himself with a knife, and the officers repeatedly

ordered Chamberlain to drop it.  (*See, e.g., id.* at 21 ("Drop your weapon."); *id.* at 23 ("We need

you to put that knife down."); *id.* at 24 ("Put the knife down and let us see you and then we can

go away.").)  Martin can be heard reporting to another officer that "he's got a big butcher's knife

. . . We have a Halligan tool holding the door open . . . Every time we come to the door he sticks

a knife out . . . he's told me 5,000 times first man who comes through the door he's gonna kill."

(*Id.* at 22).  Chamberlain confirmed to the Life Aid operator that he had a weapon.  (*See id.* at 24

("[Life Aid:] 'Ok, do you have a weapon Mr. Chamberlain?'  [Chamberlain:] 'I have a weapon.

I am protecting myself.'").)

Fottrell tried several times to explain to Chamberlain why he needed to let them in.  (*See

id.* at 23 ("Ok, we are here now and we have to make sure that you are fine.  Once we make sure

you are fine then we are outta here and that will be that.  Is that ok with you?"); *id.* at 24 ("Mr.

Chamberlain, we are not here to [] hurt you. We are here to give you a hand, help you out."); *id.*

at 26 ("Mr. Chamberlain, we'll take you to the hospital and make sure you are ok."); *id.* at 27

("Open the door[,] we'll talk to you, we'll have the ambulance check you out and then we'll

leave. That's all it's gonna take. You're making a big deal out of this. C'mon. It's gonna take ten minutes with the ambulance to check you out and see if you are ok, and we can leave.").) When he was unsuccessful at making progress communicating with Chamberlain, Fottrell asked Chamberlain if there was "somebody else besides me who you want to talk to?" but Chamberlain did not respond. (*Id.* at 28.)

After more than an hour, Fottrell ordered Carelli to cut the safety lock using bolt cutters. (AC ¶ 42; *see* Life Aid Transcript 29 ("They broke the lock Mr. President. They broke my door lock, my safety lock.").) Fottrell drew his Taser, which was mounted with a small video camera that began recording. (AC ¶ 49; *see* Taser Transcript.) Demchuk and Love then forcibly removed the door from its hinges, and Demchuk, Martin, and Fottrell pushed the door several times. (AC ¶¶ 42-43; *see* Life Aid Transcript 35 ("They are taking the hinges off the door. They are getting ready to break through. I hear you. They're breaking through. They're breaking through Mr. President . . . I'm outnumbered and I can't hold them."); Taser Transcript 8 (same).) Fottrell can be heard stating, "I need some lethal cover here." (Taser Transcript 8.) As the door fell away, the video recording shows Chamberlain standing in his apartment six to eight feet away from the door, wearing only his underwear. (AC ¶¶ 49, 54.) The following dialogue was recorded by the Taser camera:

> Demchuk: He's right here. He's right behind the door. Are you ready?
> Unknown: Kenny, Kenny, Kenny.
> Demchuk: We don't wanna hurt you, come on.
> Chamberlain: Leave, I did not call you. I did not call you. Leave.
> [Inaudible.]
> Fottrell: Shield up, shield up.
> Unknown: Gonna get this fucker he comes flying out.
> Fottrell: Pull that thing out.
> Demchuk: I'm gonna kick it.
> Fottrell: He's around it.
> [TASER DEPLOYED]

| | |
|---|---|
| Unknown: | Alright, drop it. |
| Fottrell: | Put the knife down. |
| Chamberlain: | Shoot me, come on . . . |
| Martin: | Do it again. |
| Chamberlain: | Shoot me. |
| [TASER DEPLOYED] | |
| Chamberlain: | Shoot me. |
| Fottrell: | It's not in him. |
| Chamberlain: | Shoot me. |
| Unknown: | Come on, motherfucker. |
| Chamberlain: | Shoot me. |
| Fottrell: | Do you have another cartridge? |
| Chamberlain: | Shoot me. |
| Carelli: | Don't do it, don't do it, don't do it. |

(Taser Transcript 8-9.)  At this point, the recordings end.  The Complaint alleges that the first time Fottrell discharged his Taser, only one of the two barbs fired from the weapon entered Chamberlain's body.  (AC ¶ 52.)  As a result, the Taser caused pain and electrical burns but did not incapacitate Chamberlain as intended.  (*Id.* ¶ 53.)

When neither Taser deployment incapacitated Chamberlain, Martin grabbed the beanbag shotgun from Markowski and fired several beanbag rounds, striking Chamberlain in his chest and thigh and causing him to fall to the floor.  (*Id.* ¶¶ 55-56.)  Immediately after the beanbag shots, Carelli fired two rounds from his handgun, hitting Chamberlain in the chest.  (*Id.* ¶¶ 57, 60.)  One of the bullets passed through Chamberlain's lungs, spine, and ribs, fatally wounding him.  (*Id.*)

\*      \*      \*

Plaintiff, Chamberlain's son, now brings this action as administrator of Chamberlain's estate, asserting claims pursuant to 42 U.S.C. § 1983 ("Section 1983") and associated state law tort claims against the City of White Plains, the White Plains Housing Authority, and the individual officers involved in the November 19, 2011 incident.  (*See* AC ¶¶ 100, 108, 127, 137.)

9

## II.  LEGAL STANDARDS AND THRESHOLD ISSUES

### A.  Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief."  *Id.* at 679.  Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'"  *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

B. **Materials Outside of the Complaint**

When deciding a motion to dismiss, the Court's review is ordinarily limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *see Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). Thus, "[w]hen matters outside the pleadings are presented [in support of or] in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment . . . and afford all parties the opportunity to present supporting material." *Friedl v. City of N.Y.*, 210 F.3d 79, 83 (2d Cir. 2000) (alteration and internal quotation marks omitted). For purposes of this rule, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

Under certain circumstances, however, it is appropriate for a court to consider material outside of the pleadings on a motion to dismiss. *See Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011). For example, a court may consider documents upon the terms and effect of which the complaint relies heavily – that is, "integral" documents – without converting a motion to dismiss into a summary judgment motion, *see Chambers*, 282 F.3d at 153, provided it is "clear on the record that no dispute exists regarding the authenticity or accuracy of the document[s]," *Faulkner*, 463 F.3d at 134. This rule extends to non-documentary records such as audio recordings, provided the above-mentioned requirements are met. *See Condit v. Dunne*, 317 F. Supp. 2d 344, 357-58 (S.D.N.Y. 2004) (audio recordings of radio show were properly considered on motion to dismiss because complaint relied heavily on them); *In re*

*Ashanti Goldfields Sec. Litig.*, 184 F. Supp. 2d 247, 263 (E.D.N.Y. 2002) (transcript of

conference call considered on motion to dismiss where call was referenced in complaint and both

parties' arguments relied on statements made during the call).

There are four documents attached as exhibits to the Amended Complaint:  the White

Plains Police Department ("WPPD") policy regarding "Mentally/Emotionally Disturbed

Persons," (AC Ex. A), the corresponding New York Police Department ("NYPD") policy, (*id.*

Ex B), an excerpt from the WPPD policy regarding "Barricade Situations and Barricade

Situations with Hostages," (*id.* Ex. C), and the corresponding NYPD policy, (*id.* Ex. D).

Plaintiff refers to these policies in the Complaint as evidence of the City's failure to adopt

adequate policies regarding police interaction with EDPs.  (*See id.* ¶¶ 75-93.)  I may consider

these documents because they are attached to the Amended Complaint.  *See Chambers*, 282 F.3d

at 152.  I may also consider Plaintiff's Notice of Claim, submitted to the City and WPHA as

required by state law, in connection with Defendants' arguments that the Notice of Claim is

deficient.  *See, e.g., Lieber v. Vill. of Spring Valley*, 40 F. Supp. 2d 525, 530-31 (S.D.N.Y. 1999)

(examining notice of claim on motion to dismiss).

Additionally, with their Motions and opposition thereto, the parties have submitted the

audio recordings of the incident captured by Life Aid and the audio-video recordings captured by

the camera mounted on Sergeant Fottrell's Taser.  (*See* Loomba Aff. Ex. E (CD-ROM containing

recording files); Life Aid Transcript; Taser Transcript; *see also* Note 1 above.)  Plaintiff's

Complaint repeatedly refers to the recordings of the incident captured by Life Aid and the Taser-

mounted camera.  (*See* AC ¶ 12 ("Life Aid . . . immediately began recording communications to

and from his apartment."); *id.* ¶ 29 ("The Life Aid operators, through the two-way

communication device in the apartment, could hear the loud banging of the police officers."); *id.*

¶ 38 ("The Life Aid recordings document Mr. Chamberlain, Sr.'s growing fear and agitation as the onslaught continued and escalated for over one hour."); *id.* ¶ 45 ("The Life Aid recordings clearly indicate that as the incident progressed and escalated, so did Mr. Chamberlain Sr.'s fear and agitation."); *id.* ¶ 49 ("As the door fell open, a camera on a Taser being held by Defendant Fottrell recorded Mr. Chamberlain, Sr. standing approximately six to eight feet away from the doorway wearing only a pair of boxer shorts."); *id.* ¶ 54 ("Video from the Taser recorded its tortious and torturous effects on Mr. Chamberlain, Sr.").)

Neither party contests the appropriateness of the Court's consideration of the recordings without converting the instant Motions to ones for summary judgment.  To the contrary, at the pre-motion conference before this Court on September 13, 2012, Plaintiff explicitly indicated his intent to rely on the recordings in drafting the Amended Complaint, and both parties submitted transcripts of the recordings with their motion papers.  (*See* Loomba Aff. Exs. C, D; McLaughlin Decl. Exs. A, B.)  It is clear that the recordings form a significant basis for much of the factual information contained in the Complaint, and I therefore find that the recordings are an integral component of the allegations as to how the hour-long incident unfolded.  Accordingly, I will consider the Life Aid audio recordings and the Taser video recordings in resolving the instant Motions to Dismiss.

**C.  <u>Qualified Immunity</u>**

Qualified immunity shields a government official from liability for civil damages unless "(1) [] the official violated a statutory or constitutional right, and (2) [] the right was clearly established at the time of the challenged conduct." *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (internal quotation marks omitted).  "Even where the plaintiff's federal rights . . . are clearly established, the qualified immunity defense protects a government actor if it was

objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (internal quotation marks omitted); *see Anderson v. Creighton*, 483 U.S. 635, 638-40 (1987). "The objective reasonableness test is met – and the defendant is entitled to immunity – if officers of reasonable competence could disagree on the legality of the defendant's actions." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) (internal quotation marks omitted). "The objective element of this test requires the court to look beyond the generalized constitutional protection, such as the right to be free of unreasonable searches and seizures, and to determine whether the law is clearly established in a more particularized sense," given the specific factual situation with which the officer is confronted. *Kerman v. City of N.Y.*, 261 F.3d 229, 236 (2d Cir. 2001).

Qualified immunity entitles public officials to "an immunity from suit rather than a mere defense to liability . . . . [I]t is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) (emphasis omitted). The Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan,* 555 U.S. 223, 232 (2009) (internal quotation marks omitted). Indeed, the "driving force" behind the qualified immunity doctrine is the need "to ensure that insubstantial claims against government officials will be resolved prior to discovery." *Id*. at 231 (internal quotation marks and alteration omitted).

## III.  DISCUSSION

### A.  Claim I:  Unlawful Entry[6]

To state a claim under Section 1983, a complaint must allege that the defendant (1) deprived the plaintiff of rights secured by the Constitution and laws of the United States, (2) while acting under color of state law.  42 U.S.C. § 1983.  The Fourth Amendment protects individuals and their homes against unreasonable searches and seizures, *see* U.S. Const. amdt. IV, and "[t]o be reasonable under the Fourth Amendment, a search of a home must either be conducted pursuant to a warrant or meet an exception to the warrant requirement," *Anthony v. City of N.Y.*, 339 F.3d 129, 135 (2d Cir. 2003).

A warrantless entry into an individual's home is reasonable if exigent circumstances exist that require police officers to immediately enter the property.  *See id.*; *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984).  Under the emergency aid doctrine, an exigency exists if the officers reasonably believe it is necessary to "render emergency assistance to an injured occupant or to protect an occupant from imminent injury."  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *see Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 236 (E.D.N.Y. 2010).  This test is purely objective and is based on the "totality of the circumstances confronting law enforcement agents in the particular case"; the core inquiry is "whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action."  *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011) (internal quotation marks omitted).

---

[6] The first cause of action in the Amended Complaint is subtitled "For Use of Excessive Force," (AC at 16), but includes allegations that Defendants' actions constituted "unreasonable and unnecessary use of excessive force and unlawful entry," (*id.* ¶ 100).  Out of an abundance of caution, I will treat the claim as one for both excessive force and unlawful entry, despite the limitation in the subtitle.

The Amended Complaint fails to state a claim for unlawful entry on which relief can be granted. First, the facts as alleged by Plaintiff make clear that the officers' entrance into the apartment was authorized pursuant to the emergency aid doctrine. WPDPS received a call from Life Aid, which reported that Life Aid operators had been unable to raise a response from Chamberlain after receiving an alert from his Life Aid device. (AC ¶¶ 12-13.) Upon running a "computer history check," WPDPS determined that there had been several previous EDP calls involving Chamberlain. (*Id.* ¶ 16.) Chamberlain steadfastly refused entry to medical and police personnel, even to allow them to visually confirm that no one at the location was in need of medical assistance. Additionally, officers on the scene could hear Chamberlain through the door occasionally speaking as if to another person – suggesting either the actual presence of another person who could be in danger or that Chamberlain was hallucinating, which could pose a danger to himself.

Under these circumstances, a reasonable, experienced officer would be justified in concluding that entry into the apartment was necessary. Based on the history of EDP calls involving Chamberlain, the unanswered medical alert, and the way he was behaving when emergency personnel responded to his apartment, the officers could have reasonably concluded that Chamberlain was in need of medical attention or posed a threat to himself or other possible occupants of the apartment. The officers were justified in demanding to undertake a visual inspection of the premises to confirm that no one was in distress. *See Anthony*, 339 F.3d at 135-37 (warrantless entry justified when 911 call originated from address of woman with Down Syndrome reporting man with gun); *Tierney v. Davidson*, 133 F.3d 189, 197 (2d Cir. 1998) (reasonable for officer to conclude someone was injured or in danger when responding to "priority" domestic violence call where officer found broken window and neighbors indicated

shouting ceased just before officer's arrival); *cf. Simmons*, 661 F.3d at 158-59 (speculation that

third person might be present as justification for warrantless search was insufficient when

officers "[n]either saw [n]or heard anything that might lead them to believe that anyone other

than [the defendant] was inside"). Indeed, accepting without confirmation the assurances of a

clearly unstable individual that an emergency call had been accidentally placed and that no one

inside the apartment needed emergency services would have been irresponsible.[7]

Even if their warrantless entry into Chamberlain's apartment was not justified, the

responding officers are entitled to qualified immunity for their actions. As discussed above,

based on the history of EDP calls to Chamberlain's address, the unanswered medical alert, and

the way Chamberlain was talking, including as if other individuals were inside the apartment, it

would not be unreasonable for an objective officer to conclude that there was a risk that an

occupant of the apartment needed police or medical assistance that justified the officers' entry

into the apartment. *See Kerman*, 261 F.3d at 239 ("A forced entry into the apartment of an

emotionally disturbed man possibly wielding a [weapon] cannot be dealt with by half measures.

Based on the information in the call, the police did not act unreasonably in choosing to enter and

immobilize [the man] as quickly and safely as possible."). Plaintiff has not directed the Court's

attention to any clearly established law stating otherwise, and the Court is aware of none. The

officers involved are therefore entitled to qualified immunity from suit over the warrantless entry

---

[7] Plaintiff argues, (Plaintiff's Omnibus Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("P's Mem."), (Doc. 69), 8), and the Amended Complaint alleges, (AC ¶ 71), that the officers knew that the Life Aid system had been triggered accidentally. This assertion is conclusory and I therefore need not accept it. The facts as alleged (including the recordings) show that Chamberlain denied activating the Life Aid device, that Life Aid tried to cancel the call after Chamberlain's denials, and that one officer, in response to Chamberlain's denial, seemingly accepted that the activation had been accidental. But none of these facts plausibly shows that the officers knew for a fact that the device was triggered accidentally.

into Chamberlain's apartment.[8]  Accordingly, the unlawful entry claim must be dismissed as to

all individual Defendants.[9]

**B. <u>Claim I:  Excessive Force</u>**

"[A]ll claims that law enforcement officers have used excessive force – deadly or not – in

the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed

under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S.

386, 395 (1989) (emphasis omitted).  A determination of reasonableness under the Fourth

Amendment "requires a careful balancing of the nature and quality of the intrusion on the

individual's Fourth Amendment interests against the countervailing governmental interests at

stake." *Kerman*, 261 F.3d at 239 (internal quotation marks omitted).  Evaluation "of a particular

use of force must be . . . from the perspective of a reasonable officer on the scene, rather than

with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *see Jones v. Parmley*, 465 F.3d

46, 61 (2d Cir. 2006).  "A claim [of] excessive force . . . is subject to an objective test of

reasonableness under the totality of the circumstances, which requires consideration of the

---

[8] I also find that it is objectively reasonable for the officers to have concluded that Chamberlain had impliedly consented to warrantless entry into the apartment by owning and using a Life Aid device.  A warrantless entry does not amount to a constitutional violation if it was voluntarily consented to, whether expressly or impliedly by conduct.  *See Flynn v. James*, 513 F. App'x 37, 39 (2d Cir. 2013) (summary order); *United States v. Gandia*, 276 F. App'x 10, 12 (2d Cir. 2008) (summary order).  The Life Aid device is intended to contact emergency personnel when activated; indeed, the entire purpose of the device is to summon emergency aid.  It was reasonable for the officers to conclude that by employing such a device, Chamberlain consented to having emergency responders enter the apartment in the event the device was activated, and that a subsequent withdrawal of that consent – by a clearly unstable person and in circumstances where a third person might have been present – should not be honored.

[9] Plaintiff's factual allegations do not indicate any involvement by Lieutenant Spencer in the allegedly unlawful entry into Chamberlain's apartment.  The only allegations involving Spencer are that he was the highest-ranking officer on duty at WPDPS headquarters and that he dispatched several of the responding officers upon receiving a request for backup.  (AC ¶¶ 17, 19, 22.)  This allegation of supervisory liability will be addressed under that separate claim below, but there is clearly no basis for direct liability as to Spencer.  Similarly, the Amended Complaint contains no allegations that Officer Markowski was involved in the decision to enter or actually carried out any part of the entry into the apartment.  (*See id.* ¶¶ 41-43 (entry was ordered or effected by Martin, Hart, Fottrell, Carelli, Demchuk, and Love).)  The unlawful entry claim is therefore dismissed as against Spencer and Markowski on the additional ground that they had no personal involvement in the entry.  *See Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) ("It is well-settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983.") (internal quotation marks and alteration omitted).

specific facts in each case, including . . . whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. Furthermore, qualified immunity protects police officers from the "sometimes hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (internal quotation marks omitted), *overruled in part on other grounds by Pearson*, 555 U.S. 223.

The direct applications of force that Plaintiff alleges were excessive were undertaken by Sergeant Fottrell (Taser), Sergeant Martin (beanbag gun), and Officer Carelli (handgun). All three applications occurred in the final moments of the incident, once the officers had removed the door to Chamberlain's apartment.

1.  Sergeant Fottrell's Use of the Taser

Defendants first contend that the recordings demonstrate that any claim of excessive force is implausible (and therefore fails to satisfy the *Twombly/Iqbal* pleading standard) because the officers were clearly justified in employing the amount of force used. (*See, e.g.*, Carelli Mem. 10-12.)[10] The Life Aid recordings indicate that during the hour-long incident, Chamberlain was armed with a knife[11] that the officers could see through the partially open door

---

[10] "Carelli Mem." refers to Memorandum of Law in Support of Defendant Carelli's Motion to Dismiss. (Doc. 67.)

[11] Plaintiff contends that a factual dispute exists as to whether Chamberlain had a knife at all and that the most the recordings indicate is that Chamberlain "used a metal object to prevent the officers from removing his door." (P's Mem. 24.) The Complaint, however, repeatedly refers to the officers' need to "disarm" Chamberlain, (*e.g.*, AC ¶ 51), the recordings capture both the officers and the Life Aid operator repeatedly telling Chamberlain to drop the knife, (*e.g.*, Life Aid Transcript 21, 23-24), and at one point Chamberlain confirms to the Life Aid operator that he is holding a weapon, (*id.* at 24 ("[Life Aid:] Ok, do you have a weapon Mr. Chamberlain? [Chamberlain:] I have a weapon. I am protecting myself.")).

to the apartment and that Chamberlain repeatedly refused to comply with instructions to drop the weapon.  (*E.g.*, Life Aid Transcript 21, 23-24.)  Additionally, over the course of the standoff Chamberlain made several threats of deadly force against the officers.  (*E.g.*, *id.* at 15-17, 22, 35.)  The recordings also demonstrate that Chamberlain was delusional and extremely agitated, which Plaintiff admits in the Complaint.  (AC ¶¶ 38, 45.)  The video captured by Sergeant Fottrell's Taser does not clearly show whether Chamberlain was armed or what exactly he was doing at the time the officers breached his apartment door, although Sergeant Fottrell can be heard after the first Taser discharge ordering Chamberlain to "put the knife down."  (Taser Transcript 8.)  In the video, it does appear as if one of the two barbs that were fired from the Taser did not enter Chamberlain's body, and the Taser therefore failed to incapacitate Chamberlain as intended.  Fottrell then fired the weapon a second time, sending another burst of electricity through the one wire that was in contact with Chamberlain's body.  (*Id.*)

Accepting the factual allegations in the Amended Complaint (when viewed in conjunction with the audio and video recordings) as true, I find that Sergeant Fottrell's first discharge of the Taser was not excessive as a matter of law.  After an hour-long standoff with an armed, emotionally disturbed individual who repeatedly threatened to kill the first officer through the door, it was reasonable to use a Taser to attempt to incapacitate Chamberlain, and a "reasonable officer on the scene" would have so believed.  *Graham*, 490 U.S. at 396; *see, e.g.*, *Greenfield v. Tomaine*, No. 09-CV-8102, 2011 WL 2714221, at *4 (S.D.N.Y. May 10, 2011) (officer who deployed Taser against belligerent man armed with knife advancing on officers entitled to qualified immunity), *report and recommendation adopted*, 2011 WL 2714219 (S.D.N.Y. July 12, 2011).  Use of this non-lethal force in the circumstances is not excessive, and the Complaint therefore fails to state a cause of action as to the first discharge of the Taser.  At

20

the very least, reasonable, experienced officers could disagree as to whether use of a Taser in this situation would violate Chamberlain's rights, and Fottrell is therefore entitled to qualified immunity.

At this stage of litigation, however, Sergeant Fottrell is not entitled to qualified immunity for the second discharge of his Taser.  Plaintiff argues that once Fottrell knew that only one of the barbs had made contact with Chamberlain, it was unreasonable to discharge the Taser a second time because doing so would serve only to cause pain without achieving incapacitation. (P's Mem. 24.)  The recordings do not contradict Plaintiff's allegations that Fottrell was aware of the misfire – which presumably could be seen – nor do they clearly depict Chamberlain's conduct after the initial discharge.  Plaintiff argues that Fottrell undertook an "unnecessary infliction of pain by sending repeated charges into Mr. Chamberlain, Sr., after knowing he had [] fired the weapon" unsuccessfully.  (*Id.*)  The Amended Complaint (as opposed to Plaintiff's brief) is significantly less clear on the point, stating only that Fottrell discharged the Taser negligently, such that both prongs did not enter Chamberlain's body, resulting in burns and "repeated[]" shocks.  (AC ¶¶ 52-53.)  Nevertheless, those facts render plausible that any discharge after the first constituted an unnecessary infliction of pain, and nothing in the recordings shows otherwise.  Fottrell would not be entitled to qualified immunity for the deliberate infliction of pain if he was aware that the Taser would not succeed in incapacitating Chamberlain.[12]  Dismissal of the excessive force claim as to that second discharge is inappropriate.

_____

[12] Discovery should reveal whether there is a fact issue as to whether the officers, during the rapidly unfolding encounter, realized that only one of the prongs had hit Chamberlain and that a second discharge would be as ineffective, and painful, as the first.

2. Sergeant Martin's Use of the Beanbag Gun

After the Taser failed to incapacitate Chamberlain, Sergeant Martin is alleged to have "fired several beanbag shots at Mr. Chamberlain, Sr. that struck his thigh and his chest." (*Id.* ¶ 56.) Defendants argue that if Fottrell is entitled to qualified immunity for his initial use of the Taser, Martin is also entitled for qualified immunity for resorting to an alternative means of non-lethal force after the initial attempt to incapacitate Chamberlain failed. (City Ds' Mem. 9-10.)[13] I agree. As discussed above, a reasonable officer could have concluded that use of non-lethal force was necessary in the circumstances. When Fottrell's initial use of the Taser was unsuccessful at incapacitating Chamberlain, reasonable officers could have determined that it was appropriate to resort to another form of non-lethal force to attempt to subdue him. For substantially the same reasons as entitle Sergeant Fottrell to qualified immunity for the first Taser discharge, Sergeant Martin is entitled to immunity for his use of the beanbag weapon.

3. Officer Carelli's Use of Lethal Force

In contrast, Officer Carelli is not entitled to qualified immunity at this stage of litigation. The Complaint alleges that "[a]fter the beanbags were deployed, Mr. Chamberlain went down . . . . Immediately after the beanbag shots, Carelli discharged his handgun twice and fatally injured Mr. Chamberlain, Sr." (AC ¶¶ 56-57.) The shots are not captured on either the Life Aid audio recordings or the Taser video recording; both devices had ceased recording by that time. Assuming the allegations to be true, I find that the Complaint states a claim for excessive force against Officer Carelli. Chamberlain was already down on the ground as a result of Martin's use of the beanbag gun. (*Id.* ¶ 56.) There is no indication (at least based on the Amended Complaint

---

[13] "City Ds' Mem." refers to Memorandum of Law in Support of the City Defendants' Motion for Partial Dismissal of the Amended Complaint. (Doc. 47.)

and the other materials I may consider) that he posed a threat at that time.[14]  According to the Amended Complaint, no effort was made, once Chamberlain was down, to contain or restrain him; rather, Officer Carelli "[i]mmediately" shot and killed Chamberlain.  (*Id.* ¶¶ 56-57.)  Absent some reason requiring escalation from non-lethal to lethal force, discharging a firearm at an already-downed suspect who does not pose a threat is an unreasonable and excessive use of force.  I am likewise not convinced that reasonable, experienced officers could differ as to the appropriateness of shooting a person who had already collapsed to the ground after the application of non-lethal force and (as I must assume at this stage) no longer posed a threat. Defendant Carelli has not persuaded me that qualified immunity is appropriate for him at this time.  Therefore, the excessive force claim against Carelli will not be dismissed.

### 4.  Other Individual Defendants

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Provost*, 262 F.3d at 154 (internal quotation marks and alteration omitted).  Accordingly, the allegations against Lieutenant Spencer and Officers Hart, Love, Demchuk, and Markowski do not state a claim for relief under Section 1983.  Lieutenant Spencer was never present at the scene, (AC ¶ 22), and the Complaint does not allege that he issued any orders to the officers who were present.  Similarly, the allegations against the other officers are summarized in Plaintiff's brief as follows:

> "Hart and Carelli went to Mr. Chamberlain, Sr.'s apartment with a master key and either Martin and/or Hart used the key to open the door.  Hart . . . called Mr. Chamberlain, Sr. a 'nigger' as a police tactic to distract him. . . . Love assisted in the removal of Mr. Chamberlain, Sr.'s door and [] Demchuk was ordered to violently breach Mr. Chamberlain, Sr.'s door.

---

[14] Obviously, discovery may reveal whether Chamberlain continued to wave the knife or otherwise threaten the officers after the use of the beanbag gun.

> . . . Markowski held the beanbag shot gun that was used by Defendant
> Martin. . . . Hart, Love, Markowski, and Demchuk[] continuously banged
> loudly on his door, cursed at him, and continued for well over an hour, to
> speak to him loudly, threateningly, disrespectfully and mockingly, with at
> least one officer using racial slurs."

(P's Mem. 21-22 (internal citations omitted).)  None of these allegations amounts to the use of, or participation in the use of, force – let alone excessive force.[15]

Plaintiff's theory that each officer is liable for his failure to intervene and prevent the uses of force discussed above, (*see* AC ¶¶ 73, 106), is also unavailing.  It is true that an officer who fails to intervene to prevent other officers from causing harm can be held liable "where that officer observes or has reason to know . . . that excessive force is being used." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994).  Liability does not attach, however, unless the officer had "a realistic opportunity to intervene to prevent the harm from occurring." *Id.*  The Taser video shows that Fottrell's second Taser discharge happened almost immediately after the first, and the Amended Complaint itself alleges that Officer Carelli fired his weapon "[i]mmediately" after Martin used the beanbag shotgun.  (AC ¶ 57.)  Based on my review of the Amended Complaint and the recordings, I conclude that Plaintiff does not plausibly allege that any other officer had a "realistic opportunity" to prevent either of those uses of force.  *Anderson*, 17 F.3d at 557.  Accordingly, the excessive force claim is dismissed as against Defendants Hart, Love, Demchuk, Markowski, and Spencer for failure to state a cause of action.[16]

---

[15] Plaintiff claims that the officer who used a racial slur against him is liable under Section 1983.  Reprehensible as such conduct is, "an arresting officer's use of racial epithets does not constitute a basis for a [Section] 1983 claim." *Perry v. Cnty. of Westchester*, No. 09-CV-9391, 2011 WL 5978544, at *4 n.5 (S.D.N.Y. Nov. 29, 2011) (internal quotation marks omitted).

[16] Plaintiff also argues that in the alternative, all individual Defendants can be held liable under "principles of joint and several liability."  (P's Mem. 20-21.)  For essentially the reasons stated in the City Defendants' papers, (Reply Memorandum of Law in Further Support of the City Defendants' Motion for Partial Dismissal ("City Ds' Reply"), (Doc. 55), 3-4), this argument misses the mark.  Joint and several liability is a method of apportioning damages, not a method of determining liability in the first instance, and the cases on which Plaintiff relies do not hold otherwise.

In summary, the excessive force claim remains viable as to Sergeant Fottrell for the second discharge of the Taser and as to Officer Carelli for discharging his handgun. The excessive force claim is dismissed in all other respects and as against all other Defendants.[17]

## C. Claim II:  Conspiracy

Plaintiff alleges that the individual Defendants, all White Plains police officers, were engaged in a conspiracy "to deprive Kenneth Chamberlain, Sr. of his rights secured by the Fourth, Fifth and Fourteenth Amendments."  (AC ¶ 104.)  "To prove a [Section] 1983 conspiracy, a plaintiff must show:  (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see Biswas v. City of N.Y.*, No. 12-CV-3607, 2013 WL 5421678, at *21 (S.D.N.Y. Sept. 30, 2013).  "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence."  *Pangburn*, 200 F.3d at 72 (internal quotation marks omitted).  Nevertheless, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct."  *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (internal quotation marks omitted).  The complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made."  *Twombly*, 550 U.S. at 556.

Under the intracorporate conspiracy doctrine, "officers, agents and employees of a single corporate entity are legally incapable of conspiring together."  *Hartline v. Gallo*, 546 F.3d 95, 99

---

[17] Plaintiff has chosen to include a separate "supervisory liability" claim against Sergeant Fottrell, Sergeant Martin, and Lieutenant Spencer.  Therefore, any theories of liability for the use of excessive force stemming from those Defendants' positions as supervisors will be analyzed under that claim below.

n.3 (2d Cir. 2008) (internal quotation marks omitted).  The Second Circuit recognizes this rule in

the context of conspiracy claims under 42 U.S.C. § 1985, *see id.*; *Herrmann v. Moore*, 576 F.2d

453, 459 (2d Cir. 1978), but has not yet had occasion to decide whether the doctrine also applies

to conspiracy claims under Section 1983, *see Lewis v. Havernack*, No. 12-CV-31, 2013 WL

1294606, at *12 (N.D.N.Y. Mar. 28, 2013); *Alvarez v. City of N.Y.*, No. 11-CV-5464, 2012 WL

6212612, at *3 (S.D.N.Y. Dec. 12, 2012).  Several District Courts in the Circuit have addressed

the question, however, and have held that the rationale behind the intracorporate conspiracy rule

– that there is no conspiracy if the conduct is essentially a single act by agents of a single entity

acting with the scope of their employment – applies with equal force in the Section 1983 context.

*See Lewis*, 2013 WL 1294606, at *12; *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F.

Supp. 2d 197, 210 (S.D.N.Y. 2013); *Alvarez*, 2012 WL 6212612, at *3; *Kogut v. Cnty. of

Nassau*, Nos. 06-CV-6695, 06-CV-6720, 2009 WL 2413648, at *13 (E.D.N.Y. Aug. 3, 2009);

*see also Anemone v. Metro. Transp. Auth.*, 419 F. Supp. 2d 602, 604 (S.D.N.Y. 2006) (collecting

cases) ("In the absence of controlling contrary authority, this court will continue to apply the

intracorporate conspiracy doctrine to Section 1983 claims because the doctrine's logic is

sound.").  I agree with this assessment of the doctrine's applicability.

It follows, however, that an exception to the intracorporate conspiracy doctrine exists

when the alleged conspirators are motivated by an improper personal interest separate and apart

from that of their principal.  *Lewis*, 2013 WL 1294606, at *13; *Alvarez*, 2012 WL 6212612, at

*3; *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 360 (E.D.N.Y. 1999); *see Girard v.

94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 71-72 (2d Cir. 1976).  This "personal stake" exception

applies "where law enforcement allegedly exercises official duties in unconstitutional ways in

order to secure personal benefit."  *Alvarez*, 2012 WL 6212612, at *3.

26

In this case, Plaintiff claims that the individual Defendants had entered into a conspiracy to deprive Chamberlain of his constitutional rights.  (*See* AC ¶¶ 101-08.)  The Complaint, however, is devoid of factual allegations plausibly supporting that conclusion.  Plaintiff states that "Defendants Carelli, Hart and Fottrell, each, have or had federal civil right lawsuits filed against them wherein it was alleged that they had, *inter alia*, used excessive force, racial or ethnic slurs, and engaged in other deprivations of the constitutional rights of African-Americans, Latinos, and other minority groups members while working under color of law," (*id.* ¶ 103), and that the housing development in which Chamberlain lived is "predominantly African-American," (*id.* ¶ 102).  As I mentioned at the pre-motion conference on September 13, 2012, allegations that there have been prior civil lawsuits against Defendants mean little if those lawsuits did not end in findings of wrongdoing.  And even accepting the potential relevance of the allegations in those other cases, there is no indication that those other cases involved conspiratorial conduct, that any defendant was aware of the prior conduct of his co-defendants, or even what Carelli, Hart, and Fottrell are specifically alleged to have done.  Prior alleged misconduct does not plausibly suggest that the instant alleged misconduct is the product of a conspiracy.  Plaintiff has provided no facts suggesting a prior agreement between the individual Defendants or other evidence of a collective desire to deprive Chamberlain of any constitutional rights.  The conclusory language in the Complaint attempting to cast a racial motivation on the officers' actions is insufficient to meet the *Twombly/Iqbal* standards to state a claim for Section 1983 conspiracy.  *See Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.") (alteration and internal quotation marks omitted); *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000) (to withstand motion to dismiss, "plaintiff must

provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end" as well as "some details of time and place and the alleged effects of the conspiracy") (internal quotation marks omitted). Likewise, one Defendant's use of a racial slur does not plausibly suggest a meeting of the minds in agreement to effect a deprivation of constitutional rights. Plaintiff has failed to plead sufficient facts to render plausible his allegations of conspiracy.

In any event, I find that Plaintiff's claim would be barred by the intracorporate conspiracy doctrine. All of the individual Defendants alleged to be participants in the conspiracy are officers with the White Plains Police Department. (AC ¶ 7.) Plaintiff points to his allegations regarding the use of racial slurs to argue that the officers must have been acting based on "personal animus and racial animus" because the Police Department's interest would have been to render aid rather than taunt Chamberlain and exacerbate the situation. (P's Mem. 29-30.) The Complaint does allege that "[a]t least one officer taunted [Chamberlain] with racial slurs," (AC ¶ 39), and the audio recording of the incident does reveal a single use of a racial slur by one of the officers, (Life Aid Transcript 31). Reprehensible as it is, a single use of a racial epithet by a single officer does not, as noted above, plausibly indicate that the eight individual Defendant officers (or even a subset of them) entered into any sort of agreement to deprive Chamberlain of constitutionally protected rights, let alone one based on collective racial or personal animus.[18] Nor has Plaintiff suggested any other sort of collateral personal motive that might plausibly serve to meet the personal-stake exception.

---

[18] Indeed, even Plaintiff suggests that the use of the epithet may have been an ill-advised tactic on the officer's part to distract Chamberlain and get him away from the door. (*See* AC ¶ 40 ("One of the racial slurs came from Defendant Hart, who stood outside the window . . . . He had been ordered by the sergeants to go to Mr. Chamberlain's window to 'distract' him.); P's Mem. 5 ("Defendant Hart, ordered by the sergeants to go to Mr. Chamberlain, Sr.'s window to 'distract' him, stood outside of Mr. Chamberlain, Sr.'s first floor apartment and called him a 'nigger.'").)

Accordingly, the claim under Section 1983 alleging a conspiracy among the individual Defendants must be dismissed in its entirety.[19]

### D. **Claim III:** *Monell* **Liability**

Municipal liability under Section 1983 requires proof that a particular constitutional or statutory violation was the result of an official policy:

> [A] local government may not be sued under [Section] 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under [Section] 1983.

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The Second Circuit has established a two-pronged test that a plaintiff must satisfy before recovering from a municipality under Section 1983. *See Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996). First, a plaintiff must "prove the existence of a municipal policy or custom" to show that the municipality took some action beyond merely employing the misbehaving officers. *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985). Second, the plaintiff must establish a causal connection between the policy and the alleged civil rights violation. *Id.*

To satisfy the first prong on a motion to dismiss, Plaintiff must allege the existence of one of the following:

---

[19] Plaintiff argues in his opposition papers that application of the intracorporate conspiracy doctrine is not warranted because the factual allegations in the Complaint demonstrate the existence of "a conspiracy between the WPHA, WPDPS and/or individual officers." (P's Mem. 30.) But the conspiracy claim is asserted only against the individual officers and alleges that "said Defendants [referring to Carelli, Hart, and Fottrell] and the other defendant police officers, entered into a conspiracy," making no mention of WPHA. (AC ¶ 104.) It is well established that "a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir.1998); *see Kiryas Joel Alliance v. Vill. of Kiryas Joel*, No. 11-CV-3982, 2011 WL 5995075, at *10 n.9 (S.D.N.Y. Nov. 29, 2011) ("[P]laintiffs cannot use their opposition to the motion to dismiss to raise new claims or arguments, and thus the Court does not address the new arguments made in the plaintiffs' memorandum."), *aff'd*, 495 F. App'x 183 (2d Cir. 2012). Accordingly, I will not allow Plaintiff to amend his Complaint via his opposition papers to the Motions to Dismiss to allege a different conspiracy than the one set forth in the second cause of action. And, in any event, the Amended Complaint is devoid of facts suggesting an agreement by anyone at the WPHA to deprive Chamberlain of his rights.

> (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a 'custom or usage' and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

*Moray*, 924 F. Supp. at 12 (internal citations and quotation marks omitted); *see Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012), *cert. denied*, 134 S. Ct. 125 (2013).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). As stated above, only where a plaintiff can demonstrate that a municipality's failure to train "amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact" will a policy or custom actionable under Section 1983 be established. *Moray*, 924 F. Supp. at 12 (internal quotation marks omitted); *see Connick*, 131 S. Ct. at 1359-60; *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). To establish deliberate indifference, a plaintiff must demonstrate that: (1) "a policymaker knows to a moral certainty that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training . . . will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of N.Y.*, 974 F.2d 293, 297-98 (2d Cir. 1992) (internal quotation marks omitted). "[D]emonstration of deliberate indifference

30

requires a showing that the official made a conscious choice, and was not merely negligent." *Jones*, 691 F.3d at 81.

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 131 S. Ct. at 1360 (internal quotation marks omitted).  This is because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*  At the same time, however, the Supreme Court in *Connick* reaffirmed the viability, in limited circumstances, of the "single-incident" theory of liability envisioned in the Court's prior *Canton* decision.  *See id.* at 1360-61; *Canton*, 489 U.S. at 390 n.10.  Under that theory, a municipality can be found to be deliberately indifferent based on a single constitutional violation where "the unconstitutional consequences of failing to train [are] so patently obvious that a city should be liable under [Section] 1983 without proof of a pre-existing pattern of violations." *Connick*, 131 S. Ct. at 1361.  Violation of constitutional rights must be a "highly predictable consequence" of the failure to train.  *Id.* (internal quotation marks omitted).  "Thus, deliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs." *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (alterations and internal citations and quotation marks omitted), *cert. denied*, 132 S. Ct. 1741 (2012).

While some have argued that the *Connick* decision so narrowed the single-incident theory as to essentially eliminate it, courts across the country have continued to apply that theory post-*Connick* when its strict requirements have been met.  *See, e.g.*, *Cristini v. City of Warren*, No. 07-11141, 2012 WL 5508369, at *12-13 (E.D. Mich. Nov. 14, 2012) (denying summary

judgment on single-incident theory where police officers allegedly received no training as to handling exculpatory evidence); *Schwartz v. Lassen Cnty.*, 838 F. Supp. 2d 1045, 1057-59 (E.D. Cal. 2012) (denying motion to dismiss claim under single-incident theory that jail's personnel lacked any training on providing proper medical care to inmates); *Wereb v. Maui Cnty.*, 830 F. Supp. 2d 1026, 1033-37 (D. Haw. 2011) (denying summary judgment on single-incident theory where jail employees allegedly had no training on detecting when inmates need urgent medical care); *see also Dillman v. Tuolumne Cnty.*, No. 13-CV-404, 2013 WL 3832736, at *6-8 (E.D. Cal. July 23, 2013) (dismissing claim under single-incident theory where plaintiff challenged adequacy, rather than lack of existence, of training regarding proper use of handcuffs and strip searches); *Ault v. Baker*, No. 12-CV-228, 2013 WL 1247647, at *8-10 (E.D. Ark. Mar. 27, 2013) (dismissing claim under single-incident theory where plaintiff failed to plead sufficient facts showing consequences of lack of training as to excessive force and medical needs were patently obvious). The District Court in *Wereb* provides a thorough and well-reasoned analysis of the *Connick* decision's effect on the single-incident theory, *see* 830 F. Supp. 2d at 1031-33, and in the absence of guidance from the Second Circuit on this issue, I agree that the theory is still a viable one in limited circumstances.

1. City of White Plains

Plaintiff asserts two theories of *Monell* liability under Section 1983 against the City. First, the Complaint alleges that the City has policies of "hiring and/or retaining officers without properly screening such employees as to racial animus and propensity for violence," (AC ¶ 113), and "failing to investigate, discipline or retrain police officers who had engaged in prior acts of excessive force and racially motivated conduct," (*id.* ¶ 114). The Complaint contains no factual content regarding this theory, however, and Plaintiff's motion papers do not address it. "A court

may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." *Martinez v. City of N.Y.*, No. 11-CV-7461, 2012 WL 6062551, at *1 (S.D.N.Y. Dec. 6, 2012) (internal quotation marks omitted); *see also Robinson v. Fischer,* No. 09-CV-8882, 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) (collecting cases).  I find that Plaintiff has abandoned his *Monell* theory based on the hiring and failure to train of racist and/or violent officers.  Even if I were to reach the merits of that theory, the Complaint (as noted above) includes no factual contentions to support the conclusory allegation that the City has a policy of turning a blind eye to racially motivated or excessive uses of force by its police officers.  Thus, I find that the Amended Complaint does not "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face" with respect to this theory of liability.  *Iqbal*, 556 U.S. at 678.

The second theory put forth in the Complaint is that Chamberlain's injuries "were the result of the City's adoption of inadequate policies regarding EDPs and barricaded persons." (AC ¶ 110.)  Although the Complaint includes a dozen paragraphs casting this allegation as involving policies or the absence thereof, customs, failure to supervise, and failure to train, (*see id.* ¶¶ 110-12, 115-23), each essentially says the same thing:  that by failing to train its officers on how to deal with EDPs, the City can be held responsible for the events of November 11, 2011.  Such an allegation requires Plaintiff to establish deliberate indifference to the constitutional rights of the public on the part of policymakers for the City of White Plains.

The Amended Complaint does not allege a "pattern of similar constitutional violations" as is "ordinarily necessary" to show deliberate indifference.  *Connick*, 131 S. Ct. at 1360 (internal quotation marks omitted).  But I find that the Amended Complaint plausibly alleges deliberate indifference on the part of the City under the *Canton* single-incident theory described

above.  The Amended Complaint essentially asserts that WPPD officials knew "to a moral

certainty," *Walker*, 974 F.2d at 297, that WPPD officers would encounter EDPs in the course of

their duties, as evidenced by the fact that the WPPD employee manual includes a section entitled

"Mentally/Emotionally Disturbed Persons."  (AC Ex. A.)  The Amended Complaint also alleges

that the Public Safety Commissioner for the City of White Plains was familiar with the need for a

comprehensive EDP policy from his time at the NYPD.  (*Id.* ¶ 89.)  But the WPPD manual

section on EDPs contains no guidance and no indication that WPPD officers receive any training

regarding interacting with EDPs, as the policies contained therein relate solely to procedures

once the police have brought an EDP to a hospital.  (*See id.*)  Furthermore, given the extreme

volatility of such individuals and the need for caution when dealing with them to prevent

unnecessary escalation, it is plausible that interactions with EDPs present officers with "difficult

choice[s] of the sort that training . . . will make less difficult," *Walker*, 974 F. 2d at 297, and that

a "highly predicable consequence" of officers making the wrong choices, *Connick*, 131 S. Ct. at

1361 (internal quotation marks omitted), would be "the deprivation of a citizen's constitutional

rights," *Walker*, 974 F.2d at 298.  Discovery will shed light on whether WPPD policymakers

were, in fact, deliberately indifferent to the constitutional rights of EDPs, but at this stage

Plaintiff has made sufficient allegations for his *Monell* claim to survive the City's Motion to

Dismiss.

> 2.  White Plains Housing Authority

Plaintiff also alleges that the WPHA is liable under *Monell* because it adopted an official

policy "to provide to the [WPPD] the master keys to the apartments of its tenants, without their

knowledge or consent, and without procedures for how such keys were to be used."  (AC ¶ 124;

*see also id.* ¶¶ 125-27.)  It is certainly plausible that the Neighborhood Conditions Unit of the

WPPD had been given the master key pursuant to "actions taken or decisions made by government officials responsible for establishing municipal policies" based on a partnership between WPHA and WPPD (rather than, for example, by a janitor acting without WPHA authorization).  *Moray*, 924 F. Supp. at 12.  The facts as alleged in the Amended Complaint, however, fail to demonstrate the necessary "direct causal link" between this decision and the purported violations of Chamberlain's constitutional rights at issue in this case.  *City of Canton*, 489 U.S. at 385; *see Vippolis*, 768 F.2d at 44.  The injuries to Chamberlain were the result of an hour-long standoff with police during which Chamberlain refused to allow the officers to enter his apartment.  As discussed above, sufficient exigent circumstances existed to justify the officers' decision to enter Chamberlain's apartment.  Whether they did so via use of a key or by force is of no relevance.  Indeed, Chamberlain had engaged a chain lock that prevented the key from successfully effecting entry into the apartment, and the officers were forced to dismantle the door by force anyway.  It hardly amounts to a constitutional deprivation for WPHA to provide a means to the police of entering WPHA apartments without causing property damage when the police decide such entry is necessary.  To claim that the officers' possession of the master key somehow proximately caused Chamberlain's injuries is implausible.  Accordingly, the *Monell* claim is dismissed as against WPHA for failure to state a claim.[20]

### E.  Claim IV:  Supervisory Liability

As with municipalities, "a supervisory official cannot be held liable under [Section] 1983 on a theory of *respondeat superior*."  *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 536 (2d Cir.

---

[20] Plaintiff also argues that Chamberlain was deprived of his constitutional right to "quiet enjoyment" of his leasehold interest in his apartment "without due process of law" when WPHA gave the master key to the police. (*See* AC ¶ 126.)  The parties disagree over whether quiet enjoyment of a leasehold is a constitutional right at all and whether Chamberlain had consented to the authorities' entry via key in his lease agreement with WPHA.  I need not reach these issues, however, to dismiss the claim based on the absence of a causal connection between WPHA's decision and Chamberlain's injuries.

1993); *accord Rodriguez v. City of N.Y.*, 649 F. Supp. 2d 301, 306 (S.D.N.Y. 2009).  Rather, to prevail on a theory of supervisory liability, Plaintiff must show that the supervisory official:

> (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

*Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  The Second Circuit has clarified that the "direct participation" theory of supervisory liability refers to "personal participation by one who has knowledge of the facts that rendered the conduct illegal," and encompasses personal participation that may be considered "indirect," "such as ordering or helping others to do the unlawful acts, rather than doing them him- or herself."  *Provost*, 262 F.3d at 155 (footnote omitted).

Plaintiff alleges that Sergeants Fottrell and Martin both personally participated in the alleged civil rights violations and were grossly negligent in supervising their subordinates.  (P's Mem. 47-49).  Plaintiff also alleges that Lieutenant Spencer personally participated by staying in radio contact during the incident and demonstrated deliberate indifference to Chamberlain's rights by directing officers to respond to the scene with tactical gear.  (*Id.* at 49-50.)  *See* Note 17 above.

## 1.  Fottrell and Martin:  Personal Participation

As discussed above, the only allegations that are actionable under Section 1983 are Sergeant Fottrell's second discharge of the Taser and Officer Carelli's use of lethal force.  A separate claim against Fottrell for supervisory liability is clearly duplicative with respect to his own use of the Taser when the direct claim of excessive force is proceeding against him for that action.  As to Carelli's use of lethal force, the recordings indicate that Fottrell told the other

officers on the scene to provide him with "lethal cover" just before entry was made into Chamberlain's apartment.  (Taser Transcript 8.)  I find that this is insufficient factual support to render Plaintiff's allegations of supervisory liability plausible on the theory that Fottrell "order[ed] . . . others to do the unlawful acts."  *Provost*, 262 F.3d at 155.  That Fottrell foresaw the possibility that lethal force could become necessary, depending how events unfolded, is not enough to make him responsible for Carelli's independent decision to shoot once Chamberlain was down.

Plaintiff claims that Martin used a key to open Chamberlain's door, wedged a Halligan tool through the door to keep it open, and pushed the door open to gain entry once the chain lock had been cut.  (P's Mem. 47.)  All of these allegations involve Martin working toward gaining entry to the apartment, and as discussed above, a sufficient exigency existed to justify these actions.  No constitutional violation occurred by virtue of the police entry into Chamberlain's apartment, and Sergeant Martin cannot be held liable on a theory of supervisory liability for those actions.  *See Elek v. Inc. Vill. of Monroe*, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) ("Absent an underlying constitutional violation, there is no cognizable claim for supervisor liability." ) (internal quotation marks omitted).

But the Taser video from later in the incident does reveal that after the first discharge of Fottrell's Taser failed to incapacitate Chamberlain, Martin said to "do it again" even though, as described above, only one of the Taser barbs had entered Chamberlain's body.  (Taser Transcript 9.)  As discussed above, the Amended Complaint plausibly alleges that the second Taser discharge was an unnecessary and excessive use of force.  Accordingly, it is also plausible that Sergeant Martin is liable for "order[ing] others to do . . . unlawful acts."  *Provost*, 262 F.3d at 155.

2.  <u>Fottrell and Martin:  Gross Negligence</u>

Plaintiff also argues that Fottrell and Martin are liable as supervisors because they exhibited gross negligence in overseeing their subordinates at the scene.  (P's Mem. 47-49.)  The allegations that these two Defendants allowed the other officers to use racial slurs and curses and "generally [speak] to [Chamberlain] in an offensive and disrespectful manner," (*id.* at 48), do not rise to the level of a constitutional violation and cannot serve as the basis for supervisory liability.  *See Elek*, 815 F. Supp. 2d at 808.  Moreover, the recordings show that largely the officers were patient and courteous in their communications with Chamberlain.  At this stage, however, I find that the allegations regarding Fottrell and Martin's supervision of the tactical entry into Chamberlain's apartment are sufficient to state a claim for supervisory liability for gross negligence.  Fottrell and Martin were the ranking officers on the scene, and they had a significant amount of time to assemble a safe and orderly plan for how the officers would proceed tactically when entering Chamberlain's apartment.  They had a wide variety of non-lethal tools at their disposal, including a shield.  (*See* AC ¶ 21.)  While it is true that making entry into an apartment occupied by an armed individual is a tense and dangerous undertaking, and while at this stage I do not know the details of the Sergeants' development of the entry plan, the Complaint alleges that the supervising officers should have been able to develop a plan to subdue Chamberlain that would not have escalated the way the incident did.  The Complaint also points out that the police refused to allow Chamberlain's niece, Ms. Greenhill, to speak to him to try and calm him down.  (*Id.* ¶¶ 36-37.)  I find that the Complaint has alleged sufficient facts to at least render plausible at this stage the claim that Fottrell and Martin were grossly negligent in failing to develop a tactical entry plan with a greater likelihood of ensuring both Chamberlain's

and the officers' safety.[21]  Accordingly, insofar as it alleges gross negligence, the supervisory

liability claim will not be dismissed against Defendants Fottrell and Martin.

    3.  Lieutenant Spencer

    In contrast, the Complaint fails to state any claim against Lieutenant Spencer.  The only

factual allegations in the Complaint involving Spencer are that he was the senior officer on duty

at WPDPS headquarters but never came to the scene, (id. ¶ 22), and that he directed subordinate

officers (including two intermediate-level supervisory officers) to respond to the scene with

tactical gear, (id. ¶¶ 17-19).  Plaintiff presents no authority for the notion that a police supervisor

commits grossly negligent supervision by directing experienced subordinates to arm themselves

with tactical gear in responding to a scene involving an emotionally unstable and potentially

volatile individual.  Indeed, directing officers to bring tactical equipment in responding to a call

involving a potentially volatile EDP seems only prudent.  The supervisory liability claim is

dismissed against Lieutenant Spencer.

**F.  Claims V-VIII:  State Law Tort Claims**

    In addition to the Section 1983 claims, the Amended Complaint includes state law tort

claims against all Defendants for negligence, assault and battery, conscious pain and suffering,

and wrongful death.[22]  (See id. ¶¶ 138-67.)

    1.  Notice of Claim

    Defendants first contend that the state law claims should be dismissed because Plaintiff

failed to name the individual police officer Defendants in his Notice of Claim, as required by

---

[21] There is some tension between Plaintiff's claim that Fottrell and Martin are liable for failing to come up with a plan for subduing Chamberlain without the use of deadly force and Plaintiff's claim that Carelli's use of deadly force was wholly unnecessary.  If a fact-finder agreed with the latter proposition, it might find that Fottrell and Martin's plan *was* sufficient.

[22] The assault and battery claim is not asserted against WPHA.

Section 50-e of the New York General Municipal Law.  (*See, e.g.*, City Ds' Mem. 19-20; City Ds' Reply 14.)  Plaintiff's Notice of Claim lists the City, WPDPS, and WPHA as the contemplated defendants, but it does not mention any individual officers by name in the caption or main text.  (*See* Loomba Aff. Ex B (Notice of Claim).)

 "[I]n a federal court, state notice-of-claim statutes apply to state-law claims."  *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir.1999) (emphasis omitted).  In New York, filing a Notice of Claim with a municipality is a condition precedent to commencing a tort claim against any employee of that municipality.  *See* N.Y. Gen. Mun. Law §§ 50-e(1)(a), 50-i(1).  By statute, the Notice must contain:

> "(1) the name and post-office address of each claimant, and of his attorney, if any; (2) the nature of the claim; (3) the time when, the place where and the manner in which the claim arose; and (4) the items of damage or injuries claimed to have been sustained so far as then practicable."

*Id.* § 50-e(2).  "New York courts have explained that the purpose of Section 50-e's requirement of a notice of claim is to permit the defendant to conduct a proper investigation and assess the merits of the claim."  *Aegis Ins. Servs., Inc. v. Port Auth. of N.Y. & N.J.*, 435 F. App'x 18, 25 (2d Cir. 2011) (summary order); *see Brown v. City of N.Y.*, 95 N.Y.2d 389, 393 (2000) ("Reasonably read, the statute does not require those things to be stated with literal nicety or exactness.  The test of the sufficiency of a Notice of Claim is merely whether it includes information sufficient to enable the city to investigate.  Nothing more may be required.") (internal citations and quotation marks omitted).

 The appellate courts in New York are currently split as to whether a Notice of Claim must specifically name individual municipal officers or employees in order for a plaintiff to subsequently maintain a lawsuit against them, and the Court of Appeals has not squarely addressed the question.  *Compare, e.g.*, *Cleghorn v. City of N.Y.*, 952 N.Y.S.2d 114, 117 (App.

Div. 1st Dep't 2012) ("[T]he action cannot proceed against the individual defendants because they were not named in the notice of claim.") *with Goodwin v. Pretorius*, 962 N.Y.S.2d 539, 545 (App. Div. 4th Dep't 2013) ("[C]ourts have misapplied or misunderstood the law in creating, by judicial fiat, a requirement for notices of claim that goes beyond those requirements set forth in the statute.  If the legislature had intended that there be a requirement that the individual employees be named in the notices of claim, it could easily have created such a requirement.").

In the absence of more specific guidance, I adopt the *Goodwin* Court's well-reasoned conclusion that there is no requirement that individual defendants be specifically named in the Notice of Claim.  *See Goodwin*, 962 N.Y.S.2d at 541-46 (thorough examination of doctrinal developments regarding said requirement).  While it may be generally true that a plaintiff "may not file a notice of claim naming a municipal entity and then commence an action against a roster of individual municipal employees," *Schafer v. Hicksville Union Free Sch. Dist.*, No. 06-CV-2531, 2011 WL 1322903, at *11 (E.D.N.Y. Mar. 31, 2011) (internal quotation marks omitted), the primary inquiry regarding a Notice of Claim "is not whether [the individuals] were identified *by name* in the Notice of Claim, but whether they were described sufficiently for the [municipality] to be able to investigate the claim," *Verponi v. City of N.Y.*, 930 N.Y.S.2d 177, at *5 (Sup. Ct. 2011) (unpublished Table decision) (emphasis added).  As long as the Notice of Claim "includes information sufficient to enable the city to investigate" and identify the municipal employees involved, *Brown*, 95 N.Y.2d at 393 (internal quotation marks omitted), a failure to specifically name individual defendant employees should not bar suit against them.

In this case, Plaintiff's Notice of Claim contains more than enough information to allow the City to properly investigate the alleged incident and identify the police officers involved.  It describes the specific date, time, and address of the incident and includes a detailed description

of the alleged facts regarding the interaction between Chamberlain and the police. (*See* Loomba

Aff. Ex. B.) It would then have been a straightforward inquiry for the City to determine which

individual officers had been dispatched to Chamberlain's apartment during the November 5,

2011 incident. Plaintiff's Notice was sufficient "to permit the defendant to conduct a proper

investigation and assess the merits of the claim." *Aegis Ins. Servs.*, 435 F. App'x at 25.

Therefore, the state law claims will not be dismissed as against the individual officers for failure

to identify them by name in the Notice of Claim.[23]

   2. *Prima Facie* Elements

   In New York, "[a]n 'assault' is an intentional placing of another person in fear of

imminent harmful or offensive contact. A 'battery' is an intentional wrongful physical contact

with another person without consent." *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*,

994 F.2d 105, 108 (2d Cir. 1993). A plaintiff asserting a battery claim against a police officer

must "prove that [the officer's] conduct was not reasonable within the meaning of the New York

statute concerning justification of law enforcement's use of force in the course of their duties."

*Nimely v. City of N.Y.*, 414 F.3d 381, 391 (2d Cir. 2005); *see* N.Y. Penal Law § 35.30(1);

*Brunelle v. City of N.Y.*, 702 N.Y.S.2d 648, 648-49 (App. Div. 2d Dep't 2000). Thus, with the

exception of the state actor requirement, the elements of a Section 1983 excessive force claim

and state law assault and battery claims are substantially identical. *Posr v. Doherty*, 944 F.2d 91,

94-95 (2d Cir. 1991). In effect, "the test for whether a plaintiff can maintain [state law assault

and battery] cause[s] of action against law enforcement officials is the exact same test as the one

used to analyze a Fourth Amendment excessive force claim." *Kavazanjian v. Rice*, No. 03-CV-

---

[23] In light of this ruling, I need not address:  (a) Plaintiff's argument that at the time the original Complaint was filed, the City had not yet released the names of the individual officers involved even though Plaintiff had filed a Freedom of Information Law request; or (b) Defendants' response that Plaintiff was required to amend his Notice of Claim to name the individual officers once he learned of their identities.

1923, 2008 WL 5340988, at *7 (E.D.N.Y. Dec. 22, 2008) (alterations and internal quotation marks omitted).

"In order to establish a *prima facie* case of negligence under New York law, a claimant must show that:  (1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage [(4)] as a proximate result of that breach."  *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir. 1995).

Finally, to state a claim for wrongful death, the decedent's personal representative must plead:  "(1) the death of a human being; (2) a wrongful act, neglect or default of the defendant that caused the decedent's death; (3) the survival of distributees who suffered pecuniary loss by reason of the decedent's death; and (4) the appointment of a personal representative of the decedent."  *Pub. Adm'r of Queens Cnty. ex rel. Estate & Beneficiaries of Guzman v. City of N.Y.*, No. 06-CV-7099, 2009 WL 498976, at *12 (S.D.N.Y. Feb. 24, 2009) (internal quotation marks omitted); *see* N.Y. Est. Powers & Trusts Law § 5-4.1.  A plaintiff asserting a survival claim for conscious pain and suffering must show an underlying cause of action that the decedent would have been able to pursue had he survived the alleged wrongdoing.  N.Y. Est. Powers & Trusts Law § 11-3.2(b).

3.  Wrongful Death Claim

Plaintiff's wrongful death claim fails as a matter of law.  The Amended Complaint contains no allegations that Chamberlain leaves behind any distributees who have suffered a pecuniary loss by reason of his death.  Plaintiff argues that the Amended Complaint "mentions" Chamberlain's two children, (P's Mem. 55), which by itself is not sufficient.  *See Pub. Adm'r of Queens Cnty.*, 2009 WL 498976, at *12 ("To [prove] a wrongful death case, a plaintiff must offer proof of pecuniary loss. . . . The fact that there are children who are distributees of the

estate is not, by itself, sufficient to establish that there was a pecuniary loss.")  Plaintiff urges this

Court, based on the fact that he has been appointed as Chamberlain's "Administrator" (as

opposed to an "Executor"), to conclude that Chamberlain died intestate and then take judicial

notice of the fact that under New York law, Chamberlain's children are his statutory distributees.

(P's Mem. 55.)  Even were I to draw these conclusions, however, Plaintiff has still not pleaded

that there is any pecuniary loss to those distributees caused by Chamberlain's death.  Plaintiff's

wrongful death claim is dismissed for failure to state a claim on which relief can be granted.

       4.  <u>Defendant WPHA</u>

The same rationale behind dismissing Plaintiff's *Monell* claim against WPHA – lack of

causation – also justifies dismissing Plaintiff's state law claims against WPHA.  The decision to

provide WPPD with a master key to the Winbrook Houses did not proximately cause

Chamberlain's injuries, and accordingly, Plaintiff cannot make out a claim for negligence against

WPHA.  *See Stagl*, 52 F.3d at 467.  Because WPHA committed no underlying wrong against

Chamberlain, the conscious pain and suffering and wrongful death claims also fail as a matter of

law.  *See* N.Y. Est. Powers & Trusts Law §§ 5-4.1, 11-3.2(b).  Accordingly, the state law claims

are dismissed in their entirety against Defendant WPHA.

       5.  <u>Defendants Fottrell, Martin, Carelli, and City of White Plains</u>

Plaintiff's Section 1983 claims are proceeding against Defendants Fottrell, Martin, and

Carelli.  The Complaint plausibly alleges that their conduct constituted the unreasonable use of

excessive force that caused Chamberlain's injuries and death.  For the same reasons as discussed

above, I find that the Complaint plausibly alleges that these Defendants committed state-law

assaults and batteries[24] or negligence in the alternative.[25]  Accordingly, Plaintiff's state law

---

[24] Defendants argue that Plaintiff's assault claim should be dismissed because given the fast-paced nature of the
situation, Chamberlain did not have sufficient time to apprehend imminent physical injury, a necessary element of a

claims (other than wrongful death) will not be dismissed as against Fottrell, Martin, or Carelli. Because Defendants have presented me with no argument as to why the state law claims should be dismissed as against the City of White Plains once those claims are proceeding against any of its employees, and because *respondeat superior* does apply as to the remaining state-law claims, I will not dismiss the claims against the City.

### 6. Defendants Hart, Love, Demchuk, Markowski, and Spencer

Taking the allegations against Defendants Hart, Love, Demchuk, Markowski, and Spencer to be true, none of these Defendants proximately caused any of Chamberlain's injuries. Plaintiff's allegations as to these officers are summarized above. (*See* page 23 above (quoting P's Mem. 21-22).) These Defendants' actions do not constitute assaults or batteries under New York law. None of these actions caused a reasonable apprehension of bodily injury that is sufficiently "imminent" to constitute an assault, and none of them proximately caused any contact with Chamberlain's person, defeating Plaintiff's battery claims. Nor do they amount to a breach of duty proximately causing Chamberlain's injuries. The tort claims therefore fail as a matter of law, also resulting in the failure of the conscious pain and suffering and wrongful death claims. Accordingly, the state tort claims are dismissed in their entirety against Defendants Hart, Love, Demchuk, Markowski, and Spencer.

---

claim for assault. (*See, e.g.*, City Ds' Mem. 22.) I disagree. It is clear from the recordings that Chamberlain was well aware that the officers outside his door were attempting to enter his apartment and had their guns drawn. (*See, e.g.*, Life Aid Transcript 42 ("Oh, they got their shotguns."); *id.* at 43 ("I know I'm gonna get hurt."); Taser Transcript 5 ("They have shotguns, stunguns, they have their Glocks out.").) When they ultimately entered with the Taser, beanbag shotgun, and handguns, he plausibly apprehended imminent physical injury.

[25] Defendants argue that Plaintiff's negligence claims are inconsistent with the intentional nature of the conduct the Amended Complaint alleges. (City Ds' Mem. 22-23.) That may be so, but it is axiomatic that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3).

**IV.   <u>CONCLUSION</u>**

   I have considered Defendants' remaining arguments and find them to be unpersuasive.

For the reasons stated above, the City Defendants' Motion to Dismiss is GRANTED IN PART

and DENIED IN PART, WPHA's Motion to Dismiss is GRANTED, Carelli's Motion to Dismiss

is GRANTED IN PART and DENIED IN PART, and Hart's Motion to Dismiss is GRANTED.

The Clerk of Court is directed to terminate the pending Motions, (Docs. 45, 58, 62, 65), and

terminate the following parties as Defendants:  White Plains Housing Authority, Steven Hart,

Maurice Love, Steven Demchuk, Marek Markowski, and James Spencer.  The remaining claims

in this case are as follows:

- <u>City of White Plains</u>:  Claim III (*Monell* liability); Claims V, VII, VIII (state law claims other than wrongful death).

- <u>Sergeant Stephen Fottrell</u>:  Claim I (excessive force for second Taser discharge); Claim IV (grossly negligent supervision regarding use of lethal force); Claims V, VII, VIII (state law claims other than wrongful death).

- <u>Sergeant Keith Martin</u>:  Claim IV (directing Fottrell to discharge Taser the second time; grossly negligent supervision regarding use of lethal force); Claims V, VII, VIII (state law claims other than wrongful death).

- <u>Officer Anthony Carelli</u>:  Claim I (excessive force for use of lethal force); Claims V, VII, VIII (state law claims other than wrongful death).

The remaining parties are directed to appear before me on December 13, 2013 at 4:00 p.m. for a status conference.

**SO ORDERED.**

Dated:  December 10, 2013
       White Plains, New York

<div style="text-align:right">

_____
    CATHY SEIBEL, U.S.D.J.

</div>