## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENNETH CHAMBERLAIN, JR., AS THE ADMINISTRATOR OF THE ESTATE OF KENNETH CHAMBERLAIN, SR., | Civil Action No. 12 CV 5412 (CS) |
| Plaintiff, | |
| vs. | |
| CITY OF WHITE PLAINS; WHITE PLAINS HOUSING AUTHORITY;  P.O. ANTHONY CARELLI; P.O. STEVEN HART; P.O. MAURICE LOVE; P.O. STEVEN DEMCHUK; P.O. MAREK MARKOWSKI; SERGEANT STEPHEN FOTTRELL; SARGEANT KEITH MARTIN; and LIEUTENANT JAMES SPENCER, | |
| Defendants. | |

## PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE

**NEWMAN FERRARA LLP**
Debra S. Cohen
Randolph M. McLaughlin
Danielle B. Sullivan
1250 Broadway, 27th Floor
New York, New York 10001
Tel: 212-619-5400
Fax: 212-619-3090

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................i

PRELIMINARY STATEMENT .................................................................................1

POINT I

THE SCOPE OF THE TRIAL MUST INCLUDE BOTH THE USE OF EXCESSIVE
DEADLY FORCE BY OFFICER CARELLI AND THE ASSAULT AND
BATTERY OF MR. CHAMBERLAIN, SR. ...............................................................3

A. Excessive Force. Whether the Use of Deadly Force Was Objectively Reasonable
or Excessive Requires the Jury to Look at the "Totality of the Circumstances" ............4

B. Testimony From Officers at the Scene That There Was "No Plan" is Relevant and
Admissible Evidence to the "Totality of the Circumstances" Analysis...........................6

C. Assault and Battery. Evidence Relevant to Assault and Battery Cannot Be
Precluded....................................................................................................................8

D. Recordings Relevant to Mr. Chamberlain, Sr.'s Apprehension of Imminent
Physical Injury Which Defendants Seek to Suppress Are Relevant and Admissible....11

E. Police Officer Testimony of Mr. Chamberlain, Sr.'s Apprehension of Imminent
Physical Injury Which Defendants Seek to Suppress is Relevant and Admissible .......12

F. Limiting the Scope of the Trial to Immediately Prior to and at the Time Officer
Carelli Fired His Weapon Denies Plaintiff's Right to Present Evidence Relevant and
Admissible to the Assault Charge...............................................................................14

G. White Plains Police Department Policies and Procedures and Training Materials
are Relevant and Admissible ......................................................................................15

H. Evidence of the Dragging of the Wounded Mr. Chamberlain, Sr. Out of His
Apartment is Relevant and Admissible to the Battery Charge .....................................16

I. The Jury Should Be Presented with a Full and Accurate Account of Mr.
Chamberlain, Sr.'s Conscious Pain and Suffering .......................................................16

POINT II

PLAINTIFF'S EXPERT WITNESSES SHOULD NOT BE PRECLUDED FROM
TESTIFING AT TRIAL ...............................................................................................17

A. Dr. Michael Baden .................................................................................................18

B. Mr. Gene Maloney .................................................................................................20

i

C. Defendants' Apply a Double Standard in Seeking to Limit Testimony by Plaintiff's Expert Dr. Baden but Include Testimony of their Expert Dr. Charles Wetli that is Speculative, Prejudicial and Exceeds the Scope of Dr. Wetli's Expertise ....................21

## POINT III

PLAINTIFF'S TREATING PHYSICIANS SHOULD NOT BE PRECLUDED FROM TESTIFYING AS EXPERTS BECAUSE PLAINTIFF MADE TIMELY SUPPLEMENTAL DISCLOSURES AND THEIR TESTIMONY IS ESSENTIAL AND HELPFUL TO THE JURY ..................................................................................23

A. Dr. Lerner and Dr. Widlitz were timely disclosed....................................................23

B. Treating physicians are experts who were not required to submit reports................24

C. If the medical records are not deemed to be sufficient abbreviated disclosure, Plaintiff was substantially justified and there was no prejudice to Defendants.............26

D. The four-part balancing test disfavors preclusion of Dr. Lerner's and/or Dr. Widlitz's testimony ....................................................................................................29

E. Dr. Lerner and Dr. Widlitz will give testimony that will be helpful and aide the jury .................................................................................................................................31

F. Plaintiff's Medical Records are Admissible and Relevant for the Jury to Assess Credibility and Significance of Other Evidence ............................................................33

## POINT IV

AUTOPSY PHOTOGRAPHS ARE RELEVANT AND ADMISSIBLE. ....................34

## POINT V

PLAINTIFF'S DAMAGES AND CLAIMS SHOULD BE TRIED IN UNISON AS THE ISSUES ARE INEXTRICABLY INTERWOVEN AND PROMOTE JUDICIAL AND ECONOMIC EFFICIENCY ............................................................38

## POINT VI

EVIDENCE RELEVANT TO DEFENDANT CARELLI'S CREDIBILITY OR PROPENSITY TO USE FORCE UNREASONABLY AND/OR INTENTIONALLY SHOULD NOT BE PRECLUDED ..............................................................................40

## POINT VII

PLAINTIFF'S SHOULD NOT BE PRECLUDED FROM REFERRING TO THE ATTORNEYS REPRESENTING THE CITY OF WHITE PLAINS AS "CITY ATTORNEYS" .................................................................................................................41

POINT VIII

PLAINTIFF SHOULD NOT BE PRECLUDED FROM REFERRING TO
INDEMNIFICATION BY THE CITY OF WHITE PLAINS ......................................42

POINT IX

PLAINTIFF SHOULD NOT BE PRECLUDED FROM ASKING A SPECIFIC
DOLLAR AMOUNT FROM THE JURY....................................................................43

POINT X

DEFENDANT CARELLI'S PRESENT EMPLOYMENT STATUS WITH WHITE
PLAINS POLICE DEPARTMENT IS ADMISSIBLE AS PEDIGREE
INFORMATION AND RELEVANT TO HIS CREDIBILITY ...................................44

POINT XI

PLAINTIFF DOES NOT OPPOSE DEFENDANT'S REQUEST TO PRECLUDE
INTRODUCTION OF EVIDENCE ASSOCIATED WITH ANY INVESTIGATION
MADE BY THE DEPARTMENT OF JUSTICE INTO THIS CASE ..........................45

POINT XII

PLAINTIFF SHOULD NOT BE PRECLUDED FROM ARGUING AND/OR
INTRODUCING EVIDENCE THAT THE LACK OF A PLAN WAS A
CONTRIBUTING FACTOR FOR OFFICER CARELLI'S UNREASONABLE USE
OF DEADLY FORCE ....................................................................................................45

POINT XIII

PLAINTIFF CANNOT BE PRECLUDED FROM INTRODUCING WITNESSES,
TESTIMONY OR EVIDENCE RELEVANT TO THE CHARGES OF ASSAULT,
BATTERY, CONSCIOUS PAIN AND SUFFERING, FEAR OF IMPENDING
DEATH AND SEVERE EMOTIONAL DISTRESS INFLICTED UPON MR.
CHAMBERLAIN, SR. ...................................................................................................47

POINT XIV

PLAINTIFF SHOULD NOT BE PRECLUDED FROM INTRODUCING
TESTIMONY OF DR. MICHAEL BADEN OR OTHER EVIDENCE IN HIS
REPORTS BECAUSE DEFENDANT HAS NOT FILED A *DAUBERT* MOTION....49

POINT XV

DEFENDANTS SEEK TO IMPERMISSIBLY USE THEIR MOTIONS IN LIMINE
TO URGE THE COURT TO RESTRAIN OR SILENCE PLAINTIFF SHOULD
FROM MAKING ARGUMENTS TO THE JURY.......................................................50

CONCLUSION...............................................................................................................52

## <u>TABLE OF AUTHORITIES</u>

**Cases:**                                                                                  **Page**

*Amato v. City of Saratoga Springs,*
    170 F.3d 311 (2d Cir. 1999)......................................................................39

*Bancroft v. City of Mount Vernon,*
    672 F. Supp. 2d 391 (S.D.N.Y. 2009)..........................................................46

*Bausch & Lomb Inc. v. Vitamin Health, Inc.,*
    13-CV-6498, 2016 U.S. Dist. LEXIS 16348 (W.D.N.Y. 2016) ................................29

*Bynum v. Metro. Transp. Auth.,*
    No. 05-3321, 2006 WL 655106 (E.D.N.Y. 2016) ......................................................26

*Carson v. Polley,*
    689 F.2d 562 (5th Cir. 1982) ....................................................................41

*Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.,*
    602 F.2d 1062 (2d Cir. 1979)......................................................................29

*Coopersmith v. Gold,*
    172 A.D.2d 982, 568 N.Y.S.2d 250 (3d Dep't 1991)....................................................8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993)....................................................................17, 18, 49

*Design Strategy Inc. v. Davis,*
    469 F.3d 284 (2d Cir. 2006)......................................................................27

*Estate of Jaquez v. Flores,*
    10 Civ. 2881 (KBF), 2016 WL 1084145 (S.D.N.Y. March 17, 2016) ..................6, 37

*Fanning v. Target Corp.,*
    05 Civ. 12 (PKL) (MHD), 2006 U.S. Dist. LEXIS 4804 (S.D.N.Y. 2006)................25

*Flores v. McDonald,*
    CV 09-5780-GW (AJW), 2013 U.S. Dist. LEXIS 182978 (C.D. Cal. 2013)..............18

*Gomez v. City of New York,*
    No. 05 Civ. 2147(GBD), 2008 WL 3833811 (S.D.N.Y. 2008). ....................................8

*Graham v. Connor,*
    490 U.S. 386 (1989)..........................................................................4, 9, 48

*Hernandez v. Lattimore*,
    612 F.2d 61 (2d Cir.1979)..........................................................................................8

*Hinton v. Patnaude*,
    162 F.R.D. 435 (N.D.N.Y. 1995) ..............................................................................27

*Huddleston v. United States*,
    485 U.S. 681 (1988)...................................................................................................40

*Hygh v. Jacobs*,
    961 F.2d 359 (2d Cir. 1992).......................................................................................21

*In re Dellinger*,
    461 F.2d 389 (7th Cir. 1972) .....................................................................................52

*Israeli v. Ruiz*,
    14 CV. 9244(MHD), 2015 U.S. Dist. LEXIS 97650 (S.D.N.Y. 2015) ......................26

*Jackson v. Vil. of Ilion, New York*,
    6:14-CV-563, 2016 WL 126392 (N.D.N.Y. Jan. 11, 2016),
    *appeal dismissed* (Mar. 9, 2016)..................................................................................46

*Jean-Laurent v. Hennessy*,
    840 F. Supp. 2d 529 (E.D.N.Y. 2011) ........................................................................41

*Johnson v. Glick*,
    481 F.2d 1028 (2d Cir.), *cert. denied sub nom. Employer–Officer John, #*
    *1765 Badge Number v. Johnson,* 414 U.S. 1033 (1973).................................................8

*Katsaros v. Cody*,
    744 F.2d 270 (2d Cir. 1984)................................................................................39, 40

*Kerman v. City of New York*,
    261 F.3d 229 (2d Cir. 2001)..............................................................................8, 9, 48

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)...................................................................................................17

*Kunstler v. City of New York*,
    242 F.R.D. 261 (S.D.N.Y. 2007) ...............................................................................27

*Lavigna v. State Farm Mut. Auto Ins. Co.*,
    736 F. Supp. 2d 504 (N.D.N.Y. 2010)........................................................................27

*Lee Valley Tools, Ltd. v. Indus. Blade Co.*,
    288 F.R.D. 254 (W.D.N.Y. 2013)...............................................................................27

*Lightfoot v. Union Carbide Corp.*,
    110 F.3d 898 (2d Cir. 1997)..........................................................................................44

*Lombardo v. Stone*,
    No. 99 CIV. 4603 (SAS), 2002 WL 113913 (S.D.N.Y. 2002)....................................40

*Lozada v. Weilminster*,
    92 F. Supp. 3d 76 (E.D.N.Y. 2015) ...........................................................................46

*Luce v. United States*,
    469 U.S. 38 (1984)........................................................................................................50

*Merzon v. County of Suffolk*,
    767 F. Supp. 432 (E.D.N.Y.1991) ................................................................................8

*Mileski v. Long Is. R. Co.*,
    499 F.2d 1169 (2d Cir. 1974)......................................................................................44

*Musser v. Gentiva Health Services*,
    356 F.3d 751 (7th Cir. 2004) .......................................................................................25

*O'Bert ex rel. Estate of O'Bert v. Vargo*,
    331 F.3d 29 (2d Cir. 2003)..........................................................................................35

*Old Chief v. United States*,
    519 U.S. 172 (1997).....................................................................................................33

*Outley v. New York*,
    837 F.2d 587 (2d Cir. 1988)........................................................................................29

*Pal v. N.Y. Univ.*,
    06 Civ. 5892 (PAC)(FM), 2008 U.S. Dist. LEXIS 50902 (S.D.N.Y. 2008) ..............24

*Pearlman v. Cablevision Sys. Corp.*,
    10-CV-4992(JS)(GRB), 2015 U.S. Dist. LEXIS 164410 (E.D.N.Y. 2015) ...............26

*Plakas v. Drinksi*,
    19 F.3d 1143 (7th Cir. 1994) *cert denied*, 513 U.S. 820 (1994)...........................34, 35

*Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*,
    280 F.R.D.147 (S.D.N.Y. 2012) .................................................................................27

*Scott v. City of New Rochelle*,
    986 N.Y.S.2d 819 (N.Y. Sup. Ct. Westchester Cty. 2014)...........................................8

*Shatkin v. McDonnell Douglas Corp.*,
    727 F.2d 202 (2d Cir. 1984)........................................................................................38

*Shelper v. Metro-North Commuter R.R.*,
    13 Civ. 7192 (RWS), 2016 U.S. Dist. LEXIS 51259 (S.D.N.Y. 2016)................24, 25

*Sherman v. Bear Stearns Cos. (In re Bear Stearns Cos., Sec., Derivative, &*
*ERISA Litig.)*,
    Master File No.: 08 MDL 1963 (RWS); 09 Civ. 8161 (RWS), 2016 U.S.
    Dist. LEXIS 97784 (S.D.N.Y. 2016)..........................................................................18

*Socha v. 110 Church, LLC*,
    21-mc-102, 2014 U.S. Dist. LEXIS 156976 (S.D.N.Y. 2014) ........................25, 29, 30

*Tennessee v. Garner*,
    471 U.S. 1 (1985)...........................................................................................................5

*Tepperwien v. Entergy Nuclear Operations, Inc.*,
    663 F.3d 556 (2d Cir. 2011)........................................................................................51

*United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*,
    994 F.2d 105 (2d Cir. 1993).................................................................................8, 9, 48

*United States v. Allen*,
    247 F.3d 741 (8th Cir. 2001) ................................................................................35, 37

*United States v. Ashburn*,
    11-CR-303 (NGG), 2015 U.S. Dist. LEXIS 115629 (E.D.N.Y. 2015) .......................33

*United States v. Beechum*,
    582 F.2d 898 (5th Cir. 1978) ................................................................................40, 41

*United States v. Carneglia*,
    256 F.R.D. 104 (E.D.N.Y. 2009) ................................................................................37

*United States v. Dickinson*,
    465 F.2d 496 (5th Cir. 1972) ................................................................................51, 52

*United States v. Downing*,
    753 F.2d 1224 (3rd Cir. 1985) ....................................................................................50

*United States v. Harvey*,
    547 F.2d 720 (2d Cir. 1976)........................................................................................43

*United States v. Salameh*,
    152 F.3d 88 (2d Cir. 1998)....................................................................................36, 37

*United States v. Salim*,
    189 F. Supp. 2d 93 (S.D.N.Y. 2002)................................................................35, 36, 37

*United States v. Velazquez*,
    246 F.3d 204 (2d Cir. 2001)........................................................................................36

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007)........................................................................................18

*Utah v. Strieff*,
    136 S.Ct. 2056 (2016)..................................................................................................51

*Vichare v. AMBAC Inc.*,
    106 F.3d 457 (2d Cir. 1996)........................................................................................39

*Whitfield v. City of Newburgh*,
    Court No. 08 CV 8516 (RKE), 2015 WL 9275695 (S.D.N.Y. 2015)............................7

**Statutes:**

Fed. R. Civ. P. 26(a)(1)(A) ...........................................................................................23
Fed. R. Civ. P. 26(a)(1)(A)(i) .......................................................................................23
Fed. R. Civ. P. 26(a)(2)..................................................................................................24
Fed. R. Civ. P. 26(a)(2)(B) ............................................................................................24
Fed. R. Civ. P. 37(c) (1).................................................................................................26
Fed. R. Evid. 103(a)........................................................................................................41
Fed. R. Evid. 401 ....................................................................................................46, 47
Fed. R. Evid. 403 ......................................................................34, 36, 37, 40, 42, 403
Fed. R. Evid. 404(b).......................................................................................................40
Fed. R. Evid. 411 ....................................................................................................42, 43
Fed. R. Evid. 702 ..............................................................................................17, 49, 50
N.Y.C.P.L.R. 4016..........................................................................................................44

**Secondary Sources:**

6 N.Y. Jur. 2d – Assault § 1 (1990) .........................................................................8
John E. Oliver, *Law Enforcement Intervention in Mental Health Crises: The
Legal Standards for Officer Conduct after the Supreme Court's Decision in
Sheehan v. City and County of San Francisco*, Dev. In Mental Health L., (July,
2015) .. ......................................................................................................................3

## PRELIMINARY STATEMENT

Almost five years to the day that Kenneth Chamberlain, Sr. was killed in his own home by a shot fired by Police Officer Anthony Carelli of the White Plains Police Department, a jury will finally be tasked with the determining who should be held responsible for Mr. Chamberlain, Sr.'s death. Defendants Anthony Carelli and the City of White Plains, in their motions in limine, have made it clear that they want the jury to only see and hear evidence that portrays Mr. Chamberlain, Sr. as responsible for his death, and the actions of Officer Carelli and the White Plains Police Department as reasonable and necessary.

Plaintiff's position is that in order for the jurors to reach a reasoned and fair decision, they must be allowed to evaluate the moment Mr. Chamberlain was fatally shot within the full context of the events that led to the decision by Officer Carelli to use deadly force. The police responded that day to Mr. Chamberlain, Sr.'s apartment because his medical alert device had sounded and the Life Aid operators were not satisfied by his initial response to their call to him. Within minutes of the initial medical alert, Mr. Chamberlain, Sr. recontacted Life Aid to tell them police were at his door, that he was okay and did not want to let them in. Shortly thereafter Life Aid attempted to cancel the call with the White Plains Police Department, but they refused and said they intended to make entry into Mr. Chamberlain's apartment. Ninety minutes later, Mr. Chamberlain's mental condition had clearly decompensated as the siege outside his door was escalated by police. Recordings memorialize his growing belief and fear that the police were going to kill him.

When the police finally broke through the door, this sixty-eight year old former Marine, who had been receiving treatment for many years at the local Veterans Administration Hospital for chronic obstructive pulmonary disease, arthritis, hearing loss and psychiatric disorders, stood in his boxer shorts, with the medical alert device around his neck, and called out to the President

1

that he could no longer hold them off. He was Tasered and then shot four times with a less than

lethal or "beanbag shotgun" which knocked him off his feet with a force greater than a punch

from Mike Tyson. Yet Officer Carelli claims he had to shoot Mr. Chamberlain because although

he "went down on his butt" and "his butt hit the ground", he then immediately rolled up,

regained his footing and charged at the bean bag wielding Sergeant who had stepped over Mr.

Chamberlain, Sr. to enter the apartment.  Plaintiff asserts that the jury should be allowed to

consider evidence which calls into question the credibility of Officer Carelli's and Sergeant

Martin's accounts of what occurred, the impossibility of Mr. Chamberlain, Sr. accomplishing the

physical feats they attribute to him, and physical evidence that disputes Defendants' accounts of

what occurred and supports Plaintiff's contention that Mr. Chamberlain, Sr. was not presenting a

threat that justified the force used against him.

     Despite the Defendants' desperate efforts to sanitize the mental and physical assault Mr.

Chamberlain, Sr. endured, the jury must be allowed to evaluate all of the relevant and admissible

evidence necessary to determine the subjective intent of Officer Carelli in regard to the state law

assault and battery claims and the reasonableness of his decision to fire his gun at the moment he

did, in regard to the federal excessive force claim. To determine who bears the responsibility for

Mr. Chamberlain, Sr.'s death, the events must unfold from the beginning of the incident, when

the call for medical assistance was first received by the White Plains Police Department. The

jury must be allowed to know everything that Officer Carelli saw and heard on that day in order

to determine his subjective intent in regard to the state law claims of assault and battery and the

objective reasonableness of his actions on the federal claim of excessive force.

     How the Court determines how this case will unfold at trial is clearly of great

consequence to Mr. Chamberlain, Sr.'s family, the community of White Plains, and Officer

Carelli. But it is not taking place in vacuum. The events that took place in the early morning

hours of November 19, 2011 at Mr. Chamberlain, Sr.'s home are reflective of a national crisis on

how police handle encounters with people suffering from mental illness. The Washington Post

noted in its 2015 investigation of police shootings that one-fourth of the 462 fatal police

shootings documented by the Post in the first half of 2015 were of individuals reported by either

family or the police (or both) to be mentally ill. In 45 of the 124 fatal shootings of persons with

mental illness, the police were actually responding to a call to help someone to get treatment.

*Developments In Mental Health Law,* Institute of Law, Psychiatry and Public Policy – The

University of Virginia, Volume 34, Issue 2 (July 2015). The only way to bring justice to Mr.

Chamberlain, Sr., to adequately equip police officers like Anthony Carelli to act reasonably and

appropriately when encountering individuals like him, and to prevent future Kenneth

Chamberlain, Sr.'s and Anthony Carelli's from suffering similar fates of this national crisis is to

allow a full airing in this case of all the relevant facts so that the jury is properly equipped to

carry out its responsibility for determining who should be held responsible for Mr. Chamberlain,

Sr.'s death.

## POINT I
**THE SCOPE OF THE TRIAL MUST INCLUDE BOTH THE USE OF EXCESSIVE DEADLY FORCE BY OFFICER CARELLI AND THE ASSAULT AND BATTERY OF MR. CHAMBERLAIN, SR.**
### (Defendants City of White Plains Point I, Carelli Point II)
Defendants seek to limit "the scope of the trial to the facts and circumstances in the

seconds directly surrounding the use of force by Officer Carelli, and excluding evidence of

events before and after the use of force by Carelli." Def. City MOL, p. 4.

In doing so, Defendants attempt to obstruct Plaintiff from putting evidence before the jury that is

relevant and necessary to fully and fairly try the surviving issues.

3

**A. Excessive Force. Whether the Use of Deadly Force Was Objectively Reasonable or Excessive Requires the Jury to Look At the "Totality of the Circumstances"**

For Plaintiff to prevail on the claim that Officer Carelli's fatal shooting of Mr. Chamberlain, Sr. was an excessive use of force under the Fourth Amendment the jury must find that the officer's use of force was "objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor,* 490 U.S. 386, 397 (1989). An officer's evil intentions will not create a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively reasonable use of force constitutional. *Id.* Determining whether the force used to affect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. It requires careful attention to the facts and circumstances of each case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396.

The jury must be presented with evidence relevant to all three of these factors. Evidence of the nature and quality of the intrusion that should be deemed admissible includes photographs of the incident scene, including the size and location of Mr. Chamberlain, Sr.'s apartment, and evidence of the manner and degree of force the police used to gain entry. In regard to the "severity of the crime at issue," evidence that police were not responding to a crime, but rather to provide aid in response to a medical alert alarm should be allowed through the WPPD recordings of radio dispatches and telephone calls, incident reports and all call emails. Additionally, Plaintiff's expert Gene Maloney should be allowed to testify as to his opinion on this issue.

Evidence that the interior of Mr. Chamberlain's apartment and the condition of any occupants within the apartment were visible through the exterior windows is relevant to the "countervailing governmental interests" proffered by the Defendant that they needed to verify Mr. Chamberlain's welfare and whether there was anyone else in the apartment requiring assistance. Evidence regarding Mr. Chamberlain's physical condition and his position relative to any police personnel either inside or outside his apartment at the time he was shot is relevant to whether he posed an immediate threat to the safety of officers or others. Finally, evidence that Mr. Chamberlain never attempted to leave his apartment, repeatedly communicated to police officers and Life Aid  that he was fine and not in need of assistance and took affirmative steps to safeguard himself <u>inside</u> his home is relevant to whether he was "resisting arrest or attempt to evade arrest by flight." Defendants seek to preclude evidence relevant to all of these factors.

Plaintiff should not be constrained from putting all relevant facts as to the totality of the circumstances surrounding the shooting before the jury. The scope of the trial cannot be limited in such a way as to prevent Plaintiff from presenting to the jury all relevant evidence that when Officer Carelli fired his gun Mr. Chamberlain, Sr. could not and did not pose an immediate risk to anyone. *Tennessee v. Garner,* 471 U.S. 1, 11 (1985).  In order to present the jury with the "totality of the circumstances" Plaintiff must be allowed to fully present evidence of: the effects on Mr. Chamberlain, Sr. of each of the four less lethal shotgun blasts, including that he was knocked off his feet, and the location and severity of various bruises, contusions and wounds; Mr. Chamberlain Sr.'s physical condition prior to, during and after the shooting; the location and trajectory of the gunshot that did not strike Mr. Chamberlain, Sr.; the location and trajectory of the gunshot that did strike Mr. Chamberlain, Sr.;[1] the position of Mr Chamberlain, Sr. within the

_____

[1] Plaintiff must correct a recurring misstatement in Defendants' Motion in Limine *to wit* that Plaintiff asserts that it was the second shot fired by Officer Carelli that struck Mr. Chamberlain. Plaintiff has never asserted this nor is there

apartment when he was shot; and the position of Sgt. Martin and the other police officers on the scene at the time Mr. Chamberlain, Sr. was shot. The evidence includes, but is not limited to: testimony of police officers at the scene; the information contained in the autopsy report and photographs; the information contained in the White Plains hospital records and X-ray; Mr. Chamberlain Sr.'s VA medical records and testimony of treating physicians who had treated, and were familiar with, his medical condition over a long period of time and who examined and treated him shortly before he was killed.  Defendants claim that Mr. Chamberlain, Sr. was a threat at the time he was shot and Plaintiff claims he was not. The totality of the circumstances the jury will be called to evaluate include Mr. Chamberlain, Sr.'s condition at the time Officer Carelli shot him and what a reasonable officer would have concluded about his physical capabilities. The jury will need to hear about the events prior to the shots being fired to the extent necessary to evaluate this issue. *See Estate of Jaquez v. Flores,* Opinion and Order On Motions In Limine and PreTrial Matters, 10 Civ. 2881, Doc. 218, p. 13 (KBF)(March 17, 2016).

**B.  Testimony From Officers at the Scene That There Was "No Plan" Is Relevant and Admissible Evidence To the "Totality of the Circumstances" Analysis**

Evidence relevant to circumstances immediately leading up to Officer Carelli firing at Mr. Chamberlain, Sr. should include the lack of plan created by and/or communicated to him as the designated "lethal cover". The jury should be allowed to have a full and clear picture of what was happening at the moment Mr. Chamberlain was shot. The lack of plan to guide Officer Carelli's actions is relevant to the jury's ultimate judgment of the reasonableness or unreasonableness of his actions. This does not go to Officer Carelli's subjective intent or

---

any evidence in the record, including Officer Carelli's deposition testimony that concludes whether it was the first or second shot fired that struck Mr. Chamberlain. Officer Carelli's testimony is that he fired two shots one right after the other, center mass but that he could not tell whether one or both rounds he fired struck Mr. Chamberlain. Carelli Dep., p. 155.

motivation; rather to the totality of the circumstances surrounding his actions. Plaintiff should not be precluded from arguing to the jury that the lack of plan was a contributing factor to Officer Carelli's ultimately unreasonable use of deadly force. However, the lack of plan is also relevant to his subjective intent and motivation as it relates to the assault and battery claims. The jury should be allowed to compare and contrast the thoughtful plan developed by Lt. Fuerst and Lt. Spencer in comparison to the planning vacuum in which Officer Carelli was operating during the siege outside Mr. Chamberlain, Sr.'s door and, ultimately, when the door was brought down.

Here, where the Court has dismissed claims arising from the less lethal use of force with the Taser and Less Lethal Shotgun, care must be taken not to confuse or prejudice the jury with a false view of the circumstances leading up to and surrounding the shooting by Officer Carelli. The jury might well be prejudiced by the Court's determination on summary judgment that both firings of the Taser and all four shots from the less lethal were "reasonable". The jury could be erroneously influenced to conclude that the shots fired by Officer Carelli were equally "reasonable." The proof must be allowed to be presented to support, as noted by the Second Circuit, "the fact that an initial use of force was justified does not mean that all subsequent uses of force were similarly justified. Moreover, in the course of responding to evolving scenarios, officers may encounter circumstances that compel them to recalibrate the amount of force deployed." *Whitfield v. City of Newburgh,* 2015 WL 9275695 *20 (S.D.N.Y. 2015). Plaintiff should be allowed to present evidence that Officer Carelli failed to "recalibrate" when it would have been apparent to a reasonable officer that Mr. Chamberlain, Sr. was not and could not be presenting the same threat he may have appeared to have been previously presenting. The lack of plan contributed to the failure of Officer Carelli to "recalibrate," and reassess Mr. Chamberlain,

Sr.'s status after the deployment of the less lethal shotgun, to determine whether the use of deadly force was necessary. *Id.*

### C. Assault and Battery. Evidence Relevant to Assault and Battery Cannot Be Precluded

Defendants' motions in limine blatantly ignores that, in addition to a claim of the use of excessive deadly force by Officer Carelli, the scope of the trial must include Plaintiff's claims of civil assault and battery. Under New York law, an "assault" is an intentional placing of another person in fear of imminent harmful or offensive contact. A "battery" is an intentional wrongful physical contact with another person without consent. *See Hernandez v. Lattimore,* 612 F.2d 61, 67 (2d Cir. 1979), citing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973), *cert. denied sub nom; see also Employer–Officer John, # 1765 Badge Number v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *Merzon v. County of Suffolk,* 767 F.Supp. 432, 448 (E.D.N.Y. 1991) (see authorities cited therein); *Coopersmith v. Gold,* 172 A.D.2d 982, 984, 568 N.Y.S.2d 250, 252 (3d Dep't 1991); 6 *N.Y.Jur.2d—Assault* § 1, at 194 (1990). Neither assault nor battery requires intent to cause physical injury. *Gomez v. City of New York,* 2008 WL 3833811 *2 (S.D.N.Y. Aug. 14, 2008). The terms "assault" and "battery" do not change in meaning depending on the degree of violence, the means of inflicting injury, or the part of the body injured. *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.,* 994 F.2d 105, 108 (2d Cir. 1993); *Scott v. City of New Rochelle,* 986 N.Y.S.2d 819, 831 (S.Ct. West. Cnty. 2014).

The Second Circuit does not appear to concur with the Court's conclusion from the bench at the September 12, 2016, conference that "the assault and battery claim is essentially identical to a 1983 excessive force claim." September 12, 2016 Transcript p. 84. In *Kerman v. City of New York,* the Court of Appeals noted that while both battery and excessive force may share the "justification" element, the Court further stated:

> We agree with plaintiff that the battery and excessive force charges were not substantially identical. Under New York law, a claim for battery requires a showing of intent to cause bodily harm. *United Nat'l Ins. Co. v. Waterfront N.Y. Realty,* 994 F.2d 105, 108 (2d Cir. 1993). By contrast, a Fourth Amendment claim for excessive force presents a "question [of] ... whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, *without regard to their underlying intent or motivation.*" *Graham v. Connor,* 490 U.S. at 397 (emphasis added).

*Kerman v. City of New York,* 261 F.3d 229, 243-244 (2d. Cir. 2001).

Just as "excessive force" and "assault and battery" charges are not identical, a further distinction must be recognized between the evidentiary prism through which the jury evaluates assault and battery, separately and respectively. They do not possess entirely common elements. Plaintiff must be allowed to present individualized proof supporting each charge on its own merit.

A defendant is liable for assault when he intentionally causes another person to become concerned that the defendant is about to cause a harmful or offensive bodily contact. There must be some threatening or menacing act or gesture that causes the plaintiff to believe that a harmful or offensive bodily contact is about to occur. It is not necessary that there be any contact. N.Y. Pattern Jury Instructions 3:2. Much of the evidence Defendants seek to preclude is directly relevant to the assault claim; *to wit,* threatening and menacing acts and gestures that caused Mr. Chamberlain, Sr. to fear that he was about to be subjected to harmful or offensive bodily contact. Liability and damages in this case can only fairly and fully be determined by the jury upon consideration of relevant evidence that presents a complete picture of the harm to Mr. Chamberlain, Sr. proximately caused not only by the shooting of Mr. Chamberlain, Sr. by Officer Carelli, but also the suffering he endured during the period of time he was under assault while in his apartment and experiencing the fear and apprehension of harmful and offensive contact by the police outside his door. There is no basis to deny to the jury evidence of the acts

and gestures, the sights and sounds, discernible to Mr. Chamberlain, Sr. through his partially opened door, and the documented apprehension they caused him. The array of weapons and tactical gear on display right outside his door, the prolonged and persistent banging on his door with fists and heavy equipment, the jokes and laughter of the police officers in response to his expressions of fear, the racial slurs directed against him, and Mr. Chamberlain Sr.'s responses to all of these acts and gestures, are all evidence that is relevant and admissible to the assault charge. It would be manifestly unfair to Plaintiff's presentation of the case on the assault charge to deny the jury the opportunity to hear testimony and review photographs and videos that memorialize the full facts and circumstances of what occurred from the time Mr. Chamberlain's door was first breached and the acts and gestures of the police officers outside his door were visible and audible to him.

The Court acknowledged, and cited to in the Motion to Dismiss Opinion and Order, the existence of evidence relevant to Mr. Chamberlain's apprehension of imminent physical injury, a necessary element of a claim for assault. As noted by the Court, "It is clear from the recordings that Chamberlain was well aware that the officers outside his door were attempting to enter his apartment and had their guns drawn," citing to the Life Aid Transcript 42 (Oh, they got their shotguns"): *id.* at 43 ("I know I'm gonna get hurt."); Taser Transcript 5 ("They have shotguns, stunguns, they have their Glocks out."). Motion to Dismiss Opinion and Order, fn. 24 (Doc. 78). These recordings document in real time, and in Mr. Chamberlain, Sr.'s own voice, that he feared, and presciently predicted, that if the police entered his apartment he would end up dead. The Life Aid recordings in particular, along with the complete Taser recordings, document not only Mr. Chamberlain, Sr.'s fears, but also his valiant effort to hold off what he, in his fragile mental condition, perceived as an invading enemy trying to get to him.

**D. Recordings Relevant to Mr. Chamberlain, Sr.'s Apprehension of Imminent Physical Injury Which Defendants Seek to Suppress Are Relevant and Admissible**

In addition to seeking to preclude the jury from considering the Life Aid recordings and significant portions of the Taser recordings, Defendants seek to prevent the jury from considering the testimony of police officers evincing that Mr. Chamberlain feared for his life from the moment police breached his door and how this fear grew as each new weapon, entry tool and piece of tactical equipment was displayed to him through the opening of the door and employed against him.

Defendants seek to suppress the Life Aid recordings, Taser Video 1 and Taser Video 2 in their entirety and allow the jury only to hear an excerpt from Taser Video 3 starting at the point "where the door is fully removed" i.e. "approximately 3:15 to the end of the third segment". Def. City MOL, p. 5, 9. Limiting the evidence would prevent the jury from hearing Mr. Chamberlain, Sr.'s fearfulness as he repeatedly tells the police that he did not call them, he is okay, wants them to leave, he does not want to open the door for them or allow them into his apartment. He can be heard on these recordings telling Life Aid "I know I'm going to get hurt". Taser Video 1, Life Aid Clip 202. Mr. Chamberlain, Sr. reports his observations of the police, and the apprehension of imminent physical harm they are causing him, to Life Aid: "I talked to the police, they are standing here with stun guns and shotguns. The have their 9 millimeters locked at the ready. They are going to kill me or beat me up"; "They have got guns, stun guns, they have their glocks out…they are going to kill me"; "They are trying to hurt me and murder me"; "You gonna kill me, huh? You're gonna beat my motherfucking ass? I'm a 68 year old man with heart troubles and you're gonna beat me"; "I will not open the door, they have their guns out"; "Oh, you gonna shoot me, you got your gun ready, oh you got your gun ready, oh you comin' in, no, they got their guns out, they have their guns out. I never called the police department"; "They broke the

11

lock Mr. President, they broke my door lock, my safety lock. They have stun guns and shotguns at the ready. They gonna hit me with the stun gun. They will probably kill me because I have a bad heart."; "They have shotguns, stunguns, they have their Glocks out they are planning on taking me to the White Plains Police Headquarters and beat me and then kill me"; "They are breaking through Mr. President. They're breaking through. I'm outnumbered and I can't hold them. They are taking the hinges off, they are breaking the door, they are getting ready to come in they're getting ready to come in."   Taser Video 1, Life Aid Clip 207, Life Aid Clip 209. Police officers can be heard responding to Mr. Chamberlain Sr.'s observations to Life Aid about the weapons the police are wielding outside his door by joking, "And a bad attitude. Tell them those too." Shortly thereafter, at the end of Taser Video 1, a police officer can be heard saying "I better turn this off" accompanied by the sound of laughter. (Taser Video 1).

### E. Police Officer Testimony of Mr. Chamberlain, Sr.'s Apprehension of Imminent Physical Injury Which Defendants Seek to Suppress Is Relevant and Admissible

Sgt. Fottrell testified that when he arrived on the scene at approximately 5:31 a.m. he observed Sgt. Martin holding a large ax hooked to a Halligan tool which was holding Mr. Chamberlain, Sr.'s door open approximately two inches. Fottrell Dep., p. 82-84, 122. Officer Carelli was positioned just outside Mr. Chamberlain, Sr.'s door at this time with his gun drawn. Fottrell Dep., p. 87. Mr. Chamberlain, Sr. was observed by Fottrell using a knife to hit the Halligan tool and, in Fottrell's words, "appeared to be trying to keep people away from his door." Fottrell Dep., p. 96. Sgt. Fottrell testified that when he arrived at 5:31 a.m. he also saw Officer Markowski standing outside Mr. Chamberlain, Sr.'s door with his gun drawn. Fottrell testified that Carelli's and Markowski's weapons were drawn almost the entire incident, for over an hour, (except for the period of time when Carelli needed both hands to wield a large bolt cutter to assist with entry). Fottrell Dep., 104-105. Sgt. Fottrell also testified that during this

time, because Mr. Chamberlain, Sr. saw Fottrell holding the less lethal shotgun and "it appeared to make him upset", he handed the shotgun to Officer Markowski. Fottrell Dep., p. 116-119. Defendants seek to prevent this information from reaching the jury. Def. City MOL, p. 8. Officer Hart testified in his deposition that when Officer Carelli was cutting the slap lock on Mr. Chamberlain's door, several minutes prior to taking the door off the hinges and forcing it fully open, several of the other officers took out their service weapons. Hart Dep., p. 40-41. Defendants also seek to suppress this information from consideration by the jury as to Mr. Chamberlain Sr.'s apprehension of imminent physical harm. Def. City MOL, p. 8.

Testimony of police officers Defendants seek to suppress also makes clear that Mr. Chamberlain's efforts, from the moment police arrived at his door until he lay bleeding on the floor of his apartment, were singularly focused on protecting himself from harm from the people outside his door and who did eventually force their way into his home and physically assault and kill him. As noted, Sgt. Fottrell testified he observed Mr. Chamberlain, Sr. using a knife to strike at the Halligan tool lodged in his door and appearing to be attempting to "keep them away from his door". Fottrell Dep., p. 96. Sgt. Martin testified that Mr. Chamberlain tried to hold the door to his apartment in to prevent police from gaining entry after the hinges were removed and as Martin and Officer Demchuk were kicking the door to bring it down.  Martin Dep., p. 176. Officer Demchuk testified that he never saw Mr. Chamberlain, Sr. attempt to open the door, but did observe him attempting to keep the police from opening the door. Demchuk Dep., p. 60-61.

Defendants have put forward no basis for the Court to now determine that the jury, as the trier of fact, should be precluded from considering this, and other, indisputable evidence of Mr. Chamberlain, Sr.'s apprehension of imminent physical injury and his unsuccessful attempt to protect himself from this perceived harm.  The jury should not be foreclosed from reviewing all

evidence relevant to the assault of Mr. Chamberlain, Sr. and his clearly expressed apprehension

of imminent physical injury during the 90-minute siege or "stand-off", as Defendants

characterize it, outside his apartment door, as well as once entry was made.[2] In essence,

Defendants would have this Court sanction a one-sided trial where no evidence supportive or

illuminating of Mr. Chamberlain, Sr.'s perspective is offered to the jury. Mr. Chamberlain, Sr. is

dead and cannot take the witness stand to describe to the jury when and why he believed the

police were there to kill him. It would be a manifest error and grave injustice to stifle evidence

through which he can speak to the jury on this issue – the Life Aid recordings, the Taser videos,

his medical records and the eyewitness testimony of all of the officers on the scene.

## F.  Limiting the Scope of the Trial to Immediately Prior To and At The Time Officer Carelli Fired His Weapon Denies Plaintiff's Right to Present Evidence Relevant and Admissible to the Assault Claim

Defendants seek to limit admissible evidence to circumstances immediately prior to and

at the time Officer Carelli fired his weapon and submits that the moment the door is fully

removed would mark an appropriate starting point. This is an arbitrary starting point that, if

adopted by the Court, ignores the 90-minutes that the door was partially breached and the actions

of the heavily armed officers were visible and inflicting fear and the apprehension of imminent

physical harm on Mr. Chamberlain, Sr. (as documented by his voice on the Life Aid recordings).

Officer Carelli had his firearm out and in a "low ready" position through most of the 90 minute

---

[2] The Court in its Motion to Dismiss Opinion and Order concluded that Mr. Chamberlain was aware officers were outside his door, had weapons and that he feared for his safety. Assault claims against Sgt. Fottrell and Sgt. Martin, in addition to Officer Carelli, remained in the case pursuant to the Court's Motion to Dismiss Opinion and Order, p. 46. In the Court's oral decision on the Motion for Summary Judgment it is unclear whether the assault claims against Sgt. Martin, Sgt. Fottrell, and the City of White Plains survive to be tried. If that was the Court's intent, Plaintiff respectively requests the Court to clarify and reconsider any limitation on the assault claim solely to the actions of Officer Carelli. While Carelli's actions, in and of themselves, constitute assault, the other officers who displayed and wielded weapons and equipment during the siege outside Mr. Chamberlain, Sr.'s apartment could be determined by a rational juror to be active participants in the assault upon Mr. Chamberlain and to have proximately caused his apprehension of imminent physical injury. This certainly would apply to Sgt. Martin who wielded the less than lethal shotgun and Sgt. Fottrell who wielded the TASER.

siege. There is testimony that other police officers at the scene had their firearms out and at the ready. Plaintiff asserts that admissible evidence commences from when the door was initially breached, at which point Mr. Chamberlain, Sr. is observing and reacting to the actions of the police outside his door with words and deeds that clearly reflect his fear and apprehension of imminent physical harm. Defendants seek to preclude testimony from any police officers at the scene who could not "see" what was happening when Officer Carelli fired. Def. City MOL, p. 7. What police officers and other witnesses, such as the ambulance personnel, heard is also valid evidence for the jury to consider and should not be precluded.

G. **White Plains Police Department Policies and Procedures and Training Materials Are Relevant and Admissible**

Both Defendants seek to preclude Plaintiff from using any witnesses, documents, testimony or evidence pertaining to any White Plains Police Department police reports or policies. Clearly, WPPD policies and procedures governing the actions taken on November 19, 2011, and reports referencing them in relationship to the Chamberlain incident, are relevant for the jury to adjudge whether and to what degree lack of compliance with policies and training contributed to Mr. Chamberlain, Sr.'s apprehension and conscious pain and suffering.

The Court has determined that the City of White Plains cannot be tried on the issue of municipal liability for a failure to train its officers in regard to the handling of interactions with emotionally disturbed persons and granted summary judgment. Plaintiff should not now be foreclosed from referencing the specifics of the training received by Officer Carelli and the other officers at the scene in regard to 1) interacting with EDPs; 2) handling an unusual occurrence such as a barricaded EDP; and 3) use of force, in order to contrast those protocols with their actions on the day of the incident. Plaintiff should be allowed to cross examine Defendants' police practices expert on the WPPD training and policies and/or seek opinions from Plaintiff's

15

expert as to whether polices and training were complied with. Plaintiff should also be allowed to question Officer Carelli, and other police witnesses, on their failure to comply with training and policies and to impeach their credibility. *See Soto v. Gaudette,* 2015 WL 6453083 at *9 (D.Conn. Oct. 23, 2015) (holding expert testimony may be offered concerning police violations of procedures); *Wade v. Colaner,* 2010 WL 5479629 at *4 (D. N.J. Dec. 28, 2010) (explaining that jury heard evidence regarding defendant's non-compliance with use of force policy, including failure to provide complete and accurate information of what occurred in reports).

## H.  Evidence of the Dragging of the Wounded Mr. Chamberlain, Sr. Out of His Apartment Is Relevant and Admissible to the Battery Charge

Plaintiff should not be precluded from presenting evidence that the battery of Mr. Chamberlain, Sr. continued after he was shot, but was still alive. Specifically, Plaintiff should be allowed to present evidence to the jury, through testimony and photographs, that Mr. Chamberlain, Sr. was dragged out of his apartment by his feet by police officers while still alive, before being attended to by EMT's at the scene, placed on a stretcher and transported to the hospital.

## I.  The Jury Should Be Presented A Full and Accurate Account of Mr. Chamberlain, Sr.'s Conscious Pain and Suffering

N.Y. Pattern Jury Instruction 2:320 makes clear that Plaintiff is entitled to recover the amount that the jury determines will fairly and justly compensate for the emotional pain and suffering suffered by Kenneth Chamberlain, Sr., as well as the physical harm inflicted upon him. The PJI makes clear that the compensable period of suffering is between the moment that he realized he was going to be gravely injured or die and the moment he sustained a physical injury. There can be no doubt from the Life Aid recordings that Mr. Chamberlain Sr.'s a) awareness of the danger that caused his grave injury or death; b) awareness of the likelihood of grave injury or

16

death; and c) his suffering of emotional distress as a result of his impending grave injury or death began at the time the police arrived and started banging on his door. At the very latest, his awareness and suffering commenced at the point where his door was first breached, and he could see several police officers, some in tactical gear, some with their guns out and others at various times wielding axes, bolt cutters and sledgehammers. The jury should be allowed to hear Mr. Chamberlain, Sr. chronicle his apprehension and realization that he was going to be gravely injured or die, from the moment that fear first arose and as it escalated—memorialized in real time, in Mr. Chamberlain, Sr.'s own voice.

## POINT II
## PLAINTIFF'S EXPERT WITNESSES SHOULD NOT BE PRECLUDED FROM TESTIFYING AT TRIAL
### (Defendants City of White Plains Points II A and B, and Carelli Points VII, XII, XIV)

Rule 702 of the Federal Rules of Evidence dictates the admissibility of expert testimony. Under 702, a witness is a qualified expert if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

In light of this procedure formulated in *Daubert* and enumerated by Rule 702, the Supreme Court in *Kumho Tire Co., Ltd. v. Carmichael* explicitly held that the *Daubert* standard applies to all expert witnesses, not just "scientific" expert witnesses. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). The Court emphasized that the inquiry into the potential expert witness is not a stringent test, but a flexible one. *See Daubert*, 509 U.S. at 594-95. Notably, under Rule 702, the trial court is tasked with the role of the gatekeeper and to ensure

17

that the evidence is reliable and relevant.  *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (explaining that the district court serves as the "ultimate gatekeeper"); *see also Sherman v. Bear Stearns Cos. (In re Bear Stearns Cos., Sec., Derivative, & ERISA Litig.)*, 2016 U.S. Dist. LEXIS 97784 at \*6 (S.D.N.Y. 2016) (citing to *Daubert*, 509 U.S. at 597).

In order to determine reliability of an expert's opinion, the Court in *Daubert* established a list of non-exhaustive factors to determine the indicia of reliability of that expert's proffered opinion.  *See Daubert*, 509 U.S. at 593-94.  These factors consist of: (i) whether the theory or technique can be and has been tested; (ii) if the theory or technique has been subjected to peer review and publication; (iii) the known potential error rate; and (iv) whether the theory or technique has been generally accepted by that particular community of expertise.  *Id.*

## A. Dr. Michael Baden

Here, Dr. Michael Baden's qualifications as a medical examiner are undisputed.  Def. City MOL, p. 13.  However, the Defendant does question the reliability of Dr. Baden's methodology.  As a forensic pathologist for over half a century, Dr. Baden has dealt with numerous autopsies involving gunshot victims with bullet wounds.  In addition to Dr. Baden's unquestioned experience as a forensic pathologist, there is case law that holds a forensic pathologist is qualified to testify about bullet trajectories.  *See Flores v. McDonald*, 2013 U.S. Dist. LEXIS 182978 at \*41-42 (C. D. Cal. 2013).

Within his expertise as a renown forensic pathologist, Dr. Baden explains that "there was one bullet track that entered the right upper arm without any surrounding gunshot residue, proceeded behind the humerus, exited in the axilla and continued directly into the right side of the chest at the same level, and through the back parts of the upper lobes of both the lungs."  Dr. Michael Baden's Expert Report at pg. 5 [hereinafter "Baden Report"].  In Dr. Baden's expert

medical opinion, the bullet traveled horizontally through the right arm and chest based upon the locations of the internal damage caused by the bullet.  Further, Dr. Baden also reviewed the autopsy report performed by the Westchester County Medical Examiner, Dr. Kunjlata Ashar. Baden Report at pg. 1.  In Dr. Ashar's autopsy report and accompanying pictures, she places a metal rod through Mr. Chamberlain, Sr,'s right arm that tracks the trajectory path of the bullet fired by Officer Carelli. Noticeably, it is worth mentioning that the Defendant City has refrained from questioning Dr. Ashar's methodology of assessing the bullet trajectory path.

Unlike Dr. Ashar, Dr. Baden states that he reviewed the deposition testimony of numerous police officers in this case, including Officer Carelli. Baden Report at pg. 1.  Officer Carelli gave sworn testimony that he fired two shots that were "pretty much one right after the other."  *See* Carelli Dep., p. 163, ln. 6-7. In his deposition, he explains that he fired his "two shots in one motion" at the "center mass" of Mr. Chamberlain, Sr.. *Id.* at p. 169, ln. 16-19; p. 166, ln. 14-16. Officer Carelli proceeds to explain that the term center mass is "usually the largest portion on a person from the shoulders to the hip area would be center mass which is where we were trained to aim." *Id.* at p. 166, ln. 20-22. Moreover, Officer Carelli describes that he could see Mr. Chamberlain, Sr.'s right side, and he was aiming in between Mr. Chamberlain, Sr.'s shoulder and hip.  *Id.* at p. 166, ln. 10-14. Besides Officer Carelli's sworn deposition testimony, the pictures from the crime scene of the bullet hole in the wall in Mr. Chamberlain, Sr.'s apartment shows that the bullet entered the wall at precisely 16 inches off the ground. Next, another picture with a portion of the wall cut out shows that the bullet hit the interior of the wall at a height of only 10 inches off the ground.

Altogether, this evidence served as the basis for Dr. Baden's expert medical opinion as a forensic pathologist that the bullet that killed Mr. Chamberlain, Sr. was fired in a downward trajectory. [3]

## B. **Mr. Gene Maloney**

Mr. Maloney's anticipated testimony as an expert of police practices is highly relevant to the case at bar.  If the Court were to limit or proscribe expert testimony on police force tactics employed on November 19, 2011, then that decision would deny the jury admissible and relevant evidence about the excessive force and assault and battery claims against Officer Carelli and the City.  Mr. Maloney undeniably addressed the use of non-lethal force pertaining to the use of the Taser and the beanbag shotgun in his expert report.  In other words, Defendants completely disregarded the remaining assault and battery claims in this case.  By the same token, Defendants improperly frame Mr. Maloney's analysis through a singular, one dimensional prism, which attempts to usurp his testimony of any value or relevancy to the jury.  In fact, when taken together, it is readily apparent that the foundation of Mr. Maloney's expert opinions is the objective reasonableness of police action.  Mr. Maloney's analysis and anticipated expert opinion testimony are admissible and relevant evidence that the jury should hear and determine for themselves.

In accordance with the double standard that the Defendants have promulgated, Defendants plan to call their expert witness on police practices, Mr. John Monaghan.  It is anticipated that Mr. Monaghan will testify that in his expert opinion, Officer Carelli responded reasonably when he used deadly force on Mr. Chamberlain, Sr..  However, in addressing

---

[3] If the Court determines that Dr. Baden is precluded from testifying on this issue at trial, then Plaintiff argues that based upon the physical evidence that demonstrates that the bullet proceeded in a downward trajectory that no experts are needed on this issue as the jury can use their common experience and knowledge to determine the factual issue.  Therefore, Dr. Wetli should be precluded from testifying on this issue as well.

Plaintiff's expert, the City argues that the determination of whether or not Officer Carelli used unreasonable and thus excessive force when he shot Mr. Chamberlain, Sr. is the ultimate question for the jury to decide.  The City would like to preclude the Plaintiff's expert witness from testifying on an ultimate issue in the case and at the same time, introduce their expert witness to do the same.  In sum, the Federal Rules of Evidence does not permit the Defendants "to have their cake and eat it too."  Neither Defendants' nor Plaintiff's police practices expert may offer testimony that expresses a legal conclusion or instructs the jury what conclusion to reach as to the reasonableness of Officer Carelli's use of deadly force. *Hygh v. Jacobs,* 961 F.2d 359, 363-364 (2d Cir. 1992).

### C. Defendants' Apply a Double Standard in Seeking to Limit Testimony by Plaintiff's Expert Dr. Baden but Include Testimony of their Expert Dr. Charles Wetli that is Speculative, Prejudicial and Exceeds the Scope of Dr. Wetli's Experience

Defendants seek to preclude Plaintiff's expert, Dr. Michael Baden, from opining regarding Mr. Chamberlain, Sr.'s mental health status and the reasonableness and propriety of the police officers' actions in response. However, the City's forensic pathology expert, Dr. Charles Wetli, freely opines as to Mr. Chamberlain, Sr.'s psychiatric state and its effect on the events that unfolded. Dr. Wetli comes to the conclusion that Mr. Chamberlain was in a "psychotic state" or experiencing "psychosis." Defendant Dr. Wetli's Expert Report, p. 2-3 (hereinafter "Wetli Report).  His purported role as an expert in pathology does not give Dr. Wetli the freedom to give opinions outside the scope of his professional training and experience and that are based on pure speculation.  Dr. Wetli does not explain what scientific basis he has that leads him to arrive at these conclusions.  Once again, this is another instance where the City is attempting to preclude Plaintiff's expert, Dr. Baden, from testifying about Mr. Chamberlain, Sr.'s mental state and at the same time, acting with the intention of having Dr. Wetli do the same.

21

If the Court finds that Dr. Wetli is allowed to testify as to this matter, Dr. Baden should be allowed to as well.

Frankly, the topic of Mr. Chamberlain, Sr.'s mental health should be left to his treating psychiatrist, Dr. Michelle Widlitz (whom Defendants also seek to exclude from testifying). Dr. Widlitz examined Mr. Chamberlain, Sr. on numerous occasions, concluded on a diagnosis, and memorialized her observations and treatment plans in his medical records. Based on her role as Mr. Chamberlain's psychiatrist, she is the most appropriate doctor to testify about his mental state before and at the time of the shooting of Mr. Chamberlain, Sr. by Officer Carelli.

Furthermore, Dr. Wetli's anticipated testimony regarding Mr. Chamberlain, Sr.'s blood alcohol concentration on November 19, 2011, is also utterly speculative and therefore, unreliable. In Dr. Wetli's expert report, he explains that Mr. Chamberlain's antemortem blood alcohol concentration (BAC) of 0.11% is deceptive because this was taken after he was shot and being treated with IV fluids. *Id.* at pg. 3. He proceeds to claim that the vitreous fluid alcohol of .22% is significant since it is stored in an isolated compartment of the body. *Id.* However, first, the antemortem BAC reading was taken at an unspecified time. *Id.* at 2. Second, the vitreous fluid was taken at the time of the autopsy, which was more than 24 hours after Mr. Chamberlain, Sr. had been pronounced dead. *See* Mr. Chamberlain, Sr.'s Autopsy Report. Wetli Report, at 3. Dr. Wetli neither cites nor references any particular methodology to qualify this conclusion. Such an absence calls into question the legitimacy of this opinion and does not allow the Court to properly analyze Dr. Wetli's testimony as to Mr. Chamberlain's BAC in the required gatekeeping manner to ensure reliability and ultimately, evidence that will assist the trier of fact. Consequently, Dr. Wetli should be precluded from testifying to Mr. Chamberlain, Sr.'s BAC as it is unreliable and thus, irrelevant and inadmissible.

As a final matter, Defendants seek to have Dr. Wetli speculate, without any scientific basis and against the weight of the evidence, that in his expert opinion, the bean-bags that struck Mr. Chamberlain, Sr. from the shotgun caused him no significant harm.  Dr. Wetli's speculation as to whether Mr. Chamberlain, Sr. consciously suffered pain from these bean-bag shotgun projectiles will be belied by the testimony of police officers as to his reactions to the shot, training materials describing the velocity of the projectiles and photographs of the wounds inflicted upon Mr. Chamberlain, Sr. Notably, this is all evidence Defendants wrongly seek to exclude from the jury's consideration in their motions in limine. Conclusions by the jury as to whether Mr. Chamberlain, Sr. consciously suffered pain is within the province of the jury's personal experience and rational thinking and do not require an expert from Plaintiff to contradict Dr. Wetli's absurd conclusion for which there is no evidentiary or scientific basis. Allowing Dr. Wetli to make such pronouncements from the stand serves no purpose other than to risk confusing or prejudicing the jury. And denying Plaintiff the ability to contradict it through photographs, training materials and testimony would be a manifest of injustice.

## POINT III
### PLAINTIFF'S TREATING PHYSICIANS SHOULD NOT BE PRECLUDED FROM TESTIFYING AS EXPERTS BECAUSE PLAINTIFF MADE TIMELY SUPPLEMENTAL DISCLOSURES AND THEIR TESTIMONY IS ESSENTIAL AND HELPFUL TO THE JURY
### (Defendants City of White Plains Points II C, Point III and Carelli VII, X)

### A. Dr. Lerner and Dr. Widlitz were timely disclosed.

Rule 26(a)(1)(A) requires that a party provide opposing parties the name and contact information of each individual who is likely to have discoverable information the disclosing party may use in support of its claims or defenses.  Fed. R. Civ. P. 26(a)(1)(A)(i).  In addition, a party is also under the obligation to timely supplement their disclosures if "additional or corrective information becomes available."  *Id.*  However, in the event that a party fails to make

the required initial disclosures or fails to supplement them, that party is prohibited from using that information at a trial, unless "the failure was substantially justified or is harmless." *See Pal v. N.Y. Univ.*, 2008 U.S. Dist. LEXIS 50902 at *7-8 (S.D.N.Y. 2008) (citing to Fed. R. Civ. P. 37(c) (1)). In other words, this rule prevents a party from "sandbagging" an opposing party with new evidence close to trial. *Id.*

Unfortunately, the Defendants inconceivably fail to recognize that Dr. Roberta Lerner and Dr. Michelle Widlitz, physicians at the Veterans Administration Hospital, were timely disclosed. On April 22, 2015, the Plaintiff submitted supplemental disclosures to the Defendants. These disclosures contained the names of not only Dr. Michael Baden and Mr. Gene Maloney, but also the names of medical providers with information about Mr. Chamberlain, Sr.'s health. The list of names provided to the Defendants included Dr. Michelle Widlitz and Dr. Roberta Lerner. Notably, the Defendants did not raise the argument that Dr. Baden and Mr. Maloney were not timely disclosed. In fact, the Defendants plainly admit that the Plaintiff disclosed Dr. Baden and Mr. Maloney as expert witnesses. Critically, all of the Plaintiff's expert witnesses, from Dr. Baden to Dr. Lerner, were all disclosed at once on April 22, 2015. The Defendants had more than enough notice as these disclosures gave them more than three months, before the close of expert discovery, to conduct any depositions that they felt were necessary.

### B. Treating physicians are experts who are not required to submit reports.

Second, courts have found that treating physicians who testify by using any specialized knowledge or training are technically experts for the purposes of expert witness disclosures under Rule 26(a)(2), even though they are not retained experts for which an expert report would be required under Rule 26(a)(2)(B). *See Shelper v. Metro-North Commuter R.R.*, 2016 U.S. Dist.

LEXIS 51259 (S.D.N.Y. 2016) (citing *Fanning v. Target Corp.*, 2006 U.S. Dist. LEXIS 4804

(S.D.N.Y. 2006). Moreover, the court in *Fanning* explains that the Advisory Committee Notes

clearly explain that the written report requirement in paragraph (2)(B) is only applicable to those

experts who are retained or specially employed to provide such expert testimony. *See Fanning*,

2006 U.S. Dist. LEXIS 4804 at *4-5.

Put differently, the court differentiates treating physicians from ordinary, retained experts

by stating that a treating physician can be deposed or called to testify without having to satisfy

the written report requirement. *Id.* at *5. It is inevitable that doctors will rely upon their

"specialized knowledge and training" when evaluating their patients and "as a technical matter,

plaintiffs may have been required to list the doctors as part of expert disclosure even though the

doctors were not required to provide a report." *Id.* at *7-8 (citing *Musser v. Gentiva Health

Services*, 356 F.3d 751, 756 (7th Cir. 2004). Furthermore, it has been held that an abbreviated

disclosure is likely sufficient when there are medical records that provide the specific purpose for

the treating physician's testimony. *See Socha v. 110 Church, LLC*, 2014 U.S. Dist. LEXIS

156976 at *50-51 (S.D.N.Y. 2014) (explaining that such a disclosure was likely adequate

"because it is supplemented by such records").

In light the aforementioned case law, it is clear that Dr. Lerner and Dr. Widlitz are, for all

intents and purposes, experts. Specifically, these doctors treated Mr. Kenneth Chamberlain Sr.

using their specialized medical knowledge, training, and expertise. Although Dr. Lerner and Dr.

Widlitz are experts, as treating physicians, these Veterans Administration medical providers are

different from the ordinary expert because these doctors are not specially employed by the

Plaintiff to elicit such expert testimony. Simply, Dr. Lerner and Dr. Widlitz are only involved in

this instant litigation because they happened to be Mr. Chamberlain, Sr.'s doctors, who have

treated him for various medical conditions, including but not limited to his debilitating COPD

and persistent psychiatric issues.  Thus, Dr. Lerner and Dr. Widlitz were not required to submit a

report about their findings.  Unlike the doctors in *Socha* who were planning on testifying outside

the scope of their personal observations and impressions, the treating physicians in this case will

give testimony and findings exclusively based upon the medical records of Mr. Chamberlain, Sr.

and the notes they took about his physical and mental well-being at the time of their

examinations.  Finally, it is readily apparent that the Defendants were on notice of the Plaintiff's

experts and treating physicians because the City explicitly states that the Plaintiff noticed expert

witnesses, Dr. Baden and Mr. Maloney.  If the Defendants are making this assertion, then they

are implying that the treating physicians were properly disclosed as well because both types of

experts were disclosed in the same document.

### C.  If the medical records are not deemed to be sufficient abbreviated disclosure, Plaintiff was substantially justified and there was no prejudice to Defendants

Even if it is decided that the Plaintiff's supplemental disclosure of Mr. Chamberlain, Sr.'s

medical providers expected testimony was insufficient, Dr. Lerner and Dr. Widlitz should still be

allowed to testify.  It is well settled under Rule 37(c) that "if a party fails to provide information

or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that

information or witness to supply evidence…at a trial, unless the failure was substantially

justified or is harmless."  *Pearlman v. Cablevision Sys. Corp.*, 2015 U.S. Dist. LEXIS 164410

(E.D.N.Y. 2015) (citing Fed. R. Civ. P. 37(c)(1)).[4]  Accordingly, if the failure was substantially

justified or harmless, then the court should not impose sanctions under Rule 37(c)(1).  *See Israeli*

---

[4] Plaintiff pauses to specifically address Point VII of Officer Carelli's motion in limine.  In Point VII, defense counsel cites a case, *Bynum v. Metro. Transp. Auth.*, 2006 WL 655106 (E.D.N.Y. 2006), that states the failure to disclose information must be substantially justified <u>and</u> harmless.  Although this case has no negative appellate history, it is unequivocal that this case, and Defendant, misstated Rule 37(c)(1) which explicitly sets forth "unless the failure was substantially justified <u>or</u> was harmless."  *See* Fed. R. Civ. P. 37(c)(1).

*v. Ruiz*, 2015 U.S. Dist. LEXIS 97650 *6 (S.D.N.Y. 2015) (citing to *Design Strategy Inc. v. Davis*, 469 F.3d 284, 297-98 (2d Cir. 2006) (stating that a party's failure to comply with the disclosure rules applicable to experts is not an automatic bar on their testimony because the court may forgive errors to properly disclose as harmless); *see also Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 260 (W.D.N.Y. 2013) (citing *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D.147, 158-59 (S.D.N.Y. 2012) . Substantial justification has been defined as justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. *See Kunstler v. City of New York*¸ 242 F.R.D. 261, 264-65 (S.D.N.Y. 2007). Meanwhile, the term "harmless" is characterized as an absence of prejudice. *See Ritchie Risk*, 280 F.R.D. at 159. In other words, the failure to timely disclose cannot prejudice the opposing party. Unsurprisingly, the party that failed to comply with its discovery obligations has the burden of proving that the failure to disclose was either substantially justified or harmless. *Id.* Lastly, it should be noted that the "[i]mposition of sanctions under Rule 37 is a drastic remedy and should only be applied in those rare cases where a party's conduct represents flagrant bad faith and callous disregard for the Federal Rules of Civil Procedure." *Lavigna v. State Farm Mut. Auto Ins. Co.*, 736 F. Supp. 2d 504, 511 (N.D.N.Y. 2010) (citing to *Hinton v. Patnaude*, 162 F.R.D. 435, 439 (N.D.N.Y. 1995) (citations omitted).

Here, due to the absence of clarity in this area of the law, it would be reasonable to conclude that the treating physicians of the Veterans Administration Hospital (Dr. Roberta Lerner and Dr. Michelle Widlitz) were adequately disclosed as they are experts who are not required to give reports. Furthermore, it would be reasonable to conclude from existing precedent that the summaries stated by each treating physician throughout the medical records

27

would be ample notice to the Defendants as to the anticipated testimony.  Conversely, the Defendants' position is that the treating witnesses were not disclosed.  It should be noted that the Defendants did not object at the time of the Plaintiff's supplemental disclosure, or any time thereafter until now.  Simply put, the Plaintiff was under a good faith belief that he was required to disclose the treating physicians well before the end of expert discovery as evidenced by the April 22, 2015 supplemental disclosure.  Subsequently, the Defendants chose to only depose Mr. Maloney, waiving their right to depose Dr. Baden or any of Mr. Chamberlain's treating physicians.  Frankly, it is an undisputed fact that this incident dealt with Mr. Chamberlain, Sr., an emotionally disturbed person, whom the police responded for a welfare check because he was an elderly and sick man whose Life Aid alert system accidentally went off.  Clearly, the Defendants were aware that Mr. Chamberlain, Sr.'s physical and mental health problems would be presented at trial.  Therefore, the Plaintiff was substantially justified in failing to provide a mere summary to accompany the disclosure of its treating physician experts.

With respect to harmlessness, the Defendants had more than enough time to conduct the depositions of any of the doctors that Plaintiff listed in its supplemental disclosures.  Moreover, the Defendants cannot successfully claim that this failure to provide an adequate summary of expected testimony will prejudice them because Mr. Chamberlain, Sr.'s health has always been a significant part of the case.  It is readily apparent that Mr. Chamberlain, Sr.'s health has always been a critical factor in determining whether or not he was a threat to Sergeant Martin and in turn, whether Officer Carelli was therefore justified in shooting and killing Mr. Chamberlain, Sr. In short, Mr. Chamberlain, Sr.'s treating physicians, by use of their medical expertise, knowledge, and training, will testify and further explain the observations they made of him during his medical examinations. Thus, Mr. Chamberlain, Sr.'s health is highly relevant to the

28

case at hand and it is the Plaintiff's position that his compromised physical and mental health is strong circumstantial evidence that substantially tends to rebut the Defendants' version of events. Mr. Chamberlain, Sr.'s jeopardized health effectively calls into question whether application of deadly force was necessary. Thereupon, precluding these doctors from testifying would severely and unjustly prejudice the Plaintiff. In sum, it is thoroughly discernible that the Plaintiff did not act with "flagrant bad faith nor callous disregard" that would warrant such a harsh sanction.

### D. The four-part balancing test disfavors preclusion of Dr. Lerner's and/or Dr. Widlitz's testimony.

It has been established in the Second Circuit that "[b]efore the extreme sanction of preclusion may be used by the district court, a judge should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses." *Outley v. New York*, 837 F.2d 587, 591 (2d Cir. 1988). As a result, this Circuit has put forward a four-factor balancing test that courts must consider prior to imposing preclusion; these factors include: (1) the non-complying party's explanation for why it failed to comply; (2) the importance of the evidence that faces preclusion; (3) the prejudice suffered by the opposing party; and (4) whether there is a possibility for a continuance. *See Bausch & Lomb Inc. v. Vitamin Health, Inc.*, 2016 U.S. Dist. LEXIS 16348 at *2-3 (W.D.N.Y. 2016) (citing to *Outley*, 837 F.2d at 590-91). Notably, "[c]onsiderations of fair play may dictate that courts eschew the harshest sanctions...where failure to comply is due to a mere oversight of counsel amounting to no more than simple negligence." *Outley*, 837 F.2d at 591 (citing *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979).

In this case, if the Court somehow finds that the Plaintiff did not satisfy its expert disclosures, then it is Plaintiff's position that he was acting in good faith and in accordance with case law that his disclosure of Dr. Lerner and Dr. Widlitz was timely and thorough. *See Socha v.*

29

*110 Church, LLC*, 2014 U.S. Dist. LEXIS 156976 at \*50-51 (S.D.N.Y. 2014) (describing that abbreviated disclosures were likely adequate when supplemented by medical records). In other words, the Plaintiff had no reason to believe that his discovery obligations were insufficient. In regard to the second factor, the testimony of Dr. Lerner and Dr. Widlitz is significantly important to the case at bar. Both doctors will be able dissect and translate for the jury their complex medical diagnoses and prognoses found in the medical records. These treating physicians are in the best position to testify to and explain their relevant medical evaluations of Mr. Chamberlain, Sr. Assuredly, Mr. Chamberlain, Sr.'s health is pivotal to the ultimate issue of whether or not Mr. Chamberlain, Sr. was on the ground, because his health tends to discredit some of the police officers' accounts of his actions. The next factor, prejudice to the Defendants, is practically nonexistent. The Plaintiff made supplemental disclosures with the names of medical providers who cared for Mr. Chamberlain, Sr. and produced written authorizations for the Defendants to obtain his medical records from the Veterans Administration Hospital. The Defendants were well aware that the Plaintiff intended on calling treating physicians to help supplement the medical records because the Plaintiff's sole position throughout this case has been that Mr. Chamberlain, Sr. was on the ground when he was shot. The physical and mental health of Mr. Chamberlain, Sr. is critical to analyzing whether the officers' accounts of what transpired are even possible, let alone plausible. Thus, it is abundantly clear that the Defendants are using the motion in limine process as an eraser in an attempt to nullify their oversight. Lastly, the fourth factor, whether a continuance is a possibility, is completely within the court's discretion. This case has been in the court system for over four years and the Defendants have had every opportunity to depose Mr. Chamberlain, Sr.'s treating physicians, if they so choose. Ultimately, the first three factors, and arguably the fourth, dramatically weigh the scale in favor of not

granting preclusion of the testimony of Dr. Lerner or Dr. Widlitz.  In any event, if the steps the Plaintiff took were incorrect, then his missteps cannot be anything more than simple negligence. Therefore, in this case, preclusion is not appropriate.

### E.  Dr. Lerner and Dr. Widlitz will give testimony that will be helpful and aide the jury.

Defendants go on to argue that even if these doctors were allowed to testify, their testimony would be confined to observations that they made during the course of evaluating and treating Mr. Chamberlain, Sr.  *See* Def. City MOL, p. 16-17.  An example of Dr. Lerner's testimony is that she will testify that she observed Mr. Chamberlain, Sr. only being able to walk slowly and that he had extreme difficulty breathing after walking barely half a flight of stairs. This testimony is vital to the Plaintiff's case in chief because one of the only issues in this trial is whether Officer Carelli used unreasonable force against Mr. Chamberlain, Sr. when he shot and killed him.  The underlying question of that issue is whether or not Mr. Chamberlain, Sr. was on the ground when Officer Carelli fired and fatally struck him.  Certainly, Dr. Lerner's testimony about Mr. Chamberlain, Sr.'s physical condition and breathing disabilities is highly probative because there are various officer testimonies detailing how he fell to the ground and attempted to get up.  For instance, Officer Carelli swore in his deposition that Mr. Chamberlain, Sr. was shot by the third beanbag shot, which caused him to stumble backwards. Carelli Dep., p. 149-50, ln. 22-4. Officer Carelli proceeds to describe how Mr. Chamberlain, Sr. fell and got up: "He wasn't seated. His butt hit the ground and it was quick.  He popped up, rolled up and charged at Sergeant Martin."  *Id.* at p. 153, ln. 2-4. Finally, Officer Carelli emphasized that once Mr. Chamberlain, Sr. fell to the ground, he immediately popped up.  *Id.* at p. 153, ln. 5-13.  Dr. Lerner's testimony would explain to the jury Mr. Chamberlain, Sr.'s medical condition, how it

affected his daily life at the time she evaluated him, and her future prognosis as to how these physiological infirmities would compromise his health.

Ultimately, it would be the jury's decision to decide whether the testimony by Dr. Lerner substantiated a sufficient inference to them that makes Officer Carelli's account more or less likely. Dr. Widlitz will testify to the effects Mr. Chamberlain, Sr.'s mental illness had on his physical disabilities and vice versa. This evidence is highly probative because it goes hand in hand with the testimony from Dr. Lerner. The focal point of this entire case rests solely on the determination of whether or not Mr. Chamberlain, Sr. was laying on the ground trying to get up or on his feet charging at Sergeant Martin with a knife. The Plaintiff would be severely prejudiced if the Court were to prevent him from presenting testimony from Mr. Chamberlain, Sr.'s treating physicians as it is extremely probative to the issue in this case. Obviously, the Plaintiff's position is that the testimony of Dr. Lerner and Dr. Widlitz is evidence that makes the officers' various version of events extraordinarily unbelievable. As a result of Defendant Carelli's actions, Mr. Chamberlain, Sr. is not alive today to testify to his version of events and dispute the police officers' accounts. Thus, the Plaintiff finds the testimony of Dr. Lerner and Dr. Widlitz to be significantly helpful to the jury in determining whether Officer Carelli was justified in using deadly force when he killed Mr. Chamberlain, Sr. in cold blood.

Furthermore, Dr. Lerner's and Dr. Widlitz's testimony, through the medical expertise, will give the jury key insight into how Mr. Chamberlain, Sr. was plagued by a plethora of medical ailments, physical and mental, that had a devastating and detrimental impact on his overall physical health. This type of medical diagnosis and prognosis is crucial to whether or not Mr. Chamberlain, Sr. was physically capable of performing certain everyday tasks. But more importantly, whether Officer Carelli and other police witnesses' testimony as to Mr.

Chamberlain Sr.'s alleged "gymnastic feats" at the time he was shot are credible. In sum, both treating physicians testimony will help aid the jury in determining facts within this case.

### F. Plaintiff's Medical Records are Admissible and Relevant for the Jury to Assess Credibility and Significance of Other Evidence

As a threshold matter, Plaintiff has contacted the Veterans Administration to insure that properly certified hospital records will be available at trial. Additionally, Plaintiff notes that the City intends to use the White Plains Hospital records in which they have yet to produce certified copies.  Recently, Defendants requested authorizations to obtain certified records from White Plains Hospital and the Transcare Ambulance Service, which Plaintiff immediately provided without raising unnecessary or extraneous objections.

Secondly, the introduction of the VA medical records at trial would be accompanied by the expert testimony of Dr. Roberta Lerner and Dr. Michelle Widlitz, two of Mr. Chamberlain, Sr.'s treating physicians.  These doctors would be able to explain to the jury the significance of Mr. Chamberlain, Sr.'s oppressive medical conditions and how they were affecting him at the moment they examined him.  Some of the medical records contain notes and observations that were made just days prior to the day in question.  Quite simply, Mr. Chamberlain, Sr.'s medical information should be heard by the jury in its entirety.

In any event, the probative value of Mr. Chamberlain, Sr.'s medical records is not substantially outweighed by their prejudicial effect.  The term "unfair prejudice" has been defined as "an undue tendency to suggest on an improper basis, commonly though not necessarily, an emotional one." *United States v. Ashburn*, 2015 U.S. Dist. LEXIS 115629 * 84-85 (E.D.N.Y. 2015) (citing to *Old Chief v. United States*, 519 U.S. 172, 180 (1997).  Courts should also consider "the availability of other means of proof." *See Old Chief*, 519 U.S. at 184. Here, Mr. Chamberlain, Sr.'s medical records only have a tendency to depict accurate

assessments of his physical and mental condition at or near the time of his death.  Unfortunately,
as Plaintiff has repeatedly stated, Mr. Chamberlain, Sr. is dead and cannot speak for himself.
Therefore, the Plaintiff has to rely on this circumstantial evidence presented by his medical
records and the treating physicians' testimony in corroboration with the direct evidence that
illustrates that Mr. Chamberlain, Sr. was on the ground when Officer Carelli killed him.
Ultimately, evidence that has negative connotations, such as illustrating the significant flaws in
the police officers' versions of events, does not equate to the prejudice that Rule 403 seeks to
prevent.

**POINT IV**
**AUTOPSY PHOTOGRAPHS ARE RELEVANT AND ADMISSIBLE**
**(Defendants City Point V and Carelli Point XI)**

Defendant Carelli (Point XI) argues the autopsy photographs identified by Plaintiff offer
"no further factual basis" in determining whether Defendant Carelli was objectively reasonable
in his use of force against Mr. Chamberlain, Sr. Defendant City (Point V) argues that the autopsy
photographs are irrelevant to any of the triable issues in the case. However, Defendants fail to
acknowledge that the proffered autopsy photographs are material in determining the
circumstances surrounding Defendant Carelli's use of force and Mr. Chamberlain, Sr.'s physical
capabilities at the time Officer Carelli used force, thus determining liability of the City, under
*respondeat superior*.

During the Court's bench decision on Defendants' motions for summary judgment, the
Court cited to *Plakas v. Drinksi* for the proposition that when an "officer defendant is the only
witness left alive to testify, a court must undertake a fairly critical assessment of the officer's
original reports or statements to decide whether the officer's testimony could reasonably be
rejected at trial." September 12, 2016 Transcript p. 73-74; *citing Plakas v. Drinksi*, 19 F.3d 1143,

34

1147 (7th Cir. 1994) *cert denied* 513 U.S. 820, 115 S.Ct. 81, 130 L.Ed.2d 34 (1994). Thus, as

part of the court's "fairly critical assessment," the court must consider circumstantial evidence

that may discredit the defendant's story. *O'Bert ex rel. Estate of O'Bert v. Vargo,* 331 F.3d 29,

37 (2d Cir. 2003) (internal citations omitted). Autopsy photographs would be considered such

circumstantial evidence, and are thus highly relevant to the triable issues in the case. The autopsy

photographs Plaintiff seeks to admit depict a roadmap, providing an illustration for the jury of

the actions undertaken by Officer Carelli and Sgt. Martin, and their effect on Mr. Chamberlain,

Sr. This roadmap enables the jury to determine whether or not the officer's actions conform to

their testimony.

     In *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001), a case discussed in *United States*

*v. Salim* by the Southern District of New York, the Eighth Circuit affirmed the admission of

autopsy photographs, finding that they "had substantial probative value because they showed the

entry angles of the bullets, the locations of each wound, and the extent of the injuries caused by

the hollow point bullets. The photographs were therefore an important aid to the witness [the

medical examiner] and the jury in determining the relative positions of the victim and the

shooters as each shot was fired, which was a key issue during the trial directly impacting on the

culpability of each defendant...Moreover, the autopsy photographs, which depict each individual

wound rather than the entire body of the victim, are not unfairly prejudicial." 247 F.3d 741, 793-

794 (8th Cir. 2001).

     Here Mr. Chamberlain, Sr.'s injuries go directly to the central issue of the case: whether

excessive force was used on the Mr. Chamberlain, Sr. (as well as to Mr. Chamberlain Sr.'s

conscious pain and suffering). The location and extent of the injuries is necessary to determine

whether Mr. Chamberlain, Sr. was incapacitated at the time Officer Carelli discharged his service

weapon upon him. For example, the parties disagree as to whether Mr. Chamberlain, Sr. was

lunging at an officer with a knife at the time Officer Carelli used force. According to the

Defendants, Mr. Chamberlain, Sr.'s arm was raised over his head when he was shot. Plaintiff

asserts the physical evidence, including autopsy photographs, demonstrate otherwise.

Accordingly, the jury should have the opportunity to review the autopsy photographs of the

trajectory of the bullet that hit Mr. Chamberlain, Sr., which directly contradict the Defendants'

arguments. Additionally, Plaintiff anticipates that Defendants' experts will argue that Mr.

Chamberlain, Sr. would not have felt pain from the bean-bags that had struck him, and the pain

from the gunshot wounds, if any, was transient and momentary. Consequently, the jury would be

entitled to use their own judgment to determine whether or not the injuries Mr. Chamberlain, Sr.

sustained were capable of causing him significant pain, a conclusion they could reach based on

their own common sense without the need to rely on expert testimony. Thus, the autopsy

photographs have significant probative value in helping the jury determine whether Officer

Carelli's actions were reasonable and the degree of suffering experienced by Mr. Chamberlain,

Sr.

Defendants then argue that even if the photographs were found to be relevant, their

probative value is outweighed by their prejudicial effect, under Rule 403 of the Federal Rules of

Evidence. Officer Carelli specifically argues that Plaintiff should be precluded from showing the

jury "any graphic photo" of Mr. Chamberlain, Sr. because it would be confusing, misleading and

would unfairly prejudice Defendant. Def. Carelli MOL, p. 18. However, the Second Circuit has

routinely determined that the graphic or disturbing nature of a photograph alone is not enough to

find it inadmissible. *United States v. Salim*, 189 F. Supp. 2d 93, 98 (S.D.N.Y. 2002) (citing

*United States v. Velazquez*, 246 F.3d 204, 210-11 (2d Cir. 2001)); *see United States v. Salameh*,

152 F.3d 88, 123 (2d Cir. 1998); *see also U.S. v. Allen,* 247 F.3d 741 (8th Cir. 2001). "Rather, the analysis hinges upon whether the photograph is relevant to the resolution of some disputed point in a trial or otherwise aids a jury in a factual determination." *Salim* at 98. One reason for allowing such a determination is that "a defendant should not benefit from Rule 403 exclusion of evidence based on grisly acts that he committed." *U.S. v. Carneglia*, 256 F.R.D. 104, 112 (E.D.N.Y. 2009), citing *Salameh*, 152 F.3d at 122–23 (upheld trial court's admission of photographs of bloodied bombing victims). The autopsy photographs Plaintiff seeks to admit depict the wounds Defendants inflicted on Mr. Chamberlain, Sr. and are necessary to determine the resolution of disputed points in trial, as stated above. Precluding such photographs would be a disservice to the jury, and an injustice to Mr. Chamberlain, Sr., in prohibiting the jury from seeing important evidence, providing an accurate depiction of Defendants' actions.

Defendants cite to *Estate of Jaquez v. Flores* for their proposition that the autopsy photographs should be excluded because they are confusing, misleading and cumulative; however, the Court in *Jacquez* allowed autopsy photographs into evidence. Initially, the Plaintiff in *Jaquez* offered over 100 autopsy photographs, and the judge, recognizing the "needlessly cumulative" nature of some of the photographs, allowed a limited number of photographs that "allow[] the jury to be informed…of the overall impact the events prior to the final shot had on [Plaintiff's] physical capabilities." 2016 WL 1083145 *7-8 (S.D.N.Y. Mar. 17, 2016). Plaintiff ask this Court to follow the path of the Court in *Jaquez,* by allowing the limited number of autopsy photos Plaintiff believes are necessary to inform the jury.

Here, Plaintiff seeks to offer into evidence nine autopsy photographs, all of which are relevant to the remaining issues to be tried. The injuries sustained prior to the final gunshot wound show the physical impact it had on Mr. Chamberlain, Sr., enabling a jury to determine

37

the credibility of Officer Carelli's testimony as to what was occurring when he shot and killed

him and whether Officer Carelli's use of deadly force was reasonable. Both parties intend to call

the Medical Examiner who performed the autopsy who can attest to the accuracy of the

photographs and the injuries the Mr. Chamberlain, Sr. sustained. The autopsy photographs are

necessary to illustrate the velocity at which Mr. Chamberlain, Sr. was hit by the projectiles and

draw reasonable conclusions as to the effect, based on the severity of the wounds they caused to

his body.

Defendant City argues that the photographs provide no evidence of conscious pain and

suffering. The City here is undeniably wrong. In order to establish that Mr. Chamberlain, Sr.

experienced conscious pain and suffering, it must be shown "that the decedent had some

knowledge or other basis for anticipating [death]; otherwise no basis would exist for a finding of

fright or mental anguish." *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 206 (2d Cir.

1984). Here, the autopsy photographs of the injuries Mr. Chamberlain, Sr. sustained prior to his

death all provide direct evidence of the pain and suffering he experienced. A juror can look at a

bruise, wound or contusion and use their common sense as to whether its infliction would more

likely then not be painful. Additionally, the photographs would aid the jury in determining

whether Mr. Chamberlain, Sr. experienced escalating conscious pain and suffering and fear of

impending death and mental anguish as each projectile, and the gunshot, were fired.

## POINT V
## PLAINTIFF'S DAMANGES AND CLAIMS SHOULD BE TRIED IN UNISON AS THE ISSUES ARE INEXTRICABLY INTERWOVEN AND PROMOTE JUDICIAL AND ECONOMIC EFFICIENCY
### (Defendants City of White Plains Point IV and Carelli Point I)

Officer Carelli moves to have Plaintiff's liability and damages claims bifurcated in order

to "avoid prejudice to Defendant, and to promote convenience and efficiency." Def. Carelli

MOL, p. 3. Officer Carelli argues that placing liability and damages claims into the same trial

would "result in severe prejudice to Defendant" and that it could "inappropriately sway or

influence the ability of a juror to separate sympathy for Plaintiff from the duty to remain

objective." Def. Carelli MOL, p. 3.  Defendant City asserts that the trial should be bifurcated for

compensatory and punitive damages.  Def. City MOL, p.18.

Unfortunately, Defendant Carelli incorrectly sets forth the issue of bifurcation in *Amato

v. City of Saratoga Springs,* 170 F.3d 311 (2d Cir. 1999). In this case, the Second Circuit upheld

the District Court's decision to bifurcate the trial of two police officers involved in a § 1983

claim, first having a trial as to whether or not the police officers were liable, followed by a trial

against the City and the Police Department that would commence if liability was found on the

part of either of the police officers. *Id.* at 316. In that instance, bifurcation of the claims was

necessary since the litigation of the first issue may eliminate the need to litigate the second issue.

*Id.*

However, this is not the case for Plaintiff's liability and damages claims as the issues of

liability and damages are inextricably interwoven.  In *Amato v. Saratoga Springs*, it was logical

to bifurcate the matter since if one issue was decided in a certain way, the other issue would not

have to be tried. Here, bifurcating would only create an undue burden on the jury since the

evidence to be presented for liability and damages would be exactly the same. There will be no

testimony from the victim, since he is deceased. In addition, there will be no loss of income or

psychological damages at issue in this trial.  Thus, the issue of prejudice is moot as the

determination of liability will be directly related to the issue of damages. The Second Circuit sets

forth that bifurcation may be appropriate "where the evidence offered on two different issues will

be wholly distinct." *Vichare v. AMBAC Inc.*, 106 F.3d 457, 466 (2d Cir. 1996) (quoting *Katsaros*

*v. Cody*, 744 F.2d 270, 278 (2d Cir. 1984) (affirming bifurcation 'because the two phases

involved different types of evidence'). It is economically and judicially efficient to have a trial of

both liability and damages claims together, as the evidence to be presented for each claim are

identical. Plaintiff asks the Court to uphold the Second Circuit's standard of non-bifurcation, in

that "none of the interests promoted by Rule 42(b) would [be furthered]" if "the issues of liability

and damages are intertwined." *Id.* If bifurcation of the issues were granted, the burden upon the

jury, and the expenditure of judicial resources, would be more onerous and unnecessary given

that the evidence of liability and damages is so tightly intertwined.

## POINT VI

### EVIDENCE RELEVANT TO DEFENDANT CARELLI'S CREDIBILITY OR PROPENSITY TO USE FORCE UNREASONABLY AND/OR INTENTIONALLY SHOULD NOT BE PRECLUDED
#### (Defendant Carelli Point III)

Officer Carelli asserts that Plaintiff should be precluded from using any witnesses,

documents, testimony, or evidence related to any current or prior lawsuits or claims against

Defendant, including, but not limited to, Officer Carelli's personnel records. Defendant states

that introduction of this evidence would be inadmissible pursuant to Rule 404(b) of the Federal

Rules of Evidence. "The decision whether to admit evidence under Rule 404(b) turns on

"whether the danger of undue prejudice outweighs the probative value of the evidence in view of

the availability of other means of proof and other factors appropriate for making decisions of this

kind under Rule 403." *Huddleston v. United States*, 485 U.S. 681, 688 (1988).

However, there are special exceptions to civil rights plaintiffs. In *Lombardo v. Stone,* the

Court set forth that "[a] civil rights plaintiff is entitled to prove by extrinsic evidence that the

defendant acted for the purpose of causing harm." *Lombardo v. Stone*, 2002 WL 113913, at *6

(S.D.N.Y. 2002); *United States v. Beechum*, 582 F.2d 898,911 (5th Cir. 1978) (admitting

extrinsic evidence to show intent). Excluding such evidence may affect the substantial rights of

the plaintiff under Rule 103(a). Fed. R. Evid. 103(a); *see, e.g.*, *Carson v. Polley*, 689 F.2d 562,

572 (5th Cir. 1982) (holding that district court's failure to admit officer's performance reports

"affected the substantial rights of [plaintiff], thus warranting reversal.").

Thus, it is in the Court's interest to admit evidence of prior or subsequent complaints,

discipline, and/or lawsuits concerning Officer Carelli, as this case presents a civil rights plaintiff

who is entitled to the probative value that this extrinsic evidence will add to the knowledge of the

triers of fact, in terms of the Defendant acting for the purpose of causing harm to Mr.

Chamberlain, Sr.

### POINT VII
### PLAINTIFFS SHOULD NOT BE PRECLUDED FROM REFERRING TO THE ATTORNEYS REPRESENTING THE CITY OF WHITE PLAINS AS "CITY ATTORNEYS"
### (Defendant Carelli Point IV)

Officer Carelli claims it would be "unfair" to refer to defense counsel for the City of

White Plains as "City Attorneys." However, defendant fails to take into account that the City is

in fact a named defendant in this action and assumes that Plaintiff will conflate the two

Defendants. Thus, by seeking to preclude Plaintiff from referring to any of the City's defense

counsel as "City Attorneys," Defendant seeks to prevent Plaintiff from speaking the truth with

regards to the attorneys representing the City of White Plains.

The case *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529 (E.D.N.Y. 2011), which

Defendant cites to support this request, is inapposite as the court based its decision precisely

upon the fact that the City was *not* a named defendant. *Id*. at 550.  In that case, there was a risk of

unfair prejudice because it was misleading to refer to Corporation Counsel as "City Attorneys"

where they were representing an individual defendant in a case to which the City was not a party.

41

By contrast, the remaining defendants in this suit are: Officer Carelli, the officer who fired the lethal shot that killed Mr. Chamberlain, and the City of White Plains, under the theory of *respondeat superior*. The jury has the duty to weigh the evidence to determine whether there is liability for both defendants. Both defendants have retained separate attorneys who will be referred to appropriately according to their role in representing their particular client. There is no reason that the jury would infer indemnification of Officer Carelli by the City given that the two have distinct representation. Indeed, the request that Plaintiff refer to defense counsel by the names of their law firms is much more likely to confuse the jury, who must then keep track of which firm represents the interests of which client.

The probative value of referring to the defense counsel representing the City as "City Attorneys" substantially outweighs any risk of unfair prejudice as it will help the jury distinguish between the two defendants. To do otherwise would be contrary to the purpose of FRE 403 as it would unnecessarily mislead and confuse the jury by obscuring the identities of the defendants.

### POINT VIII
### PLAINTIFF SHOULD NOT BE PRECLUDED FROM REFERRING TO INDEMNIFICATION BY THE CITY OF WHITE PLAINS
#### (Defendant Carelli Point V)

Officer Carelli argues that Plaintiff should be precluded from "mentioning indemnification by the City of White Plains" due to its potential to be misleading and unfairly prejudicial. Def. Carelli MOL, p. 13. Defendants' request should be denied because the potential indemnification of Officer Carelli is probative of his motives and bias when providing testimony.

Defendants worry that the jury will impose higher damages upon Officer Carelli if they make the inference that the City will pick up the check. However, Defendants fail to cite any case law for their assertion that evidence of potential indemnification should be excluded. Def. Carelli MOL, p. 13-14. FRE 411 provides that the court may admit evidence regarding whether a

person was insured against liability for the purpose of "proving a witness's bias or prejudice"

Fed. R. Evid. 411. Indeed, Plaintiff asserts that the City's potential indemnification of Defendant

Carelli could be used for impeachment as it could provide incentive for Officer Carelli to lie.

Officer Carelli's indemnification depends upon whether he is found to have been acting within

the scope of his employment when he shot Mr. Chamberlain, Sr.  Officer Carelli therefore has a

strong incentive to provide testimony that is more likely to result in indemnification. The Second

Circuit held in *United States v. Harvey* that "[e]vidence of all facts and circumstances which tend

to show that a witness may shade his testimony for the purpose of helping to establish one side of

a cause only, should be received." 547 F2d 720, 723 (2d Cir. 1976) (internal quotations omitted).

While evidence that is probative of bias is still subject to the balancing test of FRE 403, the

concern of inflated damages due to unfair prejudice does not substantially outweigh the

probative value of providing the jury with the hidden biases motivating Officer Carelli's

testimony.

Additionally, a limitation on specific evidence of indemnification should not result in a

disadvantage to Plaintiff in examining Defendants and presenting evidence relevant to the City's

*respondeat superior* liability. The City remains a named defendant in this action pursuant to

*respondeat superior* for the claims of assault and battery. Finally, the court may mitigate any risk

of unfair bias by providing a limiting instruction to the jury.

## POINT IX
### PLAINTIFF SHOULD NOT BE PRECLUDED FROM ASKING FOR A SPECIFIC DOLLAR AMOUNT FROM THE JURY
### (Defendant Carelli Point VI)

Officer Carelli asserts that Plaintiff should be precluded from asking for a specific dollar

amount from the jury because any damages awards should be calculated by the jury. In regard to

the state law claims, New York law explicitly provides that "in any action to recover damages for personal injuries or wrongful death, the attorney for a party shall be permitted to make reference, during closing statements, to a specific dollar amount that the attorney believes to be appropriate compensation for any element of damage that is sought to be recovered in the action." NY CPLR 4016.

The Second Circuit has recognized the problem of "the unavoidably vague measure of damages which the jury is instructed to apply, i.e., fair and reasonable compensation, to the extent that injuries, pain and suffering can be translated into dollars." *Mileski v. Long Is. R. Co.*, 499 F.2d 1169, 1172 (2d Cir. 1974). In accordance with the difficult task of deciding appropriate damages awards, the Second Circuit has preferred a more flexible approach over adopting a per se rule barring Plaintiff's counsel from mentioning specific amounts. *Lightfoot v. Union Carbide Corp.*, 110 F3d 898, 912 (2d Cir. 1997). In *Lightfoot*, the court held that though the jury award of exactly half the amount asked for by Plaintiffs indicated that they were likely influenced by the Plaintiff's request, that did not support the claim that the jury was *unfairly* influenced. *Id*. at 913. The Plaintiff's closing argument in which the relevant evidence was reviewed, and the charge instructing the jury to award damages "only upon and only in proportion to a showing as to the nature, duration and severity" of the injury provided adequate context for the jury to make its own reasoned decision. *Id.* at 913. We respectfully request that this Court allow Plaintiff's counsel to provide guidance to the jury in making this difficult calculation.

## POINT X
**Defendant Carelli's Present Employment Status With White Plains Police Department Is Admissible as Pedigree Information and Relevant to His Credibility**
**(Defendant Carelli Point VIII)**
There is no basis for precluding Plaintiff from asking standard pedigree questions of

Officer Carelli as to his present employment status and assignment with the White Plains police

department, particularly when his responses are relevant to his credibility. When Officer Carelli

was deposed on January 16, 2015, he was asked whether he was still a patrol officer with the

White Plains police department. He responded, "I'm active however not currently working." He

was then asked if he was on disability and responded, "No". He described his current status (at

that time) as "on leave pending retirement". Officer Carelli also testified that he had been on

leave for a little over a year but did not know when he would be eligible for retirement". Carelli

Dep., p. 8. Plaintiff should be allowed to inquire as to Officer Carelli's present relationship and

role with the White Plains Police Department given his ambiguous, questionable and arguably

incredible response on a straightforward question.

**POINT XI**

**PLAINTIFF DOES NOT OPPOSE DEFENDANT'S REQUEST TO PRECLUDE**
**INTRODUCTION OF EVIDENCE ASSOCIATED WITH ANY INVESTIGATION**
**MADE BY THE DEPARTMENT OF JUSTICE INTO THIS CASE**
**(Defendant Carelli Point IX)**

Plaintiff does not oppose the Defendant's request to preclude Plaintiff from introducing

evidence associated with any investigation made by the Department of Justice into this case.

**POINT XII**

**PLAINTIFF SHOULD NOT BE PRECLUDED FROM ARGUING AND/OR**
**INTRODUCING EVIDENCE THAT THE LACK OF A PLAN WAS A CONTRIBUTING**
**FACTOR FOR OFFICER CARELLI'S UNREASONABLE USE OF DEADLY FORCE**
**(Defendant Carelli Point XII)**

Defendants move to exclude arguments or evidence that Officer Carelli had alternative,

less lethal, uses of force available to him when he shot Mr. Chamberlain, Sr., on the basis that

such evidence is irrelevant to the inquiry of the reasonableness of the force that was actually

used. Defendants misstate the issue. Plaintiff's case does not turn on the fact that Officer Carelli

may have had other options available at that crucial moment. Instead, the issue is that the

excessive use of deadly force is inextricably linked to the fact that there was no plan. The jury

could conclude that the absence of a plan when the officers confronted Mr. Chamberlain, Sr. contributed to Officer Carelli's decision to unreasonably respond with lethal force. Therefore, evidence relating to the lack of planning is relevant to Officer Carelli's choice of action.

While Defendants are correct that it would be inappropriate to explore "less intrusive alternative[s that] would have done the job," the case Defendants cite for that proposition also explains that "application of physical force is 'excessive' when it is more than is necessary in the circumstances." *Bancroft v. City of Mount Vernon*, 672 F.Supp.2d  391, 405-406 (S.D.N.Y. 2009). The case law therefore recognizes a distinction between leading the jury through fanciful hypotheticals and presenting evidence that demonstrates the level of force that was *actually* used was not necessary under the circumstances and therefore objectively unreasonable.

This "reasonableness" test requires that the jury consider the "totality of the circumstances giving rise to the challenged interaction." *Jackson v. Vil. of Ilion, New York*, No. 14-563, 2016 WL 126392, at \*5 (N.D.N.Y. Jan. 11, 2016), *appeal dismissed* (Mar. 9, 2016) *quoting Lozada v. Weilminster*, 92 F. Supp.3d 75, 92 (E.D.N.Y. 2015). The lack of a cogent plan for entering Mr. Chamberlain, Sr.'s apartment falls within the "totality of circumstances giving rise to the challenge interaction." In determining whether the force used was justified, if evidence showing that there was no plan is excluded, the jury will base its decision upon only part of the relevant circumstances rather than the totality.

The standard for relevance is low, requiring only a "tendency to make a fact more or less probable than it would be without the evidence" Fed. R. Evid. 401. As a former NYPD officer and Master Firearms Instructor at Rodman's Neck, Mr. Maloney has expertise regarding tactics and use of firearms. He is therefore qualified to testify as to NYPD Officers' training with regards to preparation for confronting barricaded EDP's, as well as determining whether it is

appropriate to use deadly force. Thus, Mr. Maloney can provide the jury with valuable insight

into Officer Carelli's perspective "*on the scene* in that moment." Def. Carelli MOL, p. 24. By

helping place Officer Carelli's actions within a larger context of his training, Mr. Maloney's

testimony is evidence that tends to make it more probable "than it would be without the

evidence" that when Officer Carelli found himself in a hectic environment with no plan or orders

to follow, he reacted with an objectively unreasonable level of force. Fed. R. Evid. 401.

Mr. Maloney's testimony can help elucidate the context within which Officer Carelli

chose to respond with deadly force. Defendants will have the opportunity to argue that the force

used was reasonable, but Plaintiffs should not be precluded from offering evidence relevant to

the necessity of the force that was in fact used.

## POINT XIII
### PLAINTIFF CANNOT BE PRECLUDED FROM INTRODUCING WITNESSES, TESTIMONY OR EVIDENCE RELEVANT TO THE CHARGES OF ASSAULT, BATTERY, CONSCIOUS PAIN AND SUFFERING, FEAR OF IMPENDING DEATH AND SEVERE EMOTIONAL DISTRESS INFLICTED UPON MR. CHAMBERLAIN, SR.
### (Defendant Carelli Point XIII)

Officer Carelli asserts that the only remaining relevant inquiry in this case is whether or

not the force used by Officer Carelli was reasonable. Defendant sets forth that "evidence that

tends to suggest that the…Defendant created the need to use force or exacerbated the situation is

irrelevant and prejudicial to the determination of whether Defendant used objectively reasonable

force at the moment he fired his weapon." Def. Carelli MOL, p. 22.  In addition, Defendant

would have the Court believe that Carelli's underlying intent and/or motivation are not relevant

to inquiries in this case. Defendant makes no acknowledgement of the other claims to be tried at

trial against Defendant, including: Assault, Battery, Conscious Pain and Suffering, Fear of

Impending Death, and Severe Emotional Distress. These State claims cannot be pushed aside in

47

Defendant's thinly veiled attempt to limit the scope of evidence and testimony to only those incidents surrounding the excessive force claim against Officer Carelli.

As the Second Circuit has set forth, "An 'assault' is an intentional placing of another person in *fear of imminent harmful or offensive contact*. A 'battery' is an *intentional* wrongful physical contact with another person without consent." *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993) (emphasis added). These elements greatly contrast from those of an excessive force claim, which is distinguished by presenting "a question [of]…whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, *without regard to their underlying intent or motivation.*" *Kerman v. City of New York*, 261 F.3d 229, 244 (2d Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. at 397, 109 S.Ct. 1865) (emphasis added). The Second Circuit went on to say that "the issue of legal justification is pivotal for *both battery* and excessive force." *Id.* at 244.

Therefore, Plaintiff must not be precluded from including evidence and testimony that is relevant to the assault, battery, and other State claims. This includes, but should not be limited to, the events leading up to the moment that Officer Carelli fired his weapon, as the series of events leading up to the fatal shooting of Mr. Chamberlain, Sr. are directly related to the elements of the aforementioned State claims.

As Mr. Chamberlain, Sr. is deceased and unable to testify to these elements, the Plaintiff should at a minimum be allowed to introduce evidence and various witnesses and testimony that will be able to demonstrate to the jury, the series of events that arose at Mr. Chamberlain, Sr.'s apartment that day. These events leading up to the eventual siege on Mr. Chamberlain, Sr.'s apartment will allow the jury to make an informed and fair decision as to whether or not Mr.

Chamberlain, Sr. had imminent fear of the Defendant, and other Police Officers, outside of his

apartment.

### POINT XIV
### PLAINTIFF SHOULD NOT BE PRECLUDED FROM INTRODUCING TESTIMONY OF DR. MICHAEL BADEN OR OTHER EVIDENCE IN HIS REPORTS BECAUSE DEFENDANT HAS NOT FILED A *DAUBERT* MOTION
### (Defendant Carelli Point XIV)

Officer Carelli seeks to preclude Plaintiff from introducing the testimony of Dr. Michael

Baden or any evidence pertaining to his reports. However, Defendant has failed to file a *Daubert*

motion seeking to preclude this testimony and evidence.  In essence, Officer Carelli is usurping

the role of the court, which must serve as the gatekeeper of expert testimony, requiring that "any

and *all* scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  Defendant relies on his own

unsubstantiated opinion as to why Dr. Michael Baden's testimony and evidence should not be

admitted, claiming that his report bears "no relevance to an analysis of whether Defendant, in

light of the facts and circumstances presented to him at the moment, was objectively reasonable

in his use of force." Def. Carelli MOL, p. 23.

However, Plaintiff asserts that Dr. Baden's report addresses the very narrow issue which

is to be heard at trial—that is, whether or not Mr. Chamberlain, Sr. was on the ground at the

moment that Officer Carelli shot him.  Dr. Baden's report and testimony will help the trier of fact

to understand the evidence admitted into the case, as well as to determine a fact in issue—

namely where Mr. Chamberlain, Sr. was when he was shot.  Fed. R. Evid. 702.  "A review of the

caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than

the rule." Fed.R.Evid. 702, Committee Notes on Rules 2000 Amendment. Precluding Dr.

Baden's testimony would not go towards the general purpose of the controlling *Daubert* theory

for admitting expert testimony that is based on sufficient facts and data, and reliably applied the principles and methods to the facts of Plaintiff's case.

"An additional consideration under Rule 702-and another aspect of relevancy-is whether expert testimony proffered in the case is sufficiently tied to the *facts of the case* that it will aid the jury in resolving a factual dispute." *U.S. v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985). Finally, Plaintiff asserts that at the minimum, Dr. Baden's report is reliable and should be admitted as it goes to the most crucial and relevant issue in the case, and will help the jurors to better understand the events of November 19, 2011.

### POINT XV
### DEFENDANTS SEEK TO IMPERMISSIBLY USE THEIR MOTIONS IN LIMINE TO URGE THE COURT TO RESTRAIN OR SLIENCE PLAINTIFF SHOULD FROM MAKING ARGUMENTS TO THE JURY
### (Defendant Carelli Point XV)

As Plaintiff set forth in their motion *in limine*, the purpose of a motion *in limine* is to enable the Court to aid in the trial process by ruling in advance of trial on the relevance of certain anticipated *evidence* before the *evidence* is actually offered. *See Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460 (1984) (emphasis added). Defendant seeks to preclude Plaintiff from discussing "current events," or "citing social theories or socio-economic perceptions of inequality" during oral argument at the trial. This point on behalf of Defendant should be excluded as irrelevant to a motion *in limine*, as Plaintiff has not introduced one iota of evidence even relating to "current events," "socio-economic perceptions of inequality," or "broad social generalizations and speeches about injustice and inequality." Defendant merely tries to preclude Plaintiff making certain oral arguments, which is unrelated at all to a motion *in limine* and should be denied. Plaintiff completely dismisses this point as it is inapplicable to a motion *in limine*.

With this being said, it is clear by the mention of larger societal concerns at stake for this case, that Defendant is aware of the social and justice issues which our country is currently facing.  This Court has expressly acknowledged the "climate" surrounding this case. As the Honorable Judge Gleeson of the Second Circuit recently wrote in a dissenting opinion, arguing that the facts of the case were supported by the jury's verdict, "Jurors are obviously better suited to determining the *social impact* of contemporary workplace behavior than are judges," *Tepperwien v. Entergy Nuclear Operations, Inc.,* 663 F.3d 556, 580 (2d Cir. 2011)(emphasis added). Plaintiff agrees with this sentiment, and asks the Court to allow arguments as they arrive at the trial—especially within the opening and closing statements.

In addition, the Honorable Justice Sotomayor in her dissent in *Utah v. Strieff*, recognized the societal implications Officer Carelli seeks to preclude Plaintiff from arguing at trial. She states: "We must not pretend that the countless people who are routinely targeted by police are 'isolated.' They are the canaries in the coal mine whose deaths, civil and literal, warn us that no one can breathe in this atmosphere." *Utah v. Strieff*, 136 S.Ct. 2056, 2071 (2016) (Sotomayor, J., dissenting). She then concludes:  "Until… [the voices of individuals facing injustice] matter too, our justice system will continue to be anything but." *Id.* With this, Defendant cannot seek to preclude Plaintiff from making certain oral arguments at trial, as higher courts have been cited in their opinions regarding societal injustices and social theories alike.

Plaintiff's counsel approaches this trial with great confidence that the Court will uphold the sanctities of the First Amendment of the Constitution, and the long held truth that "a trial is a public event, [and] what transpires in the courtroom is public property…There is no special prerequisite of judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit or censor events which transpire in proceedings before it." *U.S. v.*

*Dickinson*, 465 F.2d 496, 501 (5th Cir. 1972). "If a trial judge prejudicially denies counsel an

adequate opportunity to argue a point, appellate courts will reverse, and that alone will deter

most judges from arbitrarily cutting off argument." *In re Dellinger*, 461 F.2d 389, 398-99 (7th

Cir. 1972).  Lastly, if objection was to be made to these arguments, the courtroom is the proper

place to do so—not the motion *in limine* which focuses solely on the admission of evidence.

## CONCLUSION

For the foregoing reasons, Defendants Officer Carelli and City of White Plains' motions

in limine should be denied in their entirety.

Dated: New York, New York
        October 17, 2016

Respectfully submitted,
**NEWMAN FERRARA LLP**

By: _____
        Debra S. Cohen
        Randolph M. McLaughlin
        Danielle B. Sullivan
        1250 Broadway, 27th Floor
        New York, New York 10001
        Tel.: 212-619-5400
        Fax: 212-619-3090


        Mayo Bartlett
        Abdulwali Muhammad
        50 Main Street, Suite 1000
        White Plains, New York   10606
        Tel.: 914-224-3086
        Fax : 914-468-6333